**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | No. CR 07-101-MWB |
| vs. | **MEMORANDUM OPINION AND ORDER REGARDING DEFENDANT'S MOTIONS IN LIMINE** |
| ROBERT MIELL, | |
| Defendant. | |

_____

## TABLE OF CONTENTS

I. INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    *A. Indictments And Charges*. . . . . . . . . . . . . . . . . . . . . . . . 2
    *B. Miell's Motions In Limine*. . . . . . . . . . . . . . . . . . . . . . . . 4

II. LEGAL ANALYSIS. . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    *A. Applicable Rules Of Evidence*. . . . . . . . . . . . . . . . . . . 6
        *1. Rule 104*. . . . . . . . . . . . . . . . . . . . . . . . . . 6
        *2. Other rules of evidence*. . . . . . . . . . . . . . . . . . 6
            *a. Relevance vs. prejudice*. . . . . . . . . . . . . . . . . 6
            *b. "Bad acts" evidence vs. "intrinsic" evidence*. . . . . . . . 8
    *B. Elements Of The Pertinent Charges*. . . . . . . . . . . . . . . 11
    *C. The Challenged Evidence*. . . . . . . . . . . . . . . . . . . . . 13
        *1. Evidence from the "certified fraud examiner"*. . . . . . . . . 13
            *a. The evidence in question*. . . . . . . . . . . . . . . . 13
            *b. Arguments of the parties*. . . . . . . . . . . . . . . . 14
            *c. Analysis*. . . . . . . . . . . . . . . . . . . . . . . . 16
                *i. Admissibility under Rule 702 and* Daubert. . . . . 16
                *ii. Admissibility under Rule 403*. . . . . . . . . . . 20
        *2. The "Beckfield* litigation". . . . . . . . . . . . . . . . . 21
        *3. Miscellaneous tenant complaints and description of the defendant as a "slum lord"*. . . . . . . . . . . . . . . . . 22
            *a. The evidence in question*. . . . . . . . . . . . . . . . 22

|  |  | b. | Arguments of the parties | 23 |
|  |  | c. | Analysis | 24 |
|  | 4. | Evidence from small claims court judges | 28 |
|  |  | a. | Evidence in question | 28 |
|  |  | b. | Arguments of the parties | 28 |
|  |  | c. | Analysis | 29 |
|  | 5. | Evidence of the "Bat Cave" | 30 |
|  | 6. | Photographs of Miell's personal residence | 30 |
|  |  | a. | Arguments of the parties | 30 |
|  |  | b. | Analysis | 31 |
|  | 7. | Mileage and health insurance reimbursements | 32 |
|  |  | a. | Evidence in question | 32 |
|  |  | b. | Arguments of the parties | 32 |
|  |  | c. | Analysis | 33 |
|  | 8. | Destruction of documents | 34 |
|  |  | a. | The evidence in question | 34 |
|  |  | b. | Arguments of the parties | 34 |
|  |  | c. | Analysis | 35 |

**III. CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

## I. INTRODUCTION

### A. Indictments And Charges

In the original Indictment (docket no. 1), handed down in this case on November 28, 2007, a Grand Jury charged defendant Robert Miell with nineteen counts of mail fraud arising, in the case of **Counts 1 through 6**, from an alleged scheme to defraud American Family Insurance (AFI) of payments for repairs of hail damage to the roofs of over one hundred rental properties owned by defendant Miell, based on allegations that, contrary to Miell's representations to obtain such payments, the roofs had not already been repaired, and arising, in the case of **Counts 7 through 19**, from an alleged scheme to

defraud renters of their damage deposits on the rental properties by inflating cleaning and repair costs that Miell purportedly incurred when the renters moved out. A Superseding Indictment (docket no. 29) followed on April 8, 2008; a Second Superseding Indictment (docket no. 60) followed on September 24, 2008; and a Third Superseding Indictment (docket no. 72), followed on October 21, 2008.

As presently formulated, the charges against the defendant are the following: **Counts 1 through 18** charge "mail fraud," wherein **Counts 1 through 6** are based on the alleged "insurance fraud scheme," described briefly above, which Miell allegedly pursued from at least as early as December 11, 2001, until at least December 9, 2002, and **Counts 7 through 18** are based on the alleged "damage deposit fraud scheme," described briefly above, which Miell allegedly pursued from at least as early as 2000 until at least 2007, all in violation of 18 U.S.C. § 1341; **Count 19** charges "perjury in deposition," based on an allegedly false statement by Miell in a deposition on April 26, 2006, in a civil action by AFI against Miell to the effect that Miell had not signed the name "J.J. McManus" to a billing invoice, when he had done so, all in violation of 18 U.S.C. § 1621; **Count 20** charges "perjury before the court," based on allegedly false testimony, on or about January 8, 2008, in the trial of the civil action by AFI against Miell, to the effect that Miell had power of attorney to sign J.J. McManus's name, when he did not have such power of attorney, all in violation of 18 U.S.C. § 1623; **Count 21** charges "perjury before the court," based on allegedly false testimony, on or about January 8 or 9, 2008, also in the trial of the civil action by AFI against Miell, that checks from AFI for replacement cost value were not mailed through the United States Postal Service to Miell's office address, but collected by Miell from his AFI agent's office, when the checks had been so mailed, all in violation of 18 U.S.C. § 1623; and **Counts 22 and 23** charge filing of "false tax returns" for 2001 and 2002, respectively, based on failure to declare as income funds

received through fraudulent means, all in violation of 26 U.S.C. § 7206(1). Trial in this matter is now set to begin on January 5, 2009.

On September 8, 2008, the prosecution filed a Motion In Limine Regarding Hail-Damaged Roof Repairs (docket no. 54), which pertained primarily to evidence concerning the alleged "insurance fraud scheme." The court denied that motion by order (docket no. 81) dated November 25, 2008. Shortly before the rescheduled trial date of January 5, 2009, Miell filed the two motions in limine now before the court, which pertain primarily to evidence concerning the "damage deposit fraud scheme."

### B. Miell's Motions In Limine

This matter comes before the court pursuant to Miell's December 18, 2008, Motion In Limine (First Motion In Limine) (docket no. 82), and Miell's December 22, 2008, Second Motion In Limine (docket no. 87). In his First Motion In Limine, Miell seeks to exclude the following nine categories of evidence: (1) evidence from the prosecution's "expert," Kerry Bolt, a "certified fraud examiner," concerning damage deposits received and retained by Miell; (2) evidence relating to the so-called "*Beckfield* litigation," which included one of Miell's business entities, Advanced Equities, as a defendant; (3) evidence described as "miscellaneous tenant complaints"; (4) evidence from various small claims court judges; (5) depictions of Miell as a "slum lord"; (6) evidence of the so-called "Bat Cave," in which Miell purportedly retained property belonging to tenants who had been evicted or moved out; (7) photographs of Miell's personal residence; (8) evidence of health insurance and mileage reimbursements that Miell pays to some of his employees; and (9) evidence of alleged destruction of documents by Brett Emig, Miell's "handyman." The prosecution filed a Resistance (docket no. 84) to the first motion on December 19, 2008, resisting exclusion of most of the categories of evidence in question.

4

In his Second Motion In Limine, Miell responds to what he believes are erroneous arguments offered by the prosecution in response to his First Motion In Limine. Specifically, he argues that the court should bar the prosecution from making the following arguments to the jury: (1) that the jury can convict Miell of the "mail fraud" charges in Counts 7 through 18 based merely on proof that Miell submitted to the court or the parties in small claims court allegedly false "Home Doctor" invoices and checks payable to the "Home Doctor," or (2) that Miell's production of fraudulent documents to support his alleged claimed damages is the fraudulent conduct at issue in Counts 7 through 18, so that it does not matter whether he might have been entitled to some or all of the damage deposits in question and making it unnecessary to determine whether or to what extent he might have been entitled to keep the damage deposit, because by producing a false document to support his damage claim, he committed a fraud. The prosecution filed a Resistance (docket no. 88) to Miell's Second Motion in Limine on December 23, 2008, and Miell filed a Reply (docket no. 89) in further support of that motion on December 23, 2008.

Although Miell requested a hearing on his First Motion In Limine, and the court ordinarily favors hearing oral arguments when requested, the court's crowded schedule and the holidays that occur during the short time remaining before trial in this matter is set to begin have not permitted the scheduling of timely oral arguments. The court also finds that the present motions have been thoroughly briefed by the parties and do not present particularly novel issues. Therefore, the court deems Miell's First and Second Motions In Limine fully submitted on the written submissions.

The court will consider the admissibility of each of the challenged categories of evidence in turn in its legal analysis. However, the court will first summarize the standards applicable generally to motions to exclude evidence.

## II. LEGAL ANALYSIS

### A. Applicable Rules Of Evidence

#### 1. Rule 104

As a preliminary matter, the court notes that Rule 104 of the Federal Rules of Evidence provides, generally, that "[p]reliminary questions concerning . . . the admissibility of evidence shall be determined by the court. . . ." FED. R. EVID. 104. Such preliminary questions may depend upon such things as whether the factual conditions or legal standards for the admission of certain evidence have been met. *See id.*, Advisory Committee Notes, 1972 Proposed Rule. This rule, like the other rules of evidence, must be "construed to secure fairness in administration, elimination of unjustifiable expense and delay, and promotion of growth and development of the law of evidence to the end that truth may be ascertained and proceedings justly determined." FED. R. EVID. 102. Unless otherwise indicated, the court concludes that preliminary determination of the admissibility of the evidence put at issue in Miell's Motions In Limine will likely serve the ends of a fair and expeditious presentation of issues to the jury.

#### 2. Other rules of evidence

Most of Miell's requests to exclude evidence are based on relevance and potential prejudice pursuant to Rules 401, 402, and 403, and the admissibility of "bad acts" evidence pursuant to Rule 404(b). Therefore, the court will summarize the standards for admissibility or exclusion of evidence under these rules.

##### a. Relevance vs. prejudice

Rule 401 of the Federal Rules of Evidence defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the

evidence." Rule 402 provides that relevant evidence is generally admissible, but irrelevant evidence is not.

Rule 403 provides for exclusion of even relevant evidence on various grounds, as follows:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

FED. R. EVID. 403. As the Eighth Circuit Court of Appeals has recently explained,

> Under Rule 403, district courts have broad discretion to assess unfair prejudice, and are reversed only for an abuse of discretion. *United States v. Henderson*, 416 F.3d 686, 693 (8th Cir. 2005), *cert. denied*, 546 U.S. 1175, 126 S. Ct. 1343, 164 L. Ed. 2d 57 (2006). Rule 403 "does not offer protection against evidence that is merely prejudicial in the sense of being detrimental to a party's case. The rule protects against evidence that is unfairly prejudicial, that is, if it tends to suggest decision on an improper basis." *Wade v. Haynes*, 663 F.2d 778, 783 (8th Cir. 1981), *aff'd sub nom. Smith v. Wade*, 461 U.S. 30, 103 S. Ct. 1625, 75 L. Ed. 2d 632 (1983).

*United States v. Myers*, 503 F.3d 676, 681 (8th Cir. 2007); *United States v. Farrington*, 499 F.3d 854, 858-59 (8th Cir. 2007). The Advisory Committee Notes to Rule 403 explain that a decision on an "improper basis" is "commonly, though not necessarily, an emotional one." FED. R. EVID. 403, Advisory Committee Notes; *see also United States v. Jiminez*, 487 F.3d 1140, 1145 (8th Cir. 2007) (quoting this note); *United States v. Dierling*, 131 F.3d 722, 730-31 (8th Cir. 1997) (considering whether evidence was unfairly prejudicial, because it might lead to a decision on an improper basis, where it purportedly had no connection to the charged offense and revealed grisly or violent behavior that made the defendant appear "dangerous"). Unfairly prejudicial evidence has also been described as evidence that is "'so inflammatory on [its] face as to divert the

jury's attention from the material issues in the trial.'" *United States v. Adams*, 401 F.3d 886, 900 (8th Cir. 2005) (quoting *United States v. Shoffner*, 71 F.3d 1429, 1433 (8th Cir. 1995)).

Where evidence may otherwise be inadmissible pursuant to Rule 403, the Eighth Circuit Court of Appeals and the Federal Rules of Evidence recognize that a limiting instruction on the proper uses of certain evidence may mitigate potential prejudice of such evidence. *See, e.g, United States v. Walker*, 470 F.3d 1271, 1275 (8th Cir. 2006) ("[A] limiting instruction [concerning proper use of evidence of a prior conviction] diminishes the danger of unfair prejudice arising from the admission of the evidence."); *see also* FED. R. EVID. 105 (requiring a limiting instruction when the court admits evidence for a limited purpose).

### b. *"Bad acts" evidence vs. "intrinsic" evidence*

Rule 404(b) of the Federal Rules of Evidence prohibits admission of prior convictions and "bad acts" simply to show a propensity to commit a charged offense, but does permit such evidence to be admitted for "other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." FED. R. EVID. 404(b). The Eighth Circuit Court of Appeals has explained the scope of admissibility of evidence pursuant to Rule 404(b), as follows:

> While we have interpreted Rule 404(b) to be a rule of inclusion, *see United States v. Sykes*, 977 F.2d 1242, 1246 (8th Cir. 1992), this interpretation does not give the government the unhindered ability to introduce evidence of prior crimes. Instead, the evidence of prior crimes must be 1) relevant to a material issue; 2) similar in kind and not overly remote in time to the charged crime; 3) supported by sufficient evidence; and 4) such that its potential prejudice does not substantially outweigh its probative value. *See United States v. Williams*, 308 F.3d 833, 837 (8th Cir. 2002).

*United States v. Crenshaw*, 359 F.3d 977, 998 (8th Cir. 2004); *accord United States v. Lakoskey*, 462 F.3d 965, 979-80 (8th Cir. 2006) (reiterating that Rule 404(b) is a rule of inclusion and that evidence is admissible under Rule 404(b) if it satisfies the same four-factor test), *cert. denied*, ___ U.S. ___, 127 S. Ct. 1388 (2007); *see also Clark v. Martinez*, 295 F.3d 809, 814 (8th Cir. 2002) (Rule 403 applies to evidence otherwise admissible pursuant to Rule 404(b)); *United States v. Mound*, 149 F.3d 799, 801-02 (8th Cir. 1998) (same), *cert. denied*, 525 U.S. 1089 (1999). Thus, the Eighth Circuit Court of Appeals will reverse admission of purported Rule 404(b) evidence "'only when such evidence clearly had no bearing on the case and was introduced solely to prove the defendant's propensity to commit criminal acts.'" *United States v. Marquez*, 462 F.3d 826, 830 (8th Cir. 2006) (quoting *United States v. Thomas,* 398 F.3d 1058, 1062 (8th Cir. 2005), with internal quotations omitted). On the other hand, admission of such evidence is erroneous, for example, where the record shows that the actual use that the prosecution made of the evidence did not demonstrate that the evidence was used for a permissible purpose and the court's limiting instruction failed to mention the prosecution's ostensible purpose as a basis for considering the evidence. *Crenshaw*, 359 F.3d at 1001-02.

"One of the exceptions to the general rule that evidence of other crimes committed by a defendant is inadmissible is when the proof provides the context in which the charged crime occurred—'the res gestae.'" *United States v. Fleck*, 413 F.3d 883, 890 (8th Cir. 2005) (citing *United States v. Moore*, 735 F.2d 289, 292 (8th Cir. 1984)). More specifically,

> [The Eighth Circuit Court of Appeals has] held that Rule 404(b), which governs the admission into evidence of wrongful conduct other than the conduct at issue, applies "only to 'extrinsic' and not to 'intrinsic' evidence." *United States v. Swinton*, 75 F.3d 374, 377 (8th Cir. 1996). Evidence of other wrongful conduct is considered intrinsic when it is offered for the purpose of providing the context in which the charged

> crime occurred. *United States v. Forcelle*, 86 F.3d 838, 842
> (8th Cir. 1996). Such evidence is admitted because "the other
> crime evidence 'completes the story' or provides a 'total
> picture' of the charged crime." *Id.*

*United States v. Johnson*, 463 F.3d 803, 808 (8th Cir. 2006). However, "'[i]n those cases in which [the Eighth Circuit Court of Appeals has] approved the use of other crimes evidence as an integral part of the context of the crime charged, the other crime evidence was closely or inextricably intertwined with the charged crime.'" *Fleck*, 413 F.3d at 890 (quoting *United States v. Forcelle*, 86 F.3d 838, 842 (8th Cir. 1996)). To put it a different way, "'crimes or acts which are "inextricably intertwined" with the charged crime are not extrinsic and Rule 404(b) does not apply.'" *United States v. Adams*, 401 F.3d 886, 899 (8th Cir. 2005) (quoting *United States v. O'Dell*, 204 F.3d 829, 833 (8th Cir. 2000)).

The Eighth Circuit Court of Appeals has required that the evidence of conduct that is purportedly "inextricably intertwined" with the charged crime must do more than simply explain circumstances surrounding the alleged crime, if it has "nothing to do with" the commission of the charged crime; rather, it must "'complete[] the story or provide[] a total picture *of the charged crime*.'" *Fleck*, 413 F.3d at 890 (quoting *United States v. Forcelle*, 86 F.3d 838, 842 (8th Cir. 1996), with emphasis added by the *Fleck* court) (rejecting evidence of another crime that merely explained why the police were at the Fleck home). Thus, only "'when evidence of other crimes is so blended or connected, with the one on trial as that proof of one incidentally involves the other; or explains the circumstances thereof; or tends logically to prove any element of the crime charged, it is admissible as an integral part of the immediate context of the crime charged." *Id.* (again quoting *Forcelle*, 86 F.3d at 841, with quotations omitted). Such evidence is also "subject to the dictates of Rule 403, which requires that the probative value of evidence is not substantially outweighed by the danger of unfair prejudice." *Adams*, 401 F.3d at 899

(explaining that Rule 403 applies to evidence either within or without the scope of Rule 404(b), including "intrinsic" or "inextricably intertwined" evidence).

With these rules in mind, the court turns to consideration of the admissibility of the challenged categories of evidence.

### B. Elements Of The Pertinent Charges

Of course, relevance and admissibility depend, in large part, on the charges in support of which the challenged evidence will be offered. Both of Miell's Motions In Limine challenge evidence that he contends that the prosecution intends to offer to prove **Counts 7 through 18**, the "mail fraud" counts based on the alleged "damage deposit fraud scheme," described briefly above, which Miell allegedly pursued from at least as early as 2000 until at least 2007, all in violation of 18 U.S.C. § 1341. Indeed, Miell's Second Motion In Limine is premised on what the prosecution must prove to establish these "mail fraud" counts.

The Eighth Circuit Court of Appeals has explained the nature of a § 1341 offense and the elements of proof succinctly as follows:

> Section 1341 prohibits the use of the mails to execute "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. § 1341. Thus, to convict [a defendant] of mail fraud, the government [i]s required to prove "(1) the existence of a scheme to defraud, and (2) the use of the mails . . . for purposes of executing the scheme." *United States v. Hawkey,* 148 F.3d 920, 924 (8th Cir. 1998) (quotation omitted). The term "scheme or artifice to defraud" includes a scheme "to deprive another of the intangible right of honest services." 18 U.S.C. § 1346.

*United States v. Jennings*, 487 F.3d 564, 577 (8th Cir. 2007). A more complete statement of the elements of mail fraud in violation of § 1341, however, is the following:

> To establish mail fraud, the government must prove that the defendant did the following: (1) voluntarily and intentionally devised or participated in a scheme to defraud; (2) entered into the scheme with intent to defraud; (3) knew that it was reasonably foreseeable that the mails would be used; and (4) used the mails in furtherance of the scheme.

*United States v. Johnson*, 463 F.3d 803, 807 (8th Cir. 2006) (citing *United States v. Hively*, 437 F.3d 752, 760 (8th Cir. 2006)); *accord United States v. Onwumere*, 530 F.3d 651, 653 (8th Cir. 2008) (citing *Johnson*); *United States v. Edelmann*, 458 F.3d 791, 811 (8th Cir. 2006) (also citing *Hively*).

"The scheme 'need not be fraudulent on its face but must involve some sort of fraudulent misrepresentations or omissions reasonably calculated to deceive persons of ordinary prudence and comprehension.'" *United States v. Hawley*, 148 F.3d 920, 924 (8th Cir. 1998) (quoting *United States v. Coyle*, 63 F.3d 1239, 1243 (3d Cir. 1995), with citation and internal quotation marks omitted). "'The essence of a scheme to defraud is an intent to harm the victim.'" *United States v. Lamoreaux*, 422 F.3d 750, 754 (8th Cir. 2005) (quoting *United States v. Jain*, 93 F.3d 436, 442 (8th Cir.1996)). The prosecution is not required to prove actual harm to the victim, however. *Id.* The defendant's "intent to defraud" does not require proof of an admission by the defendant, "but can be inferred from the defendant's actions," *Onwumere*, 530 F.3d at 653, including a series of acts and relevant circumstances. *United States v. Snelling*, 862 F.2d 150, 154 (8th Cir. 1988). The "use of the mails" element requires the following:

> [T]he government [i]s permitted to establish the "use of mails" element of the crime by proving that the mailing was "incident to an essential [*812] part of the scheme." *Schmuck v. United States*, 489 U.S. 705, 710-11, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989). "The statute provides that a defendant must 'cause' the use of mails, but 'a defendant will be deemed to have 'caused' the use of mails ... if the use was the reasonably foreseeable result of his actions.'" *United States v. Waterman*,

704 F.2d 1014 (8th Cir.1983) (quoting *United States v. Wrehe*, 628 F.2d 1079, 1085 (8th Cir.1980)).

*Edelmann*, 458 F.3d at 811-12; *Hively*, 437 F.3d at 761.

With these requirements for proof and the standards for admissibility of evidence in mind, the court turns to Miell's specific challenges to certain evidence that he contends that the prosecution intends to offer to try to prove the "mail fraud" charges against him.

### C.  The Challenged Evidence

### 1.      Evidence from the "certified fraud examiner"

Miell first seeks to exclude evidence from the prosecution's "expert," Kerry Bolt, a "certified fraud examiner," concerning damage deposits received and retained by Miell. The prosecution resists exclusion of this category of evidence.  It appears to the court that this issue is the most hotly contested of the issues raised in Miell's First Motion In Limine.

### a.      The evidence in question

As characterized by Miell, the evidence in question is that Mr. Bolt reviewed a limited sampling of files and, using an unknown actual occupancy rate, average damage deposit provided, the number of units owned by Miell, and other factors, extrapolated that between 2001 and 2007, Miell retained approximately "$1,212,891 of damage deposits received from tenants who leased Miell's rental properties" from an estimated total of damage deposits paid of "$1,704,153.97."  Miell notes that this figure was further subject to downward "adjustments" because it was based upon the assumption that all rental properties owned by Miell during this period were fully occupied.  As characterized by the prosecution, Mr. Bolt determined defendant's average damage deposit, determined how many rental units defendant had during the six-year period under consideration (2001 to 2007), factored in other matters—such as occupancy rate, the average amount of damage deposit retained by defendant—and concluded defendant retained more than $1 million in

damage deposits during the six-year period. The prosecution argues that Mr. Bolt was required to extrapolate his figures from available information, because many of the pertinent files, although subpoenaed, were missing, incomplete, or otherwise in poor condition.

### b.    *Arguments of the parties*

Miell asserts that Mr. Bolt's testimony is inadmissible pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and its progeny. He argues that Mr. Bolt's evidence is based on an unsubstantiated, assumption-based methodology and damage deposit averaging that cannot be and has not been tested, has not been subjected to peer review or publication, has no known error rate, and is not generally accepted in any statistical field of science. He also argues that, whatever Mr. Bolt's methodology is, it was developed for litigation, rather than naturally from any research, and does not involve any comparative appraisal of similarly-situated landlords in Cedar Rapids or any comparable metropolitan area. He asserts that Mr. Bolt's methodology is mathematically flawed, on its face, because it fails to determine for each year in question the number of differing amounts of damage deposits required by Miell, then determine the number of tenants or percentage of tenants who paid the differing amounts, then determine what percentage of the tenants in the respective categories received monies back from their damage deposits and the average amount applicable to a given category. He also argues that, methodological flaws aside, Mr. Bolt's evidence will not be helpful to the jury, *inter alia*, because it does not take into account "myriad" factors that could contribute to the amount received or withheld following termination of tenancy. Miell contends that, ultimately, Mr. Bolt's evidence is a very unscientific suggestion of "causation" that is inadmissible under Rule 702, because it is unreliable and untrustworthy.

Even if somehow admissible under Rule 702 and *Daubert*, Miell contends that this evidence should be excluded pursuant to Rule 403, because it is, at best, only marginally

relevant, and is unduly prejudicial and could result in confusion from litigation of collateral matters. Miell argues that the prejudice arises from the improper inference that less than one-third of tenants got their deposits back because Miell improperly withheld them. Miell argues that the Eighth Circuit Model Jury Instruction on "expert" testimony does nothing to ameliorate the prejudice in question or the likelihood of confusion of the issues.

The prosecution contends that Miell is attacking the factual basis for its expert's opinion, rather than the methodology or reliability of the opinion, and, therefore, Miell's challenge goes to the weight, not the admissibility, of the evidence in question. The prosecution also argues that the evidence is more probative than prejudicial. More specifically, the prosecution argues that Mr. Bolt's evidence involved accounting and mathematical calculation and, as such, is not amenable to the type of expert analysis, re-testing, and peer review that Miell complains is missing here. Rather, the prosecution argues that Mr. Bolt properly reviewed available files to determine relevant factors and to make a reasonable calculation based on available data. The prosecution argues that factors that Miell suggests Mr. Bolt should have, but did not, consider are matters that Miell can appropriately raise in cross-examination of Mr. Bolt. The prosecution argues that Mr. Bolt's evidence is not excludable simply because it was, of necessity, based on certain assumptions and extrapolations in the face of missing files or missing information in available files. The prosecution also contends that Mr. Bolt will not render any opinion regarding why Miell withheld damage deposits, merely explain the average damage deposit that Miell did return, without offering any opinion about why the rest of the deposits were withheld or whether the amounts withheld were proper or improper.

As to admissibility under Rules 401 and 402, the prosecution argues that the evidence is relevant to the extent and amount of the losses suffered by renters as the result of the alleged fraud and goes to Miell's motive, as it shows the amount of his financial benefit from the alleged fraud. The prosecution apparently contends that, because the

evidence is probative, it does not have the potential for unfair prejudice, under Rule 403, that Miell fears.

### c. Analysis

The court identified, above, the applicable standards for admitting or excluding evidence pursuant to Rules 401, 402, and 403, on which Miell relies, in part, for exclusion of Mr. Bolt's "expert" testimony. The court now adds pertinent standards regarding "expert" evidence under Rule 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), upon which Miell also relies for exclusion of Mr. Bolt's testimony.

*i. Admissibility under Rule 702 and* **Daubert**. Rule 702 of the Federal Rules of Evidence provides for expert testimony, as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

FED. R. EVID. 702. In *Daubert*, the Supreme Court explained that the trial judge's role under Rule 702 is to act as "gatekeeper" admitting expert testimony only if it is both relevant and reliable. *Daubert*, 509 U.S. at 589. The trial court is granted broad discretion in its determination of reliability. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 142 (1999).

In *Daubert*, the Supreme Court established how the trial court is to perform its "gatekeeper" function under Rule 702:

> First, the trial court must make a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue."

[*Daubert*, 509 U.S.] at 592-93, 113 S. Ct. 2786, 125 L. Ed. 2d 469. The Court cautioned that the trial court must focus "on [the] principles and methodology, not on the conclusions that they generate." *Id*. at 595, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469. Second, the court must ensure that the proposed expert testimony is relevant and will serve to aid the trier of fact. *Id*. at 592, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469. Expert testimony assists the trier of fact when it provides information beyond the common knowledge of the trier of fact. *Id*. at 591, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469. The Court, in *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999), clarified that the district court's gatekeeper function applies to all expert testimony, not just testimony based in science. *Id*. at 147, 526 U.S. 137, 119 S. Ct. 1167, 143 L. Ed. 2d 238.

*Kudabeck v. Kroger Co.*, 338 F.3d 856, 860 (8th Cir. 2003).

The Eighth Circuit Court of Appeals has explained that, in making the Rule 702 reliability determination, "the district court is free to evaluate one or all of the following factors: (1) whether the theory or technique can be or has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether the theory or technique has a known or potential error rate and standards controlling the technique's operation; and (4) whether the theory or technique is generally accepted in the scientific community." *Craftsmen Limousine, Inc. v. Ford Motor Co.*, 363 F.3d 761, 776-77 (8th Cir. 2004) (citing *Daubert*, 509 U.S. at 592-95, which states that "many factors will bear on the inquiry" and that the above-listed factors do not constitute "a definitive checklist or test"). However, the Eighth Circuit Court of Appeals has explained that "[t]he gatekeeper role should not . . . invade the province of the jury, whose job it is to decide issues of credibility and to determine the weight that should be accorded evidence." *United States v. Vesey*, 338 F.3d 913, 917 (8th Cir. 2003) (citing *Arkwright Mut. Ins. Co. v. Gwinner Oil Co.*, 125 F.3d 1176, 1183 (8th Cir. 1997)). "As the Supreme Court

emphasized in *Daubert*, 509 U.S. at 595-96, 'Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'" *Vesey*, 338 F.3d at 917; *see also Synergetics, Inc. v. Hurst*, 477 F.3d 949, 956 (8th Cir. 2007) ("[M]ere disagreement with the assumptions and methodology used does not warrant exclusion of expert testimony.").

Thus, "'[e]xpert testimony is admissible if it is reliable and will help the jury understand the evidence or decide a fact in issue.'" *Archer Daniels Midland Co. v. Aon Risk Servs., Inc.*, 356 F.3d 850, 858 (8th Cir. 2004) (quoting *Hartley v. Dillard's, Inc.*, 310 F.3d 1054, 1060 (8th Cir. 2002)). Doubts regarding the admissibility of expert testimony should be resolved in favor of its admission. *See Clark v. Heidrick*, 150 F.3d 912, 914 (8th Cir. 1998). "As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." *Hose v. Chicago Northwestern Transp. Co.*, 70 F.3d 968, 974 (8th Cir. 1995) (citing *Loudermill v. Dow Chem. Co.*, 863 F.2d 566, 570 (8th Cir. 1988)); *accord Synergetics, Inc.*, 477 F.3d at 955-56 (quoting *Bonner v. ISP Techs., Inc.*, 259 F.3d 924, 929 (8th Cir. 2001), in turn quoting *Hose*); *Archer Daniels Midland Co.*, 356 F.3d at 858 ("Generally, the factual basis of an expert's opinion goes to credibility of the testimony, not admissibility."). The Eighth Circuit Court of Appeals has instructed that "[a]n expert's opinion must be excluded only if it 'is so fundamentally unsupported that it can offer no assistance to the jury.'" *Archer Daniels Midland Co.*, 356 F.3d at 858 (quoting *Bonner*, 259 F.3d at 929-30, in turn quoting *Hose*, 70 F.3d at 974).

Here, the multi-factor test upon which Miell relies to exclude Mr. Bolt's testimony is simply a list of factors that the court is free to use to evaluate the reliability of the "expert" evidence in question, not a "definitive" test, as Miell seems to argue. *See*

*Craftsmen Limousine, Inc.*, 363 F.3d at 776-77; *Daubert*, 509 U.S. at 592-95 (identifying these factors, but noting that they do not constitute "a definitive checklist or test"). As the prosecution asserts, many of these factors simply are not relevant to the assessment of the reliability of Mr. Bolt's accounting evidence. Rather, the court finds that the pertinent question for reliability here would be whether the assumptions and extrapolations employed in Mr. Bolt's methodology are consistent with good accounting practices and statistical analysis and reasonable in light of the data available. The court cannot answer that question so emphatically in the negative that Mr. Bolt's evidence should be excluded pre-trial. Miell's "mere disagreement with the assumptions and methodology used does not warrant exclusion of expert testimony." *Synergetics, Inc.*, 477 F.3d at 956. Rather, this appears to the court to be a classic case in which the court's "gatekeeper role should not . . . invade the province of the jury, whose job it is to decide issues of credibility and to determine the weight that should be accorded evidence," *Vesey*, 338 F.3d at 917, and, more specifically still, a classic case in which "'[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'" *Id.* (quoting *Daubert*, 509 U.S. at 595-96); *Hose*, 70 F.3d at 974 ("As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination.").

To put it another way, the court finds that Mr. Bolt's testimony is reasonably reliable as to the amount of damage deposits that Miell withheld, although it sheds no light on whether or not that amount was properly or improperly withheld, and will help the jury to understand the evidence and to decide a fact issue of Miell's possible motive for improperly withholding damage deposits, owing to the amount of the financial benefit that he may have obtained thereby. *See Archer Daniels Midland Co.*, 356 F.3d at 858 ("'Expert testimony is admissible if it is reliable and will help the jury understand the

evidence or decide a fact in issue.'" (quoting *Hartley*, 310 F.3d at 1060)). Moreover, doubts regarding the admissibility of expert testimony should be resolved in favor of its admission. *See Clark*, 150 F.3d at 914. Here, Mr. Bolt's evidence is not "'so fundamentally unsupported that it can offer no assistance to the jury.'" *Archer Daniels Midland Co.*, 356 F.3d at 858 (quoting *Bonner*, 259 F.3d at 929-30, in turn quoting *Hose*, 70 F.3d at 974).

Therefore, Miell's challenge to Mr. Bolt's evidence pursuant to Rule 702 and *Daubert* does not warrant exclusion of that evidence.

*ii.* ***Admissibility under Rule 403***. Similarly, the court finds that Miell's challenge to Mr. Bolt's evidence pursuant to Rule 403 does not warrant exclusion of that evidence. First, the court agrees with the prosecution that the evidence is at least marginally relevant to show the extent of the loss suffered by renters from Miell's alleged damage deposit fraud scheme and to suggest a financial motive for Miell improperly or fraudulently to withhold damage deposits. *See* FED. R. EVID. 401 (evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence"); FED. R. EVID. 402 (relevant evidence is generally admissible). In the absence of any proffered opinion about the impropriety of Miell's withholding of damage deposits, or why he withheld damage deposits, there is also little potential for unfair prejudice from Mr. Bolt's evidence. *See* FED. R. EVID. 403 (relevant evidence may be excluded, *inter alia*, if its potential for unfair prejudice outweighs its probative value). An opinion that Miell may have withheld over two-thirds of the damage deposits paid to him is not "'so inflammatory on [its] face as to divert the jury's attention from the material issues in the trial.'" *Adams*, 401 F.3d at 900 (describing unfair prejudice, quoting *Schoffner*, 71 F.3d at 1433). A properly framed limiting instruction on the purposes for which Mr. Bolt's evidence is offered and the proper issues for expert testimony and the weight it should be

given is likely to cure any potential unfair prejudice, as distinguished from merely negative inferences about Miell's motives, that might arise from this evidence. *See Walker*, 470 F.3d at 1275 (noting that a limiting instruction diminishes the danger of unfair prejudice from admission of challenged evidence). Also, while time will no doubt be spent in light of Mr. Bolt's opinions attempting to undermine and bolster the factual bases for those opinions and by attempts to demonstrate whether or not there were legitimate reasons for Miell to withhold damage deposits, that is, in the court's view, time spent proving the case, not time spent on collateral issues. *See* FED. R. EVID. 403 (evidence may also be excluded for confusion of the issues).

Therefore, the court also rejects Miell's challenge to Mr. Bolt's evidence pursuant to Rule 403. This part of Miell's First Motion In Limine will be denied.

### 2.    The "Beckfield *litigation*"

Next, Miell seeks to exclude evidence relating to the so-called "*Beckfield* litigation," which included one of Miell's business entities, Advanced Equities, as a defendant. The prosecution represents that it does not intend to present evidence from the so-called "*Beckfield* litigation," but does assert that, if the defendant should testify at trial in a way that differs from his testimony under oath in the *Beckfield* litigation, the prosecution should be allowed to use his prior testimony for purposes of impeachment.

The court finds that this part of Miell's First Motion In Limine should be denied as moot upon the prosecution's representation that it will not use evidence relating to the "*Beckfield* litigation" at trial. The court observes, however, that Miell can be impeached, as the prosecution contends, with prior statements in testimony under oath, but without the need to identify the proceedings in which the prior testimony was taken. *See, e.g.,* FED. R. EVID. 801(d)(1) (describing such statements as not hearsay); *see also Anderson v. Genuine Parts Co., Inc.*, 128 F.3d 1267, 1272 & n.4 (8th Cir. 1997) (noting, with approval, the district court's decision to allow a party's prior testimony from another case

to be used for the purpose of impeaching that party, but allowing the party to refer to the other case only as "another proceeding," and not allowing the party to present the jury's verdict in the other proceeding).

### 3. *Miscellaneous tenant complaints and description of the defendant as a "slum lord"*

#### a. *The evidence in question*

Miell also seeks to exclude evidence that he describes as "miscellaneous tenant complaints" and depictions of him as a "slum lord." Miell identifies this evidence as evidence from former tenants who, he contends, will testify as to purported misconduct by Miell in his capacity as landlord unrelated to the mail-fraud scheme alleged in **Counts 7 through 18**, as well as evidence that he owns in excess of 600 units in Linn County and has a gross worth, depending upon market values, of approximately $60-70,000,000, that he preyed upon needy renters, kept his properties in substandard condition, ignored tenant complaints, evicted without cause, evicted in retaliation for complaints about habitability, and is essentially a greedy "slum lord." The prosecution resists exclusion of this evidence, on the ground that Miell has misunderstood both the nature and the purpose of the evidence in question. The prosecution represents that it intends to call a number of former renters to testify that they provided a damage deposit, that at the end of their lease period, Miell did not return their damage deposit, and Miell claimed damages in excess of the damage deposit. The prosecution asserts that some of the former tenants will testify that they simply gave up and walked away from their deposits, even though they disputed whether they caused the damages alleged. Others are expected to testify that they went to court to dispute Miell's retention of their damage deposits and met with varying results from the litigation. In each case, the prosecution asserts that it will introduce a "Home Doctor" invoice generated by Miell's office in connection with the dispute over the damage deposit.

### b. *Arguments of the parties*

Miell contends that generalized or even anecdotal testimony that he was a bad or callous landlord is not evidence of motive, intent, knowledge, or absence of mistake in his handling of matters relating to damage deposits. Thus, he argues that evidence that he purportedly preyed upon needy renters, kept his properties in substandard condition, ignored tenant complaints, evicted without cause, evicted in retaliation for complaints about habitability, and used to have various penalty clauses in his complicated leases is not evidence of motive, intent, knowledge, or absence of mistake in his handling of matters relating to damage deposits or his dealings with AFI. He argues that such evidence should be excluded pursuant to Rules 403 and 404(b) of the Federal Rules of Evidence, because its admission would necessitate a rather elaborate relitigation of prior piecemeal small claims litigation and would result in several trials-within-a-trial, would mislead the jury, cause confusion, and otherwise deprive him of his due process right to a fair trial.

The prosecution argues that evidence from renters, limited as indicated above, is admissible to show that there was a scheme to defraud renters out of their damage deposits. Specifically, the prosecution asserts that Miell's production of fraudulent documents to support his alleged claimed damages is the fraudulent conduct underlying the charges against him. Thus, the prosecution argues that it does not matter whether Miell might have been entitled to some or all of the damage deposit, because by producing a false document to support his damage claim, he committed a fraud. Therefore, the prosecution argues that no extensive relitigation of issues in Miell's specific disputes with renters is necessary.

The prosecution also asserts that it has no intention of characterizing Miell as a "slum lord" or offering evidence of the condition in which he maintains his properties or his treatment of renters, even if it offers evidence of his extensive holdings to demonstrate the extent of his business and the degree of his business sophistication and knowledge, and evidence that the existing conditions of the property before and after a tenancy did not

23

warrant retention of a damage deposit.  The prosecution argues that the evidence that it does intend to offer is relevant to Miell's state of mind and knowledge for purposes of the charges against him.

In his Second Motion In Limine, Miell contends that the prosecution should be barred from making some of the arguments, identified above.  Specifically, he argues that the court should bar the prosecution from arguing (1) that the jury can convict Miell of the "mail fraud" charges in **Counts 7 through 18** based merely on proof that Miell submitted to the court or the parties in small claims court allegedly false "Home Doctor" invoices and checks payable to the "Home Doctor," or (2) that Miell's production of fraudulent documents to support his alleged claimed damages is the fraudulent conduct at issue in **Counts 7 through 18**, so that it does not matter whether he might have been entitled to some or all of the damage deposits in question and it is unnecessary to determine whether or to what extent he might have been entitled to keep the damage deposits, because by producing a false document to support his damage claims, he committed a fraud.

  *c.*    *Analysis*

Although not so characterized by the prosecution, the prosecution's contention appears to be that the evidence from "renters" that it intends to introduce is not other "bad acts" evidence within the meaning of Rule 404(b) at all, but is "intrinsic" evidence of Miell's use of fraudulent documents to retain damage deposits in furtherance of the fraud scheme alleged in **Counts 7 through 18**.  To the extent that the prosecution elicits from "renters" only evidence that Miell retained damage deposits or sought judgments in excess of their deposits on the basis of invoices from "Home Doctor," and the prosecution also presents evidence that the "Home Doctor" invoices are fraudulent, the court agrees that the evidence is "intrinsic" evidence of the charged wrongdoing or "inextricably intertwined" with the charged wrongdoing, not subject to Rule 404(b) at all.  *See Fleck*, 413 F.3d at 890; *Johnson*, 463 F.3d at 808.  Miell is correct that proof of "mail fraud"

in violation of 18 U.S.C. § 1341 requires more than proof that he used fraudulent documents to support false or inflated claims against renters' damages deposits, it requires proof of use of the mails to further a fraudulent scheme. *See Jennings*, 487 F.3d at 577 (stating that mail fraud in violation of § 1341 requires both proof of the existence of a scheme to defraud and the use of the mails for the purposes of executing the scheme); *Johnson*, 463 F.3d at 807 (elements of mail fraud). The prosecution is correct, however, that evidence that Miell used fraudulent "Home Doctor" invoices to support false claims to retain damage deposits is "intrinsic" evidence *of the underlying fraudulent scheme* on which the mail fraud claims in **Counts 7 through 18** are based, even if the prosecution must also prove "use of the mails" in furtherance of that scheme. *Id.*; *Johnson*, 463 F.3d at 807.

If the prosecution's evidence from "renters" is properly limited in the manner indicated, and properly limited in quantity, there is little potential for unfair prejudice—and certainly none that outweighs the probative value of the evidence—and there will be no need for the trial to devolve into a "mini-trial" or "relitigation" of Miell's entitlement to retain any portion of the damage deposits of those renters, because the relevant question is, as the prosecution asserts, whether Miell supported his claims against damage deposits with fraudulent documents, not whether he was entitled to retain some or all of any damage deposit. *See Adams*, 401 F.3d at 899 (even "intrinsic" evidence is subject to Rule 403's balance of probative value against the danger of unfair prejudice and potential for confusion of the issues or misleading the jury). The prosecution is correct that *the underlying fraud* was complete once Miell supported a claim against a damage deposit with a fraudulent "Home Doctor" invoice, regardless of whether he was otherwise entitled to retain some or all of the damage deposit. Thus, Miell's First Motion In Limine should be denied to the extent that the prosecution's evidence is limited to a reasonable number of

renters who testify that Miell retained damage deposits or sought judgments in excess of their deposits on the basis of invoices from "Home Doctor" that were fraudulent.

As to Miell's contentions in his Second Motion In Limine that the prosecution should not be permitted to argue that the fraud was complete when Miell submitted fraudulent "Home Doctor" invoices to support his claims against damages deposits, the court finds that a properly framed limiting instruction would ameliorate the potential prejudice from what Miell argues is a misstatement of the applicable law. *See Walker*, 470 F.3d at 1275 (noting that a limiting instruction diminishes the danger of unfair prejudice from admission of challenged evidence); FED. R. EVID. 105 (requiring instructions on proper purposes when evidence is offered for a limited purpose). Such a limiting instruction, either a stand-alone instruction or part of the explanation of the required proof for the "mail fraud" offenses in **Counts 7 through 18**, would make clear that the prosecution must not only prove an underlying fraudulent scheme, but must also prove that Miell used the mails in furtherance of that scheme. *See Jennings*, 487 F.3d at 577 (stating that mail fraud in violation of § 1341 requires both proof of the existence of a scheme to defraud and the use of the mails for the purposes of executing the scheme); *Johnson*, 463 F.3d at 807 (elements of mail fraud). Thus, that part of Miell's Second Motion In Limine seeking to bar such arguments will be denied.

Miell's First Motion In Limine also raises a question concerning evidence from renters about the "before" and "after" condition of properties, as that evidence relates to whether Miell was entitled to retain any part of renters' damage deposits or whether he "inflated" damage claims in order to keep more of renters' deposits. Such evidence is *prima facie* relevant to the charges against Miell, because the fraudulent scheme underlying the mail fraud charges also allegedly involved "inflating" claims against renters' damages deposits. At the same time, such evidence does run the risk of the trial devolving into a "mini-trial" or "relitigation" of Miell's entitlement to retain all or part of specific damage

deposits. The court finds that the potential for such "mini-trials" cannot reasonably be eliminated, however, precisely because the evidence *is* relevant to one of the alleged forms of the underlying fraudulent scheme, improper inflation of damage claims.

On the other hand, the court finds that use of the term "slum lord" would involve a danger of unfair prejudice, with no offsetting probative value, because it would suggest a decision on an emotional basis, rather than on the basis of the evidence of Miell's charged illegal conduct, so that such a description must be barred pursuant to Rule 403. *See* FED. R. EVID. 403, Advisory Committee Notes (explaining that a decision on an "improper basis" is "commonly, though not necessarily, an emotional one"); *Myers*, 503 F.3d at 681 (evidence is "unfairly prejudicial" within the meaning of Rule 403 if it "tends to suggest decision on an improper basis) (internal quotation marks and citations omitted). Similarly, even if somehow relevant, there is a danger of unfair prejudice from evidence that Miell purportedly preyed upon needy renters, kept his properties in substandard condition, ignored tenant complaints, evicted without cause, evicted in retaliation for complaints about habitability, and used to have various penalty clauses in his complicated leases, because such evidence suggests that he is a "slum lord" and could mislead the jurors or confuse them as to whether the issue is Miell's business practices generally or fraudulent conduct in particular. The prosecution, however, represents that it does not intend to offer such evidence from the renters.

Finally, evidence that Miell has extensive holdings with a substantial gross worth is relevant to demonstrate the extent of Miell's business and the degree of his business sophistication and knowledge, and consequently, is relevant to show his state of mind and knowledge. The court finds that such evidence has little potential for unfair prejudice to weigh against that probative value, so that it is admissible. *See* FED. R. EVID. 403 (relevant evidence may be excluded if its potential for unfair prejudice outweighs its probative value).

Therefore, the portion of Miell's First Motion In Limine seeking to exclude "renters' evidence" will be granted as to descriptions of Miell as a "slum lord" and as to evidence that he engaged in practices not the subject of the present criminal charges, but otherwise denied. That part of Miell's Second Motion In Limine seeking to exclude certain arguments by the prosecution regarding proof of fraud will also be denied.

### 4. Evidence from small claims court judges

#### a. Evidence in question

Miell also seeks to exclude evidence from various small claims court judges. Miell explains that he expects the prosecution to delve into judicial decisions wherein claims or counterclaims by Miell against tenants to enforce terms of his rental agreements were rejected on a case-by-case basis. The prosecution resists this part of Miell's Motion In Limine on the ground that Miell has, again, missed the point about the nature of the evidence that the prosecution will offer. The prosecution contends that the evidence it intends to elicit is evidence from these judges concerning their involvement in cases where Miell presented "Home Doctor" invoices and checks allegedly written to "Home Doctor" as proof that he repaired damage allegedly caused by renters. The prosecution contends that the evidence, to be elicited from four state court judges, will show that, in the 1990s, small claims judges routinely decreased Miell's damages claims, even in default settings, finding a lack of evidence, but that in about 2001, Miell began producing "Home Doctor" invoices to support his claims, and the judges assumed that those bills were legitimate and, indeed, that when questioned, Miell averred that the "Home Doctor" was a separate company. The judges are expected to testify that they relied on the "Home Doctor" invoices in awarding Miell damages.

#### b. Arguments of the parties

Miell argues that this evidence is more prejudicial than probative under Rule 403 and is not competent Rule 404(b) evidence. He argues that small claims litigation is

routine, but introduction of evidence of such actions will only confuse the issues and require him to attempt to relitigate each claim involved. More specifically, he contends that introduction of such evidence that does not deal with the "Home Doctor" and damage deposits would mislead the jury, cause confusion, and otherwise deprive him of his due process right to a fair trial.

The prosecution contends that, limited as it has indicated, the evidence in question is relevant and that its probative value outweighs any potential for unfair prejudice. Indeed, the prosecution contends that such evidence is direct evidence of the charged conduct, not other wrongs evidence under Rule 404(b).

> ### c.    *Analysis*

The court agrees with the prosecution that evidence from small claims judges that Miell used "Home Doctor" invoices to support his damage claims is "intrinsic" evidence of the fraudulent scheme underlying the mail fraud charges in **Counts 7 through 18**, *see Jennings*, 487 F.3d at 577 (stating that mail fraud in violation of § 1341 requires both proof of the existence of a scheme to defraud and the use of the mails for the purposes of executing the scheme); *Johnson*, 463 F.3d at 807 (elements of mail fraud), and consequently, Rule 404(b) is inapplicable to such evidence. *See Fleck*, 413 F.3d at 890 ("intrinsic" evidence of the charged wrongdoing or evidence "inextricably intertwined" with the charged wrongdoing is not subject to Rule 404(b)); *Johnson*, 463 F.3d at 808 (same). It is, however, subject to a Rule 403 balancing of probative value against potential for prejudice. *See Adams*, 401 F.3d at 899 (even "intrinsic" evidence is subject to Rule 403's balance of probative value against the danger of unfair prejudice and potential for confusion of the issues or misleading the jury). The evidence in question here, limited as indicated by the prosecution, passes that balancing test, because it is substantially probative of the existence of the underlying fraudulent scheme and has relatively little potential for unfair prejudice. *See* FED. R. EVID. 403. Indeed, Miell relies for exclusion of this

evidence not on its potential for prejudice, but on its potential to mislead the jury and cause confusion. The remedy for those problems, however, is a limiting instruction identifying the proper purposes for which the evidence from the small claims court judges can be considered, *i.e.*, to prove the underlying fraudulent scheme, with a reminder that the prosecution must still prove use of the mails in furtherance of that fraudulent scheme to prove the charges against the defendant. *See Walker*, 470 F.3d at 1275 (noting that a limiting instruction diminishes the danger of unfair prejudice from admission of challenged evidence); FED. R. EVID. 105 (requiring instructions on proper purposes when evidence is offered for a limited purpose).

This portion of Miell's First Motion In Limine will also be denied.

### 5. Evidence of the "Bat Cave"

Next, Miell seeks to exclude evidence of the so-called "Bat Cave," in which Miell purportedly retained property belonging to tenants who had been evicted or moved out. The prosecution represents that it does not intend to elicit or present any such evidence. Therefore, this portion of Meill's First Motion In Limine will be denied as moot.

### 6. Photographs of Miell's personal residence

The antepenultimate category of evidence that Miell seeks to exclude is photographs of his personal residence. Miell explains that the discovery file contains photographs of his "large" home in Cedar Rapids.

#### a. Arguments of the parties

Miell asserts that he cannot fathom the purpose for which the photographs of his personal residence would be offered except to invoke a "class warfare" response to the contrast between his living conditions and the homes and units that he owns for rental. Miell argues that such photographs are not relevant or admissible under Rules 401 and 402 to any issue pleaded in the case, excludable as more prejudicial than probative under Rule 403, and not competent evidence under Rule 404(b).

The prosecution contends, however, that it does have proper purposes for offering photographs of Miell's personal residence. Specifically, the prosecution contends that one of the issues in the case is whether Miell falsely represented that he had a power of attorney from John McManus, but no such power of attorney has ever been produced, and employees who have been in Miell's residence will be asked if Miell maintained an office or file there or whether they ever saw a power of attorney there and whether those employees ever observed any missing documents from Miell's property files at his house. The prosecution asserts that it will use the photographs of Miell's house to demonstrate that the witnesses in question are able to identify the house to support their testimony that they have, in fact, been inside that house. Thus, the photographs go to the credibility of the pertinent witnesses.

### b. Analysis

The court agrees that photographs may be used to demonstrate that certain witnesses can, indeed, identify Miell's residence to support their claims that they have been there. Such evidence is relevant to the credibility of the witnesses' testimony concerning what they observed in Miell's residence concerning "missing" documents, including the alleged power of attorney and property files, and as such, is admissible. FED. R. EVID. 401 & 402. To avoid any potential prejudice from such photographs, however, if offered into evidence, they should be limited in number. *See* FED. R. EVID. 403. The court is reluctant to suggest a limiting instruction on the question of the proper purposes for which the photographs may be considered, absent a specific request from the defendant, because this is a situation in which a limiting instruction itself might call undue attention to the photographs, which otherwise are likely to engender only minimal interest in light of their minor role in supporting the credibility of testimony that certain witnesses have been to or inside of Miell's residence. This part of Miell's First Motion In Limine will be denied.

### 7.    *Mileage and health insurance reimbursements*

####    a.    *Evidence in question*

The penultimate category of evidence that Miell seeks to exclude is evidence of health insurance and mileage reimbursements that Miell pays to some of his employees. Miell explains that he reimburses his corporate employees at a fixed monthly rate for health insurance costs that such employees incur rather than obtain or provide a group health insurance plan for his employees. The prosecution points out that the employees are not required to submit proof that they made insurance payments nor are the payments tied to the amount of health insurance costs incurred by the employees. Miell also explains that he reimburses employees for mileage separate from the paychecks. Again, the prosecution points out that the employees are not required to turn in receipts for gas, so that the amount of the monthly payments are unrelated to the actual costs of gas expenditures. The prosecution points out that Miell increased the amounts of some or all of these payments to his employees after the government started its criminal investigation of Miell. Both kinds of reimbursements are in addition to regular salary or pay.

####    b.    *Arguments of the parties*

Miell argues that evidence of the health insurance and mileage reimbursements is presumably going to be offered to suggest that he is a tax cheat on his personal income taxes and, therefore, guilty of **Counts 22 and 23**. He points out, however, that he has not been charged with tax evasion regarding withholding taxes relating to such reimbursements, so that the evidence is not relevant to **Counts 22 and 23**. He argues also that such evidence is more prejudicial than probative and, as such, should be excluded under Rule 403. Finally, he argues that such evidence is not competent Rule 404(b) evidence, that it would mislead or confuse the jurors, or would otherwise deprive him of his due process right to a fair trial.

As has been the case with other evidence, the prosecution argues that Miell has missed the point: The evidence in question goes to the credibility of employee-witnesses, not to any issue of violation of tax laws in the manner in which such reimbursements were made. The prosecution argues that such evidence will be offered to show how much money Miell has paid employees who will testify at trial and that it is relevant to show whether the employees are or may have been motivated to testify favorably to Miell. The prosecution points out that the nature of the reimbursements is relevant, because it is tax-free income to the employees. The prosecution reiterates, however, that it does not intend to allege that Miell committed any crime in the manner in which he paid his employees.

### c.    Analysis

The court agrees with the prosecution that tax-free reimbursements to employees, particularly when not tied to any demonstration of the employees' use of the funds for the stated purpose or any showing of the reasonable amount for such reimbursements, may be relevant to the employees' credibility and, more specifically, to their motivation to testify favorably to Miell. FED. R. EVID. 401 & 402. Of course, the relevance increases as the size of the reimbursements increases over what is reasonable or what could reasonably be documented as true costs to the employees. Where the evidence is offered for the limited purpose of attacking credibility, it is unlikely to pose a significant danger of unfair prejudice in the form of an inference that Miell is a tax cheat. FED. R. EVID. 403. Again, the court is reluctant to suggest a limiting instruction on the question of the proper purposes for which the reimbursement evidence may be considered, absent a specific request from the defendant, because this is another situation in which a limiting instruction itself might call undue attention to the evidence and introduce the precise prejudicial inference that Miell finds objectionable, when the inference might otherwise never arise.

Therefore, this portion of Miell's First Motion In Limine will also be denied.

### 8. Destruction of documents

#### a. The evidence in question

The final category of evidence that Miell seeks to exclude is evidence of alleged destruction of documents by Brett Emig, Miell's "handyman." As characterized by Miell, the evidence in question is that, during the grand jury investigation of his conduct, the prosecution subpoenaed corporate documents held by Miell, but the government then learned of anecdotal evidence that Miell's "handyman," Brett Emig, found "files" in a dumpster at one of Miell's properties, retained them, and then destroyed them. The evidence may also include payments made to Emig, purportedly for taking possession of the "dumpster documents." The prosecution's characterization of the evidence in question is somewhat different. The prosecution contends that, in response to a subpoena, Miell provided only "depleted" files. At about the same time, Miell called Emig to one of his properties, where Emig saw Miell either putting files in a dumpster or walking away from a dumpster in which Emig found files that he recognized as property files that he thought were covered by the subpoena, and that Emig then destroyed the files on his own initiative, presumably to help Miell.

#### b. Arguments of the parties

Miell argues that evidence of the "dumpster files" and their destruction is more prejudicial than probative under Rule 403, not competent evidence under Rule 404(b), and that its admission would mislead the jury, cause confusion, and otherwise deprive him of his due process right to a fair trial. More specifically, he contends that he was not under any legal obligation to retain corporate files that were not the subject of a grand jury subpoena, nor did the subpoena specify a continuing duty to turn over files that he discovered post-indictment or after his appearances before the grand jury. He also argues that, in the absence of proof that the "dumpster files" were files that were subpoenaed or

that he had some legal duty to maintain or turn over, evidence of those files should be declared inadmissible.

The prosecution contends that the evidence of the "dumpster files" is sufficient to suggest intentional destruction of evidence by Miell or at his implicit request and, therefore, is relevant to show consciousness of guilt. Although the prosecution acknowledges that Emig denies that Miell instructed him to destroy the files, the prosecution argues that a reasonable jury could conclude that, even assuming that Emig is truthful about the circumstances in which he found and destroyed the files, Miell called Emig to the apartment and allowed himself to be seen in proximity to the dumpster as an implied instruction to Emig to destroy the files. The prosecution also scoffs at Miell's contentions that there must be proof that the destroyed files were files sought by the government for the evidence of the destruction of the documents to be admissible, because the destruction of the files prevents the prosecution from making any such proof. Moreover, the prosecution contends that the lack of direct proof of the content of the "dumpster files" goes to the weight that the jury may give evidence of destruction of those files, not to the admissibility of such evidence.

    *c.*     *Analysis*

Although the Eighth Circuit Court of Appeals has analyzed extensively when an instruction on the negative inferences to be drawn from destruction of evidence is appropriate in a civil case, *see, e.g., Stevenson v. Union Pac. R. Co.*, 354 F.3d 739, 746-50 (8th Cir. 2004), or when the *prosecution* or *a law enforcement officer* has allegedly destroyed evidence, *see, e.g., United States v. Larsen*, 427 F.3d 1091, 1095 (8th Cir. 2005); *United States v. Iron Eyes*, 367 F.3d 781, 787 (8th Cir. 2004), it apparently has not passed on the question of when such an instruction is appropriate for a criminal defendant's alleged destruction of evidence. The Eighth Circuit Court of Appeals has suggested, however, that it is permissible to draw an inference of consciousness of guilt from a

defendant's destruction of evidence. *See United States v. Bolzer*, 367 F.3d 1032, 1037 (8th Cir. 2004) (the prosecutor's reference to destruction of evidence by the defendant was a "permissible inference," where the defendant admitting moving a firearm, but his finger prints were not found on the firearm, which gave rise to an inference that he had wiped the firearm in an effort to conceal his guilt). Similarly, the Sixth Circuit Court of Appeals held that the prosecutor properly referred to a criminal defendant's attempt to tamper with evidence, by attempting to destroy photographs of himself in New York City during the time that he was alleged to have made trips to New York to exchange guns for drugs, because such tampering was probative of guilt. *See United States v. Kuehne*, 547 F.3d 667, 691 (6th Cir. 2008); *see also United States v. Castillo*, 615 F.2d 878, 885 (9th Cir. 1980) ("An attempt by a criminal defendant to suppress evidence is probative of consciousness of guilt and admissible on that basis."). Lower courts have concurred. *See, e.g., United States v. Kilbride*, 2007 WL 1589561, *2 (D. Ariz. June 1, 2007) (unpubl. op.) (finding that a reasonable jury could conclude that an attempt to reinstall an operating system on a computer after learning of an FBI search of a co-defendant's home was an attempt to destroy evidence reflecting a consciousness of guilt); *United States v. Skeddle*, 981 F. Supp. 1074, 1076 (N.D. Ohio 1997) (noting that, under Sixth Circuit precedent, Rule 404(b) allows admission of evidence that a defendant attempted to obstruct justice, for example, by destruction or suppression of evidence, to show consciousness of guilt, citing *United States v. Battista*, 646 F.2d 237, 244 (6th Cir. 1981)).

In light of these precedents, the court concludes that evidence that Miell threw away files that a reasonable juror could conclude might have been relevant to the charges against him is relevant and admissible to show consciousness of guilt, even without the further evidence that Emig then destroyed the files pursuant to Miell's implicit request or out of loyalty to Miell. A reasonable juror could conclude from the timing of the disposal of the files, Emig's identification of the files as "property files," and the fact that pertinent files

were incomplete or missing from Miell's records, that the "dumpster files" were relevant to a potential prosecution of Miell or that Miell feared that they might be relevant to such a prosecution. The court has not found any requirement in any criminal case, and Miell has pointed to none, that the prosecution must prove specifically what the files contained or that Miell was under some specific duty to retain the files, before the prosecution is entitled to an adverse inference instruction. Miell is, of course, entitled to offer evidence that the files in question were irrelevant, were destroyed or disposed of in a good faith belief that they were irrelevant, or were destroyed or disposed of in the ordinary course of business.

Consequently, this portion of Miell's First Motion In Limine will also be denied.


## III. CONCLUSION

Upon the foregoing,

1.      Miell's December 18, 2008, Motion In Limine (First Motion In Limine) (docket no. 82) is **granted in part and denied in part**, as follows:

      a.      That part of the Motion seeking to exclude Mr. Bolt's evidence is **denied**;

      b.      That part of the Motion seeking to exclude evidence of the "*Beckfield* litigation" is **denied as moot**;

      c.      That part of the Motion seeking to exclude "renters' evidence" and descriptions of Miell as a "slum lord" is **granted** as to descriptions of Miell as a "slum lord" and as to evidence that he engaged in practices not the subject of the present criminal charges, but otherwise **denied**;

      d.      That part of the Motion seeking to exclude evidence from various small claims court judges is **denied**;

e.    That part of the Motion seeking to exclude evidence of the so-called "Bat Cave" is **denied as moot**;

f.    That part of the Motion seeking to exclude photographs of Miell's personal residence is **denied**;

g.    That part of the Motion seeking to exclude evidence of health insurance and mileage reimbursements that Miell paid to some of his employees is **denied**;

h.    That part of the Motion seeking to exclude evidence of destruction of documents is **denied**.

2.    Miell's December 22, 2008, Second Motion In Limine (docket no. 87) is also **denied**.

**IT IS SO ORDERED.**

**DATED** this 26th day of December, 2008.

_____
MARK W. BENNETT
U. S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA