IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

UNITED STATES OF AMERICA,

               Plaintiff,

vs.

ROBERT MIELL,

               Defendant.

No. CR 07-101-MWB

**MEMORANDUM OPINION AND
ORDER REGARDING SENTENCING**

---

**TABLE OF CONTENTS**

I. INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
  A. Factual Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    1.   The burden of proof and scope of information . . . . . . . . . . . 4
    2.   Defendant's personal characteristics . . . . . . . . . . . . . . . . . . 9
    3.   Operation of the defendant's businesses . . . . . . . . . . . . . 12
    4.   Offense conduct . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
       a.   The insurance fraud scheme . . . . . . . . . . . . . . . 18
       b.   The damage deposit fraud scheme . . . . . . . . . . . . 21
       c.   Perjury . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
       d.   False tax returns . . . . . . . . . . . . . . . . . . . . . 35
       e.   Evidentiary support for Miell's objections . . . . . . . 36
    5.   Other deceptive conduct . . . . . . . . . . . . . . . . . . . . . . 36
       a.   The false claim of an IRS audit . . . . . . . . . . . . . 36
       b.   Other deceptive conduct not considered relevant
          conduct . . . . . . . . . . . . . . . . . . . . . . . . . . 38
  B. Procedural Background . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
    1.   Charges, guilty pleas, and convictions . . . . . . . . . . . . . . 40
    2.   Post-trial proceedings . . . . . . . . . . . . . . . . . . . . . . . 42
       a.   Revocation of release . . . . . . . . . . . . . . . . . . . 42

  **b.** *The first sentencing hearing* . . . . . . . . . . . . . . . . . . 43
  **c.** *Filings and proceedings between sentencing hearings* . 45
  **d.** *The second sentencing hearing* . . . . . . . . . . . . . . 48
  **e.** *Post-hearing matters* . . . . . . . . . . . . . . . . . . . . . 49

**II. LEGAL ANALYSIS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49
 **A.** **The Methodology For Determination Of A Sentence** . . . . . . . . . . . . 49
 **B.** **Determination Of The Guideline Sentence** . . . . . . . . . . . . . . . . 53
  **1.** *Miell's guidelines objections* . . . . . . . . . . . . . . . . 53
  **2.** *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55
   **a.** *Edition of the Sentencing Guidelines* . . . . . . . . . . . 55
   **b.** *Grouping* . . . . . . . . . . . . . . . . . . . . . . . . . . 56
   **c.** *Amount of loss* . . . . . . . . . . . . . . . . . . . . . . . 58
    **i.** *Group 1 loss* . . . . . . . . . . . . . . . . . . . 59
    **ii.** *Group 2 loss* . . . . . . . . . . . . . . . . . . . 60
    **iii.** *Group 4 loss* . . . . . . . . . . . . . . . . . . . 65
   **d.** *Number of victims* . . . . . . . . . . . . . . . . . . . . 65
   **e.** *Sophisticated means* . . . . . . . . . . . . . . . . . . . . 66
   **f.** *Substantial interference with the administration of justice* . . . . . . . . . . . . . . . . . . . . . . . . . . 69
   **g.** *Abuse of a position of trust* . . . . . . . . . . . . . . 71
   **h.** *Obstruction of justice* . . . . . . . . . . . . . . . . . 75
   **i.** *Acceptance of responsibility* . . . . . . . . . . . . . 80
  **3.** *Guidelines calculations* . . . . . . . . . . . . . . . . . . 82
   **a.** *Group 1* . . . . . . . . . . . . . . . . . . . . . . . . . . 82
   **b.** *Group 2* . . . . . . . . . . . . . . . . . . . . . . . . . . 83
   **c.** *Group 3* . . . . . . . . . . . . . . . . . . . . . . . . . . 84
   **d.** *Group 4* . . . . . . . . . . . . . . . . . . . . . . . . . . 84
  **4.** *The Total Offense Level* . . . . . . . . . . . . . . . . . . 84
  **5.** *Criminal history calculation* . . . . . . . . . . . . . . . 85
  **6.** *Advisory guidelines range calculation* . . . . . . . . . 85
 **C.** **Determination Of Whether To Depart Or Vary** . . . . . . . . . . . . 86
 **D.** **Consideration Of The § 3553(a) Factors** . . . . . . . . . . . . . . . 89
  **1.** *The nature and circumstances of the offense* . . . . . . . . . . . 91
  **2.** *The history and characteristics of the defendant* . . . . . . . . 94
  **3.** *The need for the sentence imposed* . . . . . . . . . . . . . . . . 96

    *4.*     *The kinds of sentences available and the sentencing ranges*
            *for similar offenses* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98
    *5.*     *Any pertinent policy statement* . . . . . . . . . . . . . . . . . . . . 101
    *6.*     *The need to avoid unwarranted disparities* . . . . . . . . . . . 101
    *7.*     *The need to provide restitution* . . . . . . . . . . . . . . . . . . . 103
    *8.*     *Summary*   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 103

*III. CONCLUSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 104

In LITTLE DORRIT (1855-57), Charles Dickens portrayed a greedy landlord as repeatedly urging his rent collector to "squeeze" the inhabitants of his most squalid property, even though the rent collector believed that he had already "squeezed" them dry. Although this defendant's properties were not squalid, there is nevertheless a disturbingly Dickensian quality to this case: The defendant, who owned hundreds of rental properties in Cedar Rapids and Linn County, Iowa, and, consequently, was himself worth many millions of dollars, engaged in a fraud scheme involving renters' damage deposits over many years to "squeeze" an extra few hundred dollars each from people that he thought were too economically vulnerable or unsophisticated to contest his claims. His damage deposit fraud scheme involved creation of fake and inflated invoices for repairs to and cleaning of his rental properties to justify claims and judgments against renters' damage deposits. He also engaged in another fraud scheme to obtain insurance payments for repair of hail damage to the roofs of more than a hundred of his rental properties based on fake or inflated invoices, whether or not the roofs in question had actually been repaired. The defendant pleaded guilty to eighteen counts of mail fraud arising from these

schemes.  He also pleaded guilty to two of three counts of perjury[1] and was convicted by a jury of two counts of filing false tax returns.  I write this sentencing decision to explain why I find that the defendant's conduct warrants an upward departure or variance in his sentence for these offenses, from an advisory guidelines sentencing range of 168 to 210 months to 240 months, the statutory maximum sentence for the mail fraud offenses.

## I.  INTRODUCTION

### A.  Factual Background

#### 1.      The burden of proof and scope of information

Much of my rationale for an upward variance in this case is based on defendant Robert Miell's personal characteristics and offense conduct.  Therefore, I begin with those aspects of this case.

Defendant Robert Miell makes only general objections to the recitation of the "Offense Conduct" in the Second Final And Amended Presentence Investigation Report (Final PSIR)(docket no. 291), ¶¶ 17-78, and no objections at all to the recitations of his "Criminal History" or "Offender Characteristics," *id.* at ¶¶ 138-157.  His general objections to the "Offense Conduct" are that the "allegations" are far beyond the factual basis to which he pleaded guilty on January 2, 2009; that he disputes the accuracy and reliability of the information used to enhance his sentence under an advisory guidelines scheme; that enhancement of his sentence based on any evidence or allegations that have not been tested in court through cross-examination is a violation of due process and the Fifth and Sixth Amendments of the United States Constitution; and that any enhancement

---

[1]The prosecution dismissed the third perjury count upon the defendant's guilty plea.

to his sentence based on the allegations in these paragraphs should be proved by the prosecution beyond a reasonable doubt.

Were Miell's legal objections to the "Offense Conduct" portions of the Final PSIR matters of first impression, I might be inclined to agree with him, particularly to the extent that facts upon which the sentencing court relies should be proved beyond a reasonable doubt, or at least by clear and convincing evidence, not merely by the greater weight or preponderance of the evidence. At bottom, given that proof beyond a reasonable doubt is the bedrock of the nation's state and federal criminal justice system, it strikes me as fundamentally unfair to enhance a defendant's sentence based upon factual findings by only a preponderance of the evidence. While large sums of money routinely change hands in our civil justice system based upon a mere preponderance of the evidence, this minimal burden is a very slim reed by which to deprive a defendant of his liberty. Nevertheless, Miell's legal objections are not questions of first impression, but matters upon which well-settled law is contrary to his positions.

As the probation officer notes, pertinent United States Sentencing Guidelines authorize wide-ranging consideration of information relevant to sentencing against a relaxed standard of proof. *See, e.g.,* U.S.S.G. § 1B1.3, Relevant Conduct (Factors that Determine the Guideline Range), directs that the Base Offense Level, specific offense characteristics, cross references in Chapter Two, and adjustments in Chapter Three, shall be determined on the basis of: all acts and omissions committed, aided, abetted, counseled, commanded, inducted, procured, or willfully caused by the defendant, that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense; U.S.S.G. § 1B1.3, comment. (backg'd) (providing that "[c]onduct that is not formally charged or is not an element of the offense of conviction may enter into the determination

of the applicable guidelines sentencing range.   The range of information that may be considered at sentencing is broader than the range of information upon which the applicable sentencing range is determined."); U.S.S.G. § 1B1.4 (Information to be Used in Imposing Sentence (Selecting a Point Within the Guideline Range or Departing from the Guidelines), states, "In determining the sentence to impose within the guidelines range, or whether a departure from the guidelines is warranted, the court may consider, without limitation, any information concerning the background, character and conduct of the defendant, unless otherwise prohibited by law.   See 18 U.S.C. § 3661."); U.S.S.G. § 6A1.3, comment ("In determining the relevant facts, sentencing judges are not restricted to information that would be admissible at trial. See 18 U.S.C. § 3661); U.S.S.G. § 6A1.3, comment (indicating, further, that "[t]he Commission believes use of a preponderance of the evidence standard is appropriate to meet due process requirements and policy concerns in resolving disputes regarding application of the guidelines to the facts of the case."). So, too, does a controlling statute. *See* 18 U.S.C. § 3661 ("No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence.").

Finally, applicable case law is contrary to Miell's positions. *See United States v. Watts*, 519 U.S. 148, 154 (1997) (holding that a lower evidentiary standard at sentencing permits sentencing court's consideration of acquitted conduct); *Witte v. United States*, 515 U.S. 389, 399-401 (1995) (noting that sentencing courts have traditionally considered a wide range of information without the procedural protections of a criminal trial, including information concerning criminal conduct that may be the subject of a subsequent prosecution); *Nichols v. United States*, 511 U.S. 738, 747-48 (1994) (noting that district courts have traditionally considered a defendant's prior criminal conduct even when the

conduct did not result in a conviction). Any information may be considered, so long as it has sufficient indicia of reliability to support its probable accuracy. *Watts*, 519 U.S. at 157; *Nichols*, 511 U.S. at 748; *United States v. Zuleta-Alvarez*, 922 F.2d 33 (1st Cir. 1990), *cert. denied*, 500 U.S. 927 (1991); *United States v. Beaulieu*, 893 F.2d 1177 (10th Cir.), *cert. denied*, 497 U.S. 1038 (1990). Reliable hearsay evidence may be considered, *United States v. Petty*, 982 F.2d 1365 (9th Cir. 1993), *cert. denied*, 510 U.S. 1040 (1994); *United States v. Sciarrino*, 884 F.2d 95 (3d Cir.), *cert. denied*, 493 U.S. 997 (1989), including out-of-court declarations by an unidentified informant, where there is good cause for the non-disclosure of the informant's identity and there is sufficient corroboration by other means. *United States v. Rogers*, 1 F.3d 341 (5th Cir. 1993); *see also United States v. Young*, 981 F.2d 180 (5th Cir.), *cert. denied*, 508 U.S. 980 (1993); *United States v. Fatico*, 579 F.2d 707, 713 (2d Cir. 1978), *cert. denied*, 444 U.S. 1073 (1980). Of course, the court may not consider unreliable allegations. *United States v. Ortiz*, 993 F.2d 204 (10th Cir. 1993).

Moreover, the Eighth Circuit Court of Appeals has recognized that "[b]ecause the sentencing process does not carry the same evidentiary protections guaranteed during a criminal trial, relevant, reliable evidence" may be considered, even if the defendant was not present, represented, or able to confront and cross-examine the pertinent witnesses. *Smith v. United States*, 206 F.3d 812, 813 (8th Cir. 2000) (*per curiam*). Due process requires only that the defendant have (1) "notice of the proposed enhancement" and (2) "an opportunity to rebut or explain the evidence to be used against him." *Id.*; *see also United States v. Brown*, 430 F.3d 942, 944 (8th Cir. 2005) (concluding that "the admission of hearsay testimony at sentencing does not violate confrontation rights" (quotation omitted)). Miell has certainly had the notice and opportunity to respond that due process requires.

Quite recently, in *United States v. O'Brien*, 130 S. Ct. 2169 (2010), the Supreme Court stated,

> Elements of a crime must be charged in an indictment and proved to a jury beyond a reasonable doubt. *Hamling v. United States,* 418 U.S. 87, 117, 94 S. Ct. 2887, 41 L. Ed. 2d 590 (1974); *Jones v. United States*, 526 U.S. 227, 232, 119 S. Ct. 1215, 143 L. Ed. 2d 311 (1999). Sentencing factors, on the other hand, can be proved to a judge at sentencing by a preponderance of the evidence. See *McMillan v. Pennsylvania,* 477 U.S. 79, 91-92, 106 S. Ct. 2411, 91 L. Ed. 2d 67 (1986).

*O'Brien*, 130 S. Ct. at 2174-2175.

What is just as important as the relaxed standard of proof generally applicable at sentencings is my conclusion that, for the most part, a much higher burden of proof has been satisfied here. Specifically, with the exception of the loss amount from the damage deposit fraud scheme, I am convinced beyond a reasonable doubt not only of Mr. Miell's guilt, but of all of the sentencing enhancements and the variance. Indeed, in light of the prosecution's evidence, I am convinced beyond *all* doubt—that mythical standard we tell jurors is unattainable—of everything but that one enhancement.

Thus, this statement of the factual background is drawn primarily from the Second Final And Amended Presentence Investigation Report (Final PSIR) (docket no. 291), which I adopt over the defendant's objections. Where Miell has made more specific objections to particular facts in parts of the Final PSIR other than the "Offense Conduct," "Criminal History," or "Offender Characteristics" sections, those objections are addressed below, even if they are waived by failure to object to the pertinent paragraphs in the listed sections. Additional factual background is drawn from the episodic sentencing proceedings on September 2 and 3, 2009, and August 17 and 18, 2010. While I stop short of finding

8

that all of the facts recited below were proved beyond a reasonable doubt, I do find that all were proved at least by the greater weight of the evidence, and most were proved by overwhelming evidence.

### 2.    *Defendant's personal characteristics*

At the time of the final installments of defendant Robert Miell's sentencing hearing on August 17 and 18, 2010, Miell was 56 years old.  Miell was born and raised in Iowa. He lived in Marion, Iowa City, Des Moines, and Cedar Rapids.  He has lived in Cedar Rapids since 1980.  His father, Keith Meill, passed away in 1999.  His mother, Marilyn Miell (nee:  Niemeier), now age 80, resides in Marion, Iowa.  Miell has contact with his mother on a weekly basis.  He helps her maintain her 400-acre farm by ensuring that the land is rented and well maintained.  He reported that he had a very good childhood free from any type of abuse.  Miell has one sibling, June (nee:  Miell) Locke, age 52, who resides in Elbron, Illinois, and is employed in hotel management.  Miell has weekly contact with his sister.

Miell is single and has no marital history.  He has one child, Marissa DeRue, no longer a minor, from a previous relationship with Brenda DeRue.  He has no contact with his daughter.  He reported having an agreement with her mother to pay $400 per month for child support.  He reported never being court ordered to pay child support.  He also represented at the sentencing hearing that he provided other support to his child and her mother, including buying them a house.

Miell reports a severe allergy to peanut oil, that he suffers from a pinched disc in his back that may require surgery, and that, in 2003, he broke seven ribs and crushed his collar bone.  He takes ibuprofen and vicodin for pain.  I do not find that any aspect of Miell's physical condition is significant for sentencing purposes.  Miell did not report to the probation officer any history of mental or emotional health concerns, nor any history

of alcohol abuse.  Nevertheless, at sentencing, his counsel presented evidence suggesting that Miell has a tendency to "hoard" things, ranging from items of no value to cash and items of significant value, which counsel acknowledged was not enough to support a "Rule 12 [sic: Rule 12.2?] motion," but which might be enough for a variance.  I find nothing in this evidence that suggests either a significant impairment or a basis for a variance. Miell also denied to the probation officer any use of controlled substances, notwithstanding that, during grand jury testimony in 1989, he admitted using marijuana and cocaine and sharing cocaine with others.  I find that the contradictory evidence about his drug use is indicative of Miell's habit of attempting to deceive others—and, perhaps, himself—about his conduct.  His five-plus-hour allocution was, likewise, a total denial and dissertation in self-deception.

Miell graduated from the University of Iowa in 1976.  He attended Drake University School of Law from 1977 to 1978, but he quit law school to begin a real estate business.  He obtained his real estate license in 1976 and his broker's license in 1978.

Since 1979, Miell has operated real estate businesses.  At the time of his arrest, he owned and operated Equity Realtors in Cedar Rapids.  During his pretrial interview, he estimated his monthly income as $25,000.  However, he did not return the financial documents provided to him by the U.S. Probation Office.[2]  Instead, he submitted his own Personal Financial Statement, in which he claimed total assets of $38,935,925, including

---

[2]The documents provided by the Probation Office included a declaration of net worth and cash flow statements, a declaration under penalty of perjury that the information is true and correct, and an acknowledgment that false statements may result in possible prosecution under the provisions of 18 U.S.C. § 1001.

rental properties worth $35,165,925,[3] and a personal residence worth $3,500,000; total liabilities of $2,651,000; a net worth of $36,284,925; a total annual income of $6,180,000; total annual expenses of $4,539,000, consisting primarily of property taxes and real estate loan payments; and a net annual income of $1,641,000.  The inconsistency between his estimate of his monthly and net yearly income is yet another example of his tendency to prevaricate.

The figures from Miell's Personal Financial Statements submitted to the probation officer contrast sharply with the information in the bankruptcy schedules filed May 28, 2009, and July 13, 2009, in Miell's Chapter 13 bankruptcy proceedings.  Those schedules show total assets of $72,203,023; total liabilities of $56,392,640; a net worth of $15,810,383; total monthly income of $455,577; total monthly expenses of $235,402; and net monthly income of $220,175.  The inconsistencies between these figures and those that Miell provided to the probation officer are also examples of his pattern of lying.

Although Miell objected to the portions of a prior version of the Presentence Investigation Report (PSIR) recounting the financial information from his Personal Financial Statement, on the ground that "he does not possess anywhere remotely near the assets listed in the draft presentence report, and his bankruptcy filings accurately reflect his financial status," he does not repeat that objection to the Final PSIR, and he self-reported the information in the Personal Financial Statement.  It is difficult to explain a $20 million dollar discrepancy in Miell's net worth, when both figures are purportedly based on his self-reporting.  The discrepancy suggests that Miell is still not being completely honest with either this court or the bankruptcy court about his assets.

---

[3]The worth of rental properties is based on the reported market value of the rental properties ($71,225,000) minus reported mortgage amounts for those properties ($36,059,075).

Moreover, I agree with the probation officer that, whatever figures are used, Miell has substantial net worth and the ability to pay a substantial financial penalty.[4]  This is so, notwithstanding that Miell provided the probation office with several notices of foreclosure that were not detailed in the presentence report.  Also, Linn County Court records show Miell was named as either plaintiff or defendant in over 200 civil matters.  The status of those civil matters is unknown, and Miell did not report any civil judgments against him or payable to him.

Miell's criminal history is minor, consisting of a $100 fine in 1999 for "failure to assist"; a $500 fine in 2002 for "reckless driving"; and one day in jail and a $250 fine in 2003 for "driving while license under suspension."  As a result, he was assessed no criminal history points in the guidelines sentencing calculation summarized *infra*.

Thus, at first glance, at least until recently, Miell appeared to be a highly successful business man with a negligible criminal record.  Such appearances were deceiving.

### 3.    *Operation of the defendant's businesses*

Miell owned hundreds of rental properties in Linn County, Iowa.  The precise number of rental properties grew steadily during the time of the charged conduct (2000 through 2007), from approximately 300 to 500 properties.  As such, Miell was the fourth largest property owner in Linn County, Iowa.  Miell's rental properties consisted of single family homes, apartment buildings, and some commercial property.  All property was owned in his own name, with two exceptions:  For a period, Miell owned an apartment

---

[4]On August 23, 2010, the prosecution filed a Notice Regarding Restitution Claims (docket no. 304) stating that the parties have reached an agreement pursuant to which Miell agrees to entry of a judgment of restitution as part of the criminal judgment in this case with respect to **Counts 7** through **18** of the Indictment, the mail fraud counts arising from the damage deposit fraud scheme.  I will direct entry of judgment concerning restitution pursuant to the parties' agreement.

complex with others under the name 21st Avenue Place, but he ultimately bought out his partners (or is in the process of paying off their share); and he is the partial owner of a building at 1855 First Avenue Southeast, Cedar Rapids, Iowa, which is owned by a partnership, H&W Building Partnership.

Miell operated and managed his rental properties through several companies, all of which he operated out of an office at 1855 First Avenue Southeast, in Cedar Rapids. Those companies include Miell Property Management; Advanced Equities, Inc.; Equity Associates, Inc., and Realtors; Mayfair Builders, Inc.; 21st Avenue Place, Inc.; and Medallion Park.[5]   On July 10, 2008, Miell formed Elite Property Management, L.L.C.,

---

[5]Equity Associates, Inc., and Realtors, was formed in 1979 by Ron Kelley and others. Miell became associated with the company at the time, having notarized one of the corporate documents, that is, a Statement of Change of Registered Office, of Registered Agent, or Both, on December 23, 1980. By 1991, he was the registered agent for the corporation. In 1992, the registered agent is listed as R. Gordon Sargent. Mayfair Builders, Inc., is a corporation that began in 1967, but was taken over by Miell in 1992. Miell listed John J. McManus as President and registered agent of the company. John M. McManus is a former resident of Anamosa, Iowa, who invested in two properties with Miell in the late 1980s, but he was not involved in Mayfair Builders. During a deposition on April 26, 2006, Miell explained that the reason for the existence of Mayfair Builders, Inc., was to make loans. Advanced Equities, Inc., was incorporated in 1981, by Miell and Ron Kelley. Miell took over the corporation after Kelley's conviction for conspiracy to distribute cocaine in 1991. Miell listed the registered agent of Advanced Equities, Inc., again as R. Gordon Sargent. Miell used the name Equity Associates, Inc., and Advanced Equities somewhat interchangeably as the name of the company that leased the rental properties to tenants. Miell's employees stated they did not perceive any difference between the two companies. Miell Property Management is a name that the defendant used to conduct business. It appears this is a "doing business as" name and does not exist as a separate business entity. He used the name of this company to pay maintenance employees. 21st Avenue Place, Inc., was formed in 1980, as a holding company whose asset was an apartment building in Cedar Rapids. Miell became involved in this

(continued...)

13

the name under which he currently operates his property management business.  At about the same time that Miell created Elite Property Management, Miell moved his business operation from 1855 First Avenue to a building approximately one block away at 1956 First Avenue, Cedar Rapids, Iowa.

Of greater immediate interest than these business entities is Miell's association with "The Home Doctor."  Miell registered the name "The Home Doctor" as a trademark in 1989.  It appears that he initially used this name as a "doing business as" name for his maintenance workers.  The legitimate use of this business name was short-lived, however, as there is no indication of its legitimate use after 1990.  The name resurfaced, in about 2000, when Miell created fake invoices under that name and submitted them to Iowa state court judges in support of small claims court actions against renters.  "The Home Doctor" figures prominently in Miell's offense conduct, discussed below.

In the course of investigation of the criminal conduct at issue in the numerous charges against Miell, evidence was developed—and subsequently presented during the first part of Miell's sentencing hearing on September 2 and 3, 2009, or described in the Final PSIR—that fraud was Miell's everyday way of doing business.  Such fraud included using fictitious identities to operate his businesses ("John McManus" and "R. Gordon Sargent") and fraudulent use of a notary stamp to notarize false signatures.  Miell's use of these fictitious identities and fraudulent use of a notary stamp deserve further discussion.

---

[5](…continued)
corporation in the 1990s and eventually bought out the other investors.  Medallion Park is another name the defendant used to conduct business.  It appears that this is a "doing business as" name and does not exist as a separate business entity.  Miell maintained a bank account under this name and paid some of his employees using this account.

John McManus is a real person who once invested in an apartment complex with Miell. John McManus was a dentist from Anamosa in the 1970s and early 1980s, but ultimately moved to Arizona in 1983, where he continues to be employed as a dentist. When McManus moved to Arizona, Miell bought out his share of the apartment complex. McManus also owned a duplex in Cedar Rapids and had sold it on contract. When the buyer defaulted, Miell took over the contract and eventually purchased the duplex from McManus. Other than these short-term investment arrangements in these two properties, McManus had no other business relationship with Miell.

Nevertheless, Miell used McManus's name in his business operations in various ways. First, all The Home Doctor receipts bore the name "John McManus." Miell would sign the invoices "J.J. McManus" or "John J. McManus." Miell also used McManus as a straw person allegedly involved in his businesses. Miell filed documents with Iowa officials claiming McManus was an officer or registered agent of several of Miell's companies. Miell also claimed that McManus loaned him large amounts of money, but that is not true. Miell also filed mortgages with the Linn County recorder's office purporting to show that McManus had a mortgage on millions of dollars worth of properties that Miell owned. By doing this, Miell falsely encumbered his property to suggest that he had no equity in the property, so that it would be judgment proof.

At a deposition in a civil case by American Family Insurance (AFI) against Miell, arising from the "insurance fraud scheme" that is the basis for **Counts 1** through **6** in this case, Miell also claimed that The Home Doctor was the name used for properties where John McManus loaned him money. Miell claimed that if repairs or improvements were made to those properties, it was done under the name The Home Doctor, and the money was "paid back to him based on how much money he spent." Miell claimed that McManus billed him on The Home Doctor letterhead and that Miell sent payments to McManus.

15

Miell also claimed that McManus "ran this business." However, these assertions were not accurate. McManus had nothing to do with The Home Doctor. The invoices were part of Miell's fraud scheme. Miell ultimately admitted in AFI's civil case that McManus did not sign any of The Home Doctor invoices. The checks that Miell allegedly wrote to The Home Doctor were never provided to anyone and were never cashed. Rather, Miell presented photocopies of the checks to Iowa state court judges purporting to show that he paid another company for repairs, when he had not.

During the trial of AFI's civil lawsuit, Miell claimed that he did not know where John McManus was living and did not know how to reach him. This was not accurate. While trial on AFI's civil lawsuit was pending, Miell was in communication with McManus to obtain a release on an old lien that still existed on the duplex. He spoke with McManus on the phone and sent him a check dated January 5, 2008, for $5,000 as payment for release of the lien. He also filed a Release of Lien with the Linn County Recorder's Office on February 14, 2008.

The government's handwriting expert determined that Miell had also forged the signatures of notaries who allegedly witnessed the signature of John McManus. Among the notaries whose signatures Miell forged was Karla Wilson, a notary living in Des Moines. In the civil case by AFI against Miell, Miell claimed Ms. Wilson notarized his documents and denied having a notary stamp in her name. In relation to the criminal prosecution, Miell stipulated that Ms. Wilson did not know him, had never worked for him, and had not notarized any documents for McManus or R. Gordon Sargent (another straw person discussed below), and had never traveled to Cedar Rapids to notarize documents. It is unclear how Miell became aware of Karla Wilson or got a notary stamp in her name, but he used and directed other employees to use a notary stamp in her name to notarize documents in the office.

16

R. Gordon Sargent is also a real person who once lived in Florida, but has never met Miell and has never had anything to do with him. Lisa Waggoner, a former girlfriend and employee of Miell's, indicated that Miell told her once that he found the name in a Florida telephone book when he was on vacation. Miell used Sargent's name to sign leases and other rental documents in an effort to evade tenants: When tenants complained, he and his employees would refer them to Sargent. Miell also used Sargent's name as someone purportedly connected with his companies. The prosecutor's handwriting expert established that Miell signed the name "R. Gordon Sargent" to a number of documents. In the course of the civil litigation, Miell gave a description of Sargent, claiming that he was an engineer who worked in Dallas, but Miell was never able to provide anyone with an address, phone number, or any other manner of reaching Sargent. The real Sargent does not match Miell's description, has not worked in Dallas, and is not an engineer.

Miell was questioned at length about McManus and Sargent in AFI's civil litigation and in a lawsuit brought on behalf of a number of tenants. Miell repeatedly claimed that McManus and Sargent were his business partners and that they had loaned him money. For example, he claimed that, at the time of the hail storm in 2001, Sargent and McManus were directors of his company. These claims were not true.

### 4.  *Offense conduct*

Although Miell had limited criminal history and substantial, apparently legitimately-obtained personal wealth, he pleaded guilty to or was convicted after a jury trial of a plethora of offenses in this case arising from criminal conduct, over several years, to obtain sums ranging from a few hundred dollars from individual tenants to hundreds of thousands of dollars from AFI, lying about his fraudulent schemes and improper use of McManus's name, and filing of false tax returns. Somewhat more specifically, the Third Superseding Indictment, Miell's guilty pleas, the Final PSIR, the evidence and verdict at

the jury trial, and the evidence at the episodic sentencing hearing on September 2 and 3, 2009, and August 17 and 18, 2010, show that Miell engaged in mail fraud, in violation of 18 U.S.C. § 1341, in furtherance of two fraud schemes, "the insurance fraud scheme" and "the damage deposit fraud scheme," as well as perjury in depositions and in court, in violation of 18 U.S.C. §§ 1621 and 1623, and the filing of two false federal income tax returns, in violation of 26 U.S.C. § 7206(1). I will summarize the conduct involved in each of these kinds of offenses.

### a.   The insurance fraud scheme

Miell engaged in an "insurance fraud scheme," which resulted in the "mail fraud" charges in **Counts 1** through **6**. That scheme worked as follows.

American Family Insurance Company (AFI) provided insurance for Miell's rental properties. The AFI policies provided "actual cash value" (ACV) coverage for damages to the rental properties. The amount of the ACV payment was calculated as the estimated cost of the damage repairs minus depreciation to the damaged portion of the insured property. The AFI policies also provided additional "replacement cost value" (RCV) coverage for the actual replacement cost of damages to the insured properties. These additional RCV payments for damages would be made only after the following conditions were met: (1) the insured damages were actually repaired; and (2) AFI received proof of the actual cost of the completed repairs.

On May 10, 2001, a hail storm damaged the roofs of more than 100 of Miell's rental properties that were insured by AFI. Miell submitted claims to AFI for damages to his properties, seeking ACV payments for the estimated cost of the damage repairs minus depreciation to the damaged portions of the insured properties. AFI paid Miell in excess of $190,000 comprising the ACV payments. Miell also sought additional RCV payments for the cost of replacing the roofs. However, beginning on December 11, 2001, and

18

ending on December 9, 2002, Miell did so by falsely reporting that roof repairs had been completed on 145 of his insured properties, but the roofs of these 145 properties had not been repaired.  To support his false claims to AFI, Miell provided AFI with copies of invoices that he represented were from roofing companies that had completed hail-damage repair on the insured properties.  The invoices that Miell provided had been fabricated, in that some of them were from roofing companies that did not exist, and others were from roofing companies that did exist, but had done no work on the insured properties.  In support of his false claims to AFI, Miell also provided AFI with copies of checks that he represented were used to pay the hail-damage repair invoices.  However, Miell had not used these checks to pay for hail-damage repairs.  The copied checks were never disbursed or cashed.  The roofing companies, shown as the payees on the checks, either did not exist or had not done work on the insured properties.

Relying on, and because of, Miell's false claims and documentation, AFI mailed to Miell approximately $336,541.26 in RCV payments for nonexistent roof repairs.  On the following dates, AFI mailed Miell the following checks to be delivered by the United States Postal Service according to the directions thereon:

| **DATE** | **ITEMS MAILED/ADDRESSEE** |
| --- | --- |
| November 27, 2002 | Six checks (## 758444, 758455, 758457, 758460, 758472,  758475,) mailed to Cedar Rapids, Iowa, from AFI in Des Moines; |
| November 27, 2002 | Seven checks (## 758464, 758466, 758468, 758471, 758477, 758479, 758480) mailed to Cedar Rapids, Iowa, from AFI in Des Moines; |
| December 11, 2002 | Nine checks (## 759726, 759728, 759730, 759732, 759733, 759735, 759737, 759740, |

759741) mailed to Cedar Rapids, Iowa, from AFI in Des Moines;

December 11, 2002        Eight checks (## 759779, 759780, 759781, 759782, 759784, 759786, 759787, 759788) mailed to Cedar Rapids, Iowa, from AFI in Des Moines;

December 11, 2002        Eight checks (## 759725, 759750, 759751, 759752, 759753, 759754, 759755, 759773) mailed to Cedar Rapids, Iowa, from AFI in Des Moines;

December 11, 2002        Nine checks (## 759756, 759758, 759759, 759760, 759761, 759774, 759775, 759776, 759777) mailed to Cedar Rapids, Iowa, from AFI in Des Moines.

A portion of the checks mailed to Miell were not charged in the Third Superseding Indictment as counts, because the statute of limitations passed as to many of the mailings.

On October 23, 2004, AFI sued Miell in the United States District Court for the Northern District of Iowa, Cedar Rapids Division, for breach of contract and fraudulent misrepresentations, in *American Family Insurance v. Miell*, No. 04-CV-142 (hereinafter, AFI's civil case). In January 2008, AFI's civil case proceeded to a jury trial, presided over by United States Magistrate Judge Jon Stuart Scoles. On January 15, 2008, the jury returned a verdict, finding that Miell breached the contracts and made fraudulent misrepresentations to AFI; awarding AFI $886,865 in actual damages (reflecting all insurance proceeds paid to Miell); and awarding punitive damages of $1,017,332. The parties have since reached a settlement of $1,565,096.74. Miell paid a $500,000 bond and an additional $10,000 toward the settlement. AFI credited Miell with $99,000 for an unrelated claim.

One of the invoices that Miell provided to AFI in support of his fraudulent claims was a Home Doctor invoice. Miell submitted this invoice to AFI as proof that he repaired a roof. Although Miell had, in fact, repaired the roof in question, The Home Doctor did not do that repair. Rather, that roof was repaired by a man named Rob Dixon. In addition, Miell inflated the invoice by $1,000, claiming to AFI that he paid $2,878 to repair the roof, when the records revealed that he paid Dixon $1,878 to repair the roof. The Home Doctor invoice was allegedly signed by John McManus.

### b.     The damage deposit fraud scheme

The "insurance fraud scheme" was not the only fraud scheme in which Miell engaged for which he faced criminal charges in this case. He also engaged in a "damage deposit fraud scheme," which resulted in the "mail fraud" charges in **Counts 7** through **18**. That scheme worked as follows.

Before leasing or renting one of his properties to a tenant, Miell required the tenant to provide a damage deposit. This damage deposit, less the costs of any necessary cleaning, repairs, or replacements, was to be returned to the tenant at the end of the lease period. At the conclusion of a rental period, Miell ordered his staff to inspect, clean, and repair any damage to the rental unit. His employees kept records of the time spent and repairs made to the property. Likewise, if replacements were made to the rental units, those additional expenses were noted. These costs were reflected on a damage-deposit-return form, commonly entitled Summary Of Move-Out Work form, that was provided to Miell by his employees. Beginning at least as early as 2000 and continuing until at least 2007, Miell fraudulently kept some or all of hundreds of renters' damage deposits at the conclusion of their rental periods by falsely informing the renters that they caused damages to the rental property and that the cleaning, repair, and replacement costs were equal to, or in excess of, the amount of the renters' damage deposits.

21

Specifically, upon receiving a damage-deposit-return form, Miell inflated the costs and replacements as determined by his staff so as to fraudulently make the costs of cleaning, repairs, and replacements meet or exceed the amount of the renter's damage deposit. Miell did this by handwriting changes to the Summary Of Move-Out Work form, increasing the alleged costs of repairs. Miell then directed his staff to notify the renter that the renter would either not receive any of his or her damage deposit or that the renter owed Miell money, because the costs of cleaning, repairs, and replacements met or exceeded the renter's damage deposit. This was done by mailing a copy of the Summary Of Move-Out Work form to the renter's last known address. In this manner, Miell fraudulently kept portions of renters' damage deposits. In addition, Miell frequently added additional alleged costs to the Summary Of Move-Out Work form, so that, not only would it show that the tenant was not entitled to a return of the damage deposit, but that the tenant would actually owe Miell money, sometimes more than $1,000. Miell would often file suit in small claims court to obtain a judgment against the former tenant in the amount of the alleged costs in excess of the damage deposit.

On occasion, a renter sued Miell for the return of his or her damage deposit. When Miell went to small claims court in Linn County on claims by or against tenants, he would create, or cause his staff to create, false and fraudulent invoices from The Home Doctor that purported to constitute a bill sent to him for the costs of cleaning, repairs, and replacements to the rental unit. Miell would also, at times, write checks or cause checks to be written to The Home Doctor that were never actually disbursed or cashed. He would then produce, or cause others to produce, these false and fraudulent documents, invoices, and checks to the Iowa District Court for Linn County as alleged proof of the costs of cleaning, repairs, and replacements. In this manner, Miell fraudulently kept, or attempted to keep, portions of renters' damage deposits.

22

The Home Doctor invoices began showing up in about 2000 or 2001.  Prior to that time, the state court judges routinely discounted Miell's claimed costs of repairs.  After he began producing The Home Doctor invoices, however, the judges could not summarily discount these invoices, as they had no proof that they were false.  One or more judges directly asked Miell whether The Home Doctor was tied to him in any way, and Miell claimed that it was not connected to him.

On the following dates, Miell caused the following items to be placed in an authorized depository for mail matter and to be sent and delivered by the United States Postal Service according to directions thereon:

| **DATE** | **ITEMS MAILED/ADDRESSEE** |
|---|---|
| December 2002 | Notice regarding damage deposit from 1855 First Avenue SE, Cedar Rapids, IA, to 2207 Kenrich Drive, SW, Cedar Rapids, IA; |
| December 2002 | Notice regarding damage deposit from 1855 First Avenue SE, Cedar Rapids, IA, to 4002 Westover Road, SE, Cedar Rapids, IA; |
| December 2002 | Notice regarding damage deposit from 1855 First Avenue SE, Cedar Rapids, IA, to 3212 Kenrich Drive, SW, #10, Cedar Rapids, IA; |
| December 2002 | Notice regarding damage deposit from 1855 First Avenue SE, Cedar Rapids, IA, to 603 Olive Drive, NW, Cedar Rapids, IA; |
| 1st Quarter of 2003 | Notice regarding damage deposit from 1855 First Avenue SE, Cedar Rapids, IA, to 2922 O Avenue, NW, #6, Cedar Rapids, IA; |

| | |
|---|---|
| 1st Quarter of 2003 | Notice regarding damage deposit from 1855 First Avenue SE, Cedar Rapids, IA, to 1615 C Avenue, NE, Cedar Rapids, IA; |
| 1st Quarter of 2003 | Notice regarding damage deposit from 1855 First Avenue SE, Cedar Rapids, IA, to 309 7th Avenue, Hiawatha, IA; |
| 1st Quarter of 2003 | Notice regarding damage deposit from 1855 First Avenue SE, Cedar Rapids, IA, to 1917 K Street, SW, Cedar Rapids, IA; |
| 2nd Quarter of 2003 | Notice regarding damage deposit from 1855 First Avenue SE, Cedar Rapids, IA, to 1025 3rd Street (east unit), Marion, IA; |
| 3rd Quarter of 2003 | Notice regarding damage deposit from 1855 First Avenue SE, Cedar Rapids, IA, to 3417 Eastern Avenue, NE, Cedar Rapids, IA; |
| 3rd Quarter of 2003 | Notice regarding damage deposit from 1855 First Avenue SE, Cedar Rapids, IA, to 1911 Northbrook Drive, NE, Cedar Rapids, IA; |
| 2nd Quarter of 2004 | Notice regarding damage deposit from 1855 First Avenue SE, Cedar Rapids, IA, to 119 West Post Road, NW, Cedar Rapids, IA. |

Miell objects to paragraph 3 of the Final PSIR, which also lists these mailings as the basis for the damage deposit fraud scheme. Specifically, he objects to the statement that the items were placed in the mail, he contends the items were faxed, and he asserts "[t]here was no scheme." As the probation officer points out in response to this objection, paragraph 3 was taken directly from "mail fraud" charges relating to the damage deposit

fraud scheme in the Third Superseding Indictment, to which Miell pleaded guilty.  Miell's belated attempt to challenge the factual basis for his guilty plea to these charges is rejected.

As explained in more detail in the legal analysis to follow, under Iowa law, Miell had a fiduciary duty to his tenants as to damage deposits. *See* IOWA CODE § 562A.12(2). While Iowa law prohibits landlords from commingling deposits with other funds, Miell did so.  He did not maintain a separate account for damage deposits; instead, he deposited them into his bank account and used them like any other revenue for his operation.  For the reasons also explained in more detail in the legal analysis to follow, Miell's assertion that he had been exempted by the Iowa Real Estate Commission from the requirement to maintain a separate trust account for renters' deposits is simply not true.

Attempts to determine the amount of damage deposits that Miell unlawfully retained during the period of the charged conduct (2000 through 2007) were hampered for a number of reasons.  First, Miell's filing system and record retention is, at best, poor.  The government issued forthwith subpoenas on Miell's companies to obtain 30 or 40 files.  The documentation contained in the files was inconsistent and incomplete.  For example, some files contained leases going back several years, while others did not.  Files contained some Summary Of Move-Out Work forms, but none contained all such forms for all renters.  Second, the prosecutor issued non-forthwith subpoenas to Miell's companies to obtain an additional 140 or so property files.  These files had been purged.  They contained very little documentation, and especially lacked some of the key documents, such as The Home Doctor invoices, Summary Of Move-Out Work forms, or similar documents.

One of Miell's employees admitted that he burned boxes of files that he discovered shortly after he knew that the prosecutor had sought them by subpoena.  Specifically, Brett Emig, one of Miell's employees who did maintenance work, testified in grand jury proceedings, and again during the first part of the sentencing hearing on September 2,

25

2009, that he destroyed some of Miell's property management files that he found in a dumpster at a rental property to which Miell had called him to do some repair work. At the sentencing hearing, Emig testified that, perhaps a month and a half after he became aware of the grand jury subpoena for Miell's property files, and at a time when he thought the grand jury investigation had already concluded, he saw Miell's truck at a rental property in Hiawatha, where Emig was going to do repair work. Just about the time that Emig saw Miell's truck, Miell actually called him on his cell phone to ask him to do some work at another, nearby property that Miell owned. Emig then met Miell to get face-to-face instructions for repair work on the nearby property. After Emig started the repairs, while dumping some materials from the repairs in a dumpster, Emig found what he said "look[ed] like a bunch of leases in boxes" in the dumpster. Realtime Transcript, Sentencing Hearing, September 2, 2009, 171:15-16. Emig testified that he removed two boxes of these documents from the dumpster, because "with all the legal issues [Miell] had, I just thought it was stupid if someone is watching him, you know, why put them in there and I don't know if he did, but I mean, here they are." *Id.* at 172:14-18. Emig took the boxes home and stored them in his garage, then a couple of months later burned them in his wood-burning fireplace, without telling Miell. Emig testified that he did eventually tell Miell that he had taken the files out of the dumpster, but he did not think that he had told Miell that he had burned them. He said Miell's response was something to the effect that anybody could have put the files in the dumpster.

Miell attempted to undermine Brett Emig's testimony, particularly at the August 2010 installment of the sentencing hearing, with testimony of a former employee, Jacqueline (Jackie) Varner, essentially to the effect that nobody who worked for Miell put much stock in anything Brett Emig said about anything. Yet, no one has offered an adequate explanation for why so much material is missing from Miell's property

26

management files, nor any reason to reject Brett Emig's specific testimony about his discovery and destruction of property files.

I will discuss, below, in my calculation of Miell's Sentencing Guidelines range, my determination of the loss resulting from the damage deposit fraud scheme, despite the prosecution's difficulties in attempting to determine the amount of loss from incomplete property files.

### c.    *Perjury*

Miell was charged with perjury in a deposition in **Count 19** and perjury in a civil jury trial in **Counts 20** and **21**.  These charges arose from Miell's conduct in AFI's civil case against Miell, brought prior to the criminal prosecution for the insurance and damage deposit fraud schemes.  Although **Count 21** was subsequently dismissed, in return for Miell's guilty pleas to **Counts 1** through **20**, it is nevertheless still relevant here pursuant to U.S.S.G. § 5K2.21.

As to **Count 19**, one of the material matters in AFI's civil case was whether Miell sent a Home Doctor receipt to AFI falsely showing that he paid The Home Doctor to repair one of the hail-damaged roofs.  Miell had repaired the roof in question, but The Home Doctor did not perform the repairs.  Miell used The Home Doctor invoice to inflate the costs of repairs by $1,000.  On April 26, 2006, Miell appeared as a witness at a deposition, was placed under oath, and provided testimony concerning The Home Doctor receipt and other matters related to the submission of documents to AFI to justify RCV payments.  During the deposition, counsel for AFI questioned Miell about a certain document:  the first page of the document was a phone message and the second page was a Home Doctor invoice dated August 29, 2001, for $4,984.23, signed by J.J. McManus. Miell had submitted the invoice to AFI to seek an RCV payment in the amount of the invoice.

Specifically, the following questions and answers appear in the deposition transcript:

| | |
|---|---|
| Question: | I want to hand you what's been marked as Exhibit 10.  Do you recognize the first page?  Does that look familiar to you, sir? |
| Answer: | No.  I've not seen the first page. |
| Question: | Okay.  Let's go to the second page.  Have you ever seen that before? |
| Answer: | Not that I recall, no. |
| Question: | Is that your handwriting? |
| Answer: | Yes. |
| Question: | What is the House [sic] Doctor, meaning is it a corporation, sole proprietorship— |
| Answer: | It was a— |
| Question: | Was or is, sir?  Pardon me for interrupting. |
| Answer: | Was. |
| Question: | It doesn't exist anymore? |
| Answer: | Not that I know of. |
| Question: | Okay.  It was.  Go ahead. |
| Answer: | On the places that John McManus had loaned money if there were repairs or things done that were billed out, that's was that was for. |
| Question: | Okay.  Who owned the Home Doctor. |

Answer:    It was— At the recorder's office I think my
           name was on it. I'm not sure if Mr. McManus'
           was or was not. It was not a corporation.

Question:  What was it?

Answer:    Basically that's what it was. Basically an
           identification of places where he had lent money
           and of what he had expensed on those to be
           reimbursed for.

Question:  . . . The House [sic] Doctor never was a
           corporation; true?

Answer:    Not to my knowledge. No.

Question:  Sole proprietorship? Partnership?

Answer:    If anything, it was a partnership, but it wasn't
           filed as a partnership.

Question:  If anything, it was a partnership?

Answer:    Well—

Question:  I'm just trying to understand, not argue with
           you. This isn't meant to be a trick question.
           I've just got to get this through my head.

Answer:    If there were places where John McManus lent
           me money and there were repairs that were done
           either if it was purchased or he lent money and
           there was improvements made to fix the property
           up, any invoices that were done or expenses that
           were done were paid back to him based on how
           much money he spent on that case.

| | |
|---|---|
| Question: | Why would repairs be made to these homes where he had loaned you money? |
| Answer: | Various things from obviously roofs to new kitchens, bathrooms, finishing basements, putting up two-stall garages, different things. |
| Question: | Does the House [sic] Doctor have an address? I don't see it on the paper. |
| Answer: | No.  It was basically the 1855 First Avenue. |
| Question: | Is that McManus' signature? |
| Answer: | Yes.  Well, I would assume so. |
| Question: | It's not your handwriting? |
| Answer: | <u>No.</u> |

The underscored testimony, that the signature was not in Miell's handwriting, was false. In October 2007, after his deposition in April 2006, a grand jury issued a subpoena to compel Miell to provide handwriting exemplars.  Miell was suspected of having forged the signatures of several people, including R. Gordon Sargent, Karla Wilson, and John McManus.  Handwriting analysis showed that the handwriting in McManus's purported signature on The Home Doctor invoice was Miell's.

Miell objects to paragraph 4 of the Final PSIR, which describes the offense charged in **Count 19**.  Miell indicates that he had both a property management agreement and a power of attorney, and contends that paragraph 4 is incorrect where it states that he believed that the invoices were false.  Again, as the probation officer points out, paragraph 4 was taken directly from the Third Superseding Indictment and relates to a

count to which Miell pleaded guilty.  I reject Miell's belated attempt to challenge the factual basis for his guilty plea to this charge.

As to **Count 20**, when AFI's civil case went to trial in January 2008, the authorship of the John McManus name came up again.  At trial on January 8 and 9, 2008, in testimony under oath, Miell had a different explanation, as shown in the following exchange:

| | |
|---|---|
| Question: | Is this a billing from the Home Doctor? |
| Answer: | Yes, Sir. |
| Question: | From who? |
| Answer: | From myself. |
| Question: | From yourself.  Doesn't it say under Home Doctor, J.J. McManus? |
| Answer: | Yes, it does. |
| Question: | Is that his signature; McManus? |
| Answer: | No, sir.  That is mine. |
| Question: | It's yours.  Did you tell me that in your deposition? |
| Answer: | I presume it's mine.  I think it's mine. |
| Question: | Well, let me ask you this.  Does J.J. McManus exist? |
| Answer: | Yes, he does. |
| Question: | Where is he? |

Answer:     I don't know where he is.

Question:   Why did you sign J.J. McManus' name?

Answer:     <u>I had a power of attorney for Mr. McManus.</u>

The underscored testimony was false, because Miell had no such power of attorney. The prosecutor questioned approximately a dozen current and former co-workers to determine whether they knew of or had ever seen such a power of attorney, some of whom were questioned before the grand jury. The answer was uniformly negative. In addition, the prosecutor served a grand jury subpoena on the custodian of records for all of Miell's business entities demanding production of such a power of attorney. Miell chose to appear as the custodian of record and testified that the companies were not in possession of such a document.

As to the dismissed perjury count, **Count 21**, another material matter in AFI's civil case involved Miell's reliance on his insurance agent. Miell claimed, for example, that his insurance agent was intimately involved in the claims process and told him that he had a one-year deadline to complete all roof repairs. Thus, the nature and extent of contact between the agent, Brett Throlson, and Miell was an important issue at trial in AFI's civil case. The specific question was whether AFI sent the RCV payments to Miell directly through the United States Mail or, instead, to his insurance agent.

During Miell's deposition, which took place on May 23, 2006,[6] Miell was asked about how he received the RCV checks. The following question and answer appear in the deposition transcript:

---

[6]Miell had one deposition, but it was continued, so that, like his sentencing hearing, it took place on several days. In the case of his deposition, the dates included April 26, 2006, and May 23, 2006.

> Question:    And American Family sent you directly a check
>              and not through Brett Throlson?
>
> Answer:      Correct.

In November 2007, after Miell's deposition testimony, the grand jury returned its first Indictment against him.  The Indictment included the insurance fraud counts, and alleged that the RCV checks were mailed directly to Miell at his business address, which was consistent with Miell's own deposition testimony and the testimony of employees of AFI that RCV payments never go through agents.  In contrast to ACV payments, for which the insured need not produce any documents, RCV payments are made only if an insured provides proof of actual repairs.  Because of the potential for fraud, RCV payments never go through the agent.

On January 8, 2008, and January 9, 2008, while testifying under oath at trial in AFI's civil case, however, Miell changed his testimony about how he received the RCV checks.  The following questions and answers appear in the trial transcript:

> Question:    Is it your testimony to this Judge and this jury
>              that you never received a check from American
>              Family paying you for damage to the roofs from
>              the hailstorm at your offices?   Is that your
>              testimony?
>
> Answer:      I don't recall that, sir.
>
> Question:    Don't recall what?
>
> Answer:      That I received checks mailed directly to me
>              from American Family's office in Des Moines.
>
>                             * * *
>
> Question:    Did you receive any of these payments through
>              the United States Mail?

Answer:       <u>I don't recall that.</u>

Question:    Did you receive these payments in one envelope, two envelopes, three envelopes, or four?

Answer:       <u>I don't recall because to my knowledge, Mr. Throlson would call and say that he had checks and I would go to his office and pick them up.</u>

\* \* \*

Question:    Is it your testimony to this Judge and this jury that the checks were not taken—the replacement cost benefit checks were not taken by the United States Postal Service from Des Moines directly to your office?

Answer:       <u>To the best of my knowledge, that's correct.</u>

\* \* \*

Question:    And if I understand your testimony yesterday to questions by Mr. Proctor, you testified that all the checks went to Mr. Throlson for settlement of your replacement cost value.  Is that what your testimony was yesterday?

Answer:       <u>Yes it was.</u>

\* \* \*

Question:    And just so I'm clear, it's your sworn testimony today that you did not receive any of the replacement cost value checks through the mail. Is that your testimony today?

Answer:       <u>I received them at Mr. Throlson's office.</u>

34

The underscored testimony was false.  As set forth above, the policy and practice of AFI was to mail RCV checks directly to the insured, not to send them through agents.

As a result of this false testimony, the prosecutor had to present the case to a grand jury a second time to change the language of the Indictment to allege a mailing from Des Moines to Cedar Rapids, instead of directly to Miell's business address.

### d.    *False tax returns*

**Counts 22** and **23** charged Miell with filing false tax returns.  The factual background to these offenses is as follows.

On April 15, 2002, and September 15, 2003, Miell filed, under penalty of perjury, false and fraudulent U.S. Individual Income Tax Returns, Form 1040, for the calendar years 2001 and 2002.  The returns failed to include as income the RCV payments that Miell received from AFI.  Miell obtained those funds through fraudulent means and they were not used for their intended purpose; therefore, they constituted taxable income.  The RCV payments that Miell obtained by fraud became taxable income in the year in which he received them.  Miell received one check for RCV insurance proceeds in 2001 in the amount of approximately $6,339, and he received the remainder of the $336,000 in RCV insurance proceeds in tax year 2002.  Miell failed to report any of this income in his tax returns in the tax years in question.  Using a tax rate of 28% for the non-reported income of $336,000, the total tax loss from the insurance fraud scheme was $94,080.

Miell objects to paragraph 7 of the Final PSIR, which describes the offense charged in **Count 22**, on the ground that he did not have the money that is included in that paragraph.  As the probation officer points out, paragraph 7 was taken directly from the Third Superseding Indictment.  Moreover, whether or not Miell did or did not "have the money" in question at some point is hardly a defense to the charge that he received the money through a fraudulent scheme and failed to report it as income.  This challenge to

Miell's guilt on this charge at sentencing is far too late.  Thus, this objection is overruled.  Similarly, Miell objects to paragraph 8 of the Final PSIR, which describes the offense charged in **Count 23**, by stating that ". . . attorneys Kutmus and Brown [his trial attorneys] withheld material in their hotel room.  This evidence should have been presented in his defense."  To the extent that the court has been able to determine what "material" was supposedly withheld by Miell's trial attorneys, the court finds that the "material" was not exonerating and, moreover, that a challenge to his guilt on this charge at sentencing is far too late.  Thus, this objection is also overruled.

### e.      Evidentiary support for Miell's objections

Miell makes various factual objections to the "Offense Conduct" section of the PSIR, but has offered no credible evidence to support any of them.  Thus, Miell's factual objections, including those not expressly addressed above, are overruled.

### 5.      Other deceptive conduct

In addition to the fraudulent and deceptive conduct that led to the charges against him, Miell engaged in other deceptive conduct for which he has never been charged.  That conduct is also relevant here, at the very least, as demonstrative of his personal characteristics.

### a.      The false claim of an IRS audit

This criminal case was scheduled for trial on January 5, 2009.  On January 2, 2009, Miell advised the court that he intended to plead guilty to the first 20 counts of the Third Superseding Indictment.  Consequently, I set his plea on those counts for Saturday, January 3, 2009, with trial on the remaining counts (21 through 23) to take place starting January 7, 2009.  On Saturday, January 3, 2009, Miell entered a guilty plea to the first 20 counts of the Indictment.  At the conclusion of the hearing, Miell (through counsel) claimed that he had been audited by the IRS for the two tax years in question (2001 and

2002). Miell's counsel stated that he had just learned of this fact and needed additional time to look at the documentation on the ground that there might be exculpatory evidence. The transcript of the January 3, 2009, plea hearing reflects the following representation:

> MR. BROWN: Your Honor, I'm in a parking lot in Perry, Iowa, right now, and all I know is Saturday I get faxed documentation that reflects that there was involvement with the IRS and there was a tax levy and a garnishment, and [Miell's] represented to me that this was the end result of the audit for those tax years, that there was some underpayment of withholding tax. That was the final conclusion. He further believes—at least I make the professional statement that he believes that the auditor had access to this Guarantee Bank accounts and the Guarantee Bank accounts is where the AIF [sic] monies went into for the respective years. So those are the principal things we were going to investigate.

Relying on this representation, I granted Miell's motion to continue the trial indefinitely.

On January 5, 2009, I convened two telephone conferences. In the first teleconference, which was scheduled at the prosecution's request, the prosecution asserted that there was no audit of Miell on the tax years at issue in this case, so that a continuance on that basis was unfounded. During this teleconference call, Miell's attorney represented that Miell had provided counsel with tax lien documents, which Miell represented to be the culmination of the audit. In addition, defense counsel represented that Miell told counsel that the IRS had, during the audit, obtained copies of deposit tickets that would have disclosed the income that the government alleged that Miell failed to report to the IRS. Defense counsel claimed the deposit tickets in the IRS's possession would be exculpatory evidence. I ordered Miell to provide the prosecution and me with whatever documents he had supporting the allegation that he was audited, and I scheduled a follow-up phone conference for later in the day. During the second teleconference, the prosecutor

demonstrated to my satisfaction that Miell had never been audited, that the tax lien documents that he had provided dealt with employee withholding taxes, not his income tax, and that the liens covered years other than the two at issue in the criminal case. Accordingly, I scheduled trial on the remaining counts for January 8, 2009.

Miell's false statement to the court, made through his attorney, required the prosecutor to conduct a further investigation into the false claim and caused the court to waste resources by conducting hearings and entering orders scheduling and rescheduling the trial on the tax charges.

### b.     Other deceptive conduct not considered relevant conduct

Miell was convicted of filing false tax returns for failing to report the income that he obtained from the insurance fraud scheme. He also pleaded guilty to engaging in a damage deposit scheme whereby he obtained income in the form of unlawfully retained damage deposits from 2000 through 2007. However, Miell did not report any of the proceeds of his damage deposit fraud scheme as income on his tax returns, nor was this conduct taken into account in **Counts 22** and **23** of the Third Superseding Indictment.

In addition, the prosecution advised the probation officer that, in preparing for trial, it became aware that Miell's tax returns were materially false in several other ways. First, Miell failed to report income from some properties that he owned during 2001 and 2002. Second, he produced to the United States a document purporting to show his revenue for the two years in question, but this document reports income substantially in excess (by approximately $3.5 million) of that he reported to the Internal Revenue Service. It appears that Miell substantially under-reported his income by failing to report other miscellaneous income he received in the form of laundry machine revenue, late fees, pet fees, service fees, and the like. This revenue appears on Miell's document, generated by his staff from information contained in his computers, but again, was never reported to the Internal

Revenue Service.

Furthermore, Miell's testimony in AFI's civil case, both in the deposition and at trial, contained additional false statements for which no perjury charges were brought. The core of Miell's theory of defense in the civil trial and criminal trial, as to the charges arising from the insurance fraud scheme, was that he was given a one-year deadline in which to complete all repairs. Miell persisted in asserting this supposed one-year deadline for repairs, even in his allocution at sentencing. Miell admitted sending false documents to AFI, but claimed he acted in good faith, because it was simply impossible to complete the repairs in the time frame provided. Miell first made this claim of a one-year deadline during his deposition in AFI's civil case. He repeated this claim throughout his deposition testimony and trial testimony in that case. He produced two documents he claimed that AFI sent him setting forth the deadline. The documents actually referred to single-family homeowners' policies and did not reference the hail storm. Instead, they referenced a different time frame, and AFI provided the documents to Miell by mistake in the discovery file during AFI's civil case. Miell's insurance policy clearly set forth that he had a "reasonable" time frame to repair his roofs. Approximately six months before the hail storm, AFI had sent Miell documents in reference to unrelated roof damage from a falling tree limb that, in pertinent part, emphasized that Miell had a "reasonable" time period to repair the roof. AFI even enclosed a highlighted copy of Miell's insurance policy to make clear this time frame for repairs. At the civil jury trial, AFI employees and the AFI agent testified that Miell did not have a one-year deadline. While the AFI agent initially told Miell that he had such a deadline, the agent testified that he clarified the matter with AFI and informed Miell that he was not under any deadline. Thus, Miell has clung to his assertion that he had a one-year deadline to effect repairs long after that defense was

manifestly untenable—even assuming, for the sake of argument, that the existence of a one-year deadline could stand as any defense to his criminal conduct.

## B.  Procedural Background

### 1.  Charges, guilty pleas, and convictions

Miell was first charged in this case in an Indictment (docket no. 1) handed down November 11, 2007, but the charges ultimately at issue are in a Third Superseding Indictment (docket no. 72) handed down October 21, 2008.  In the Third Superseding Indictment, **Counts 1** through **18** charged Miell with "mail fraud" allegedly arising from the insurance fraud scheme (**Counts 1** through **6**)[7] and the damage deposit fraud schemes (**Counts 7** through **18**);[8] **Counts 19** through **21** charged Miell with "perjury";[9] and

---

[7]**Counts 1** through **6**, which allegedly arose from the "insurance fraud scheme," charged that, for the purpose of executing and attempting to execute the insurance fraud scheme and to obtain money by means of false and fraudulent pretenses and representations, Miell knowingly caused six items or sets of items—checks from AFI—to be delivered by the United States Postal Service according to the directions thereon, all in violation of 18 U.S.C. § 1341

[8]**Counts 7** through **18**, which allegedly arose from a "damage deposit fraud scheme," charged that, for the purpose of executing and attempting to execute the damage deposit fraud scheme, Miell knowingly caused eleven items—damage deposit notice to former tenants—to be placed in an authorized depository for mail matter and to be sent and delivered by the United States Postal Service according to directions thereon, all in violation of 18 U.S.C. § 1341.

[9]**Count 19** charged "perjury in deposition," based on an allegedly false statement by Miell in a deposition on April 26, 2006, in AFI's civil case to the effect that Miell had not signed the name "J.J. McManus" to a billing invoice, when he had done so, all in violation of 18 U.S.C. § 1621.  **Count 20** charged "perjury before the court," based on allegedly false testimony by Miell, on or about January 8, 2008, in the trial of a civil

(continued...)

Counts **22** and **23** charged Miell with "filing false tax returns."[10]

On January 3, 2009, just prior to trial, Miell pleaded guilty to **Counts 1** through **20**, the mail fraud charges and two of the perjury charges, with the third perjury charge, in **Count 21**, to be dismissed at a later date. The prosecution did, indeed, move to dismiss **Count 21** on January 6, 2009, *see* docket no. 111, and I granted that motion and dismissed **Count 21** without prejudice on January 7, 2009, *see* docket no. 112. Thus, Miell proceeded to trial on January 8, 2009, in Sioux City, Iowa, only on the charges of filing false tax returns in **Counts 22** and **23**. On January 9, 2009, the jury handed down a Verdict, *see* docket no. 119, finding Miell guilty of both charges of filing false tax returns.

At least initially, Miell remained on release after his conviction to await sentencing.

---

[9](...continued)
action, to the effect that Miell had power of attorney to sign J.J. McManus's name, when he did not have such power of attorney, all in violation of 18 U.S.C. § 1623. **Count 21** also charged "perjury before the court," based on allegedly false testimony by Miell, on or about January 8 or 9, 2008, also in the trial of AFI's civil case, that checks from AFI for replacement cost value were not mailed through the United States Postal Service to Miell's office address, but collected by Miell from his AFI agent's office, when the checks had been mailed to Miell's office address, all in violation of 18 U.S.C. § 1623.

[10]**Counts 22** and **23** charged Miell with filing "false tax returns." **Count 22** charged Miell with willfully filing a false tax return for calendar year 2001, based on failure to declare as income funds received from AFI, when in truth, and as Miell then and there well knew and believed, he had obtained those funds through fraudulent means and they were not used for their intended purpose and, therefore, constituted taxable income, all in violation of 26 U.S.C. § 7206(1). **Count 23** charged Miell with willfully filing a false tax return for calendar year 2002, based on failure to declare as income funds received from AFI, when in truth, and as Miell then and there well knew and believed, he obtained those funds through fraudulent means and they were not used for their intended purpose and, therefore, constituted taxable income, all in violation of 26 U.S.C. § 7206(1).

### 2.     Post-trial proceedings

Post-trial proceedings in this criminal case have been protracted by Miell's bankruptcy proceedings, complicated issues of restitution,[11] and, most recently, by replacement of Miell's defense counsel after prior counsel were allowed to withdraw in the midst of the September 2009 installment of Miell's sentencing hearing.   Important landmarks in the post-trial proceedings are set out below.

### a.     Revocation of release

One pertinent matter for present purposes is that, on May 8, 2009, the prosecution filed a motion (docket no. 137) alleging that Miell had violated the conditions of his release in several respects and requesting revocation of his bond and his immediate detention. After a hearing on May 20, 2009, and supplemental briefing from the parties, a magistrate judge of this court concluded that Miell had failed to prove by clear and convincing evidence that he was not likely to flee.  Specifically, the magistrate judge found that Miell has substantial personal wealth; that he is facing a lengthy prison sentence as a result of his conviction; that he had contact with a convicted felon that was more than a mere technical violation of his terms of release and, instead, involved Miell taking steps to hide the source of a personal loan that he had received from the convicted felon; and that the prosecution had offered evidence that Miell had either lied or had withheld important information from the probation officer who was preparing Miell's Presentence Investigation Report. Therefore, the magistrate judge ordered Miell detained pending sentencing.  *See* Detention Order (docket no. 153).

On July 6, 2009, I denied Miell's appeal of the detention order.  *See United States v. Miell*, 2009 WL 1956451 (N.D. Iowa July 6, 2009).  Specifically, on *de novo* review,

---

[11]Again, restitution was ultimately resolved by an agreement of the parties.

I found that Miell had failed to establish by clear and convincing evidence that he is not likely to flee, in light of evidence that he faced a substantial term of imprisonment, providing a motive to take flight; that he has the type of substantial wealth that could finance a flight from justice; that he has access to substantial sums of cash as a result of his rental properties; that he has not accounted for significant amounts of cash that he has received since September 2008, when he stopped making payments on his mortgages; that he had obtained cashier's checks in the amount of $105,000, but had not established what happened to those funds; and that he had obtained a substantial loan from a convicted felon, Ron Kelley, then took steps to conceal the source of the loan.   Therefore, I ordered Miell detained pending sentencing.   *See* Order Regarding Defendant's Appeal Of Detention Order (docket no. 160).

### b.      *The first sentencing hearing*

Miell's sentencing hearing was eventually scheduled for September 2, 2009, in Cedar Rapids, Iowa.   On August 13, 2009, the prosecution filed a lengthy Sentencing Brief (docket no. 174), and included therein a section entitled "Motion For Upward Departure." On August 20, 2009, the prosecution filed a separate Motion For Upward Departure (docket no. 175).   In support of its motion for upward departure, the prosecution argued that Miell's criminal conduct far exceeded what was necessary to establish his guideline offense level, citing U.S.S.G. § 5K2.0; that Miell committed offenses to conceal other crimes, citing U.S.S.G. § 5K2.8, but presumably intending to cite U.S.S.G. § 5K2.9; and that Miell's offense level fails to account for the dismissed "perjury" charge, citing U.S.S.G. § 5K2.21

On August 26, 2009, Miell's former counsel filed a Motion For A Downward Departure (docket no. 182).   In his motion, Miell asserted that his objections to the PSIR, which he incorporated by reference, warranted a downward departure.   He argued,

further, that what he called "a downward departure" is supported by the factors listed in 18 U.S.C. § 3553(a). On August 31, 2009, Miell filed both a Response Sentencing Brief (docket no. 183) and a Resistance To The Government's Motion For An Upward Departure (docket no. 184).

I held what turned out to be only the first installment of Miell's episodic sentencing hearing as scheduled on September 2 and 3, 2009, in Cedar Rapids, Iowa. At the hearing, the prosecution presented documentary evidence and the testimony of the following witnesses: Jeff McGuire, an IRS special agent; Leah Swicegood, an IRS employee; Masami Knox, a United States Postal Inspector; Brent Gast, from America Family Insurance; Doug Graham, a former tenant; Brett Emig, a former employee; Tabitha Emig, a former employee; Ron Kelley, a former business partner and friend; Gary Van Cura, a Linn County Deputy Sheriff and a friend of Miell's; John Matthew McManus; and Kerry Bolt, a forensic fraud examiner. Miell presented further testimony of Tabitha Emig, as his witness, and testimony of additional witnesses Jacqueline (Jackie) Varner and Julie Walker, both former employees. I also heard victim allocutions from Patty Carlson and Janet Fuller. At the end of the day on September 3, 2009, however, a dispute developed between Miell and his attorneys as to whether or not he had ever been allowed to review the PSIR. I granted the oral motions of Miell's attorneys to withdraw; gave Miell thirty days to seek retained counsel or to request appointed counsel; left the record open for new counsel to file new objections to the PSIR and for the presentation of further evidence; gave the prosecution a deadline to file further briefing on "intended loss"; and continued the sentencing hearing until a date to be determined later.

### c.   *Filings and proceedings between sentencing hearings*

By Order (docket no. 191), dated October 13, 2009, United States Magistrate Judge Jon S. Scoles set a hearing for October 16, 2009, on whether Miell was eligible for court-appointed counsel.  At the hearing on October 16, 2009, Miell was granted an additional two-week continuance, until October 30, 2009, for purposes of retaining counsel. *See* Hearing Minutes (docket no. 194); Order (docket no. 195).  At a further hearing on October 30, 2009, Miell was granted a further two-week continuance, to November 13, 2009, to determine whether counsel that he had contacted was willing to appear after reviewing transcripts.  *See* Hearing Minutes (docket no. 196); Order (docket no. 197). After a hearing on November 13, 2009, Judge Scoles found that no attorney had yet appeared for Miell, so he appointed an attorney from the CJA panel to represent Miell, with the caveat that, because Miell reported that funds were available to retain counsel, Miell would be required to reimburse the government for the cost of court-appointed counsel.  *See* Hearing Minutes (docket no. 199); Order (docket no. 200).  On November 19, 2009, Miell's current counsel, Alfredo Parrish, entered an Appearance (docket no. 202).

That was not the end of the problems with Miell's representation, however. Apparently still not satisfied with his representation, Miell filed, on April 23, 2010, a *pro se* Motion To Dismiss Attorney (docket no. 233).  Judge Scoles heard that motion on May 4, 2010, *see* Hearing Minutes (docket no. 238), and entered an Order (docket no. 239) on May 5, 2010, denying that motion.  On May 27, 2010, Miell filed a *pro se* Motion To Appeal Magistrate Jon Scoles['s] Denial Of Motion To Dismiss Counsel (docket no. 249), and a *pro se* Supplement (docket no. 256) on June 4, 2010.  By Order (docket no. 264), dated June 15, 2010, I affirmed Judge Scoles's order denying Miell's *pro se* motion to dismiss his attorney.  Miell filed another *pro se* Supplement (docket no. 269) to his motion

to dismiss counsel on June 18, 2010, apparently unaware that I had denied the motion in question on June 15, 2010.

Miell filed or attempted to file numerous other motions and supplements *pro se*, notwithstanding that he was represented by counsel. Eventually, on June 15, 2010, I entered an Order (docket no. 265) finding that Miell is not entitled to "hybrid" representation, so that I would not consider his *pro se* motions, with the exception of his *pro se* appeal of Judge Scoles's denial of his motion to dismiss attorney, and that the prosecution need not respond to any *pro se* motion filed by Miell. I permitted Miell to file *pro se* motions with the Clerk of Court in order to allow him to make a record, however. Miell continued to make numerous *pro se* filings, which I have never reviewed.

Also between the sentencing hearings, Miell, through new counsel, filed on March 11, 2010, his Motion To Withdraw Guilty Pleas To Counts 1 Through 20 (docket no. 217), on the grounds (1) that I violated Rule 11 of the Federal Rules of Criminal Procedure, by failing to inform Miell of the possibility of consecutive sentences, applicable forfeiture, or the court's authority to order restitution, and (2) that trial counsel was ineffective in preparing for trial and advising him regarding his guilty pleas. The prosecution filed a Resistance (docket no. 219) to that motion on March 17, 2010. I held an evidentiary hearing on the motion on March 31, 2010, *see* Hearing Minutes (docket no. 228), and entered a Memorandum Opinion And Order (docket no. 240) on May 10, 2010, denying the motion. *See United States v. Miell*, ___ F. Supp. 2d ___, 2010 WL 1904605 (N.D. Iowa May 10, 2010). On June 3, 2010, Miell filed a *pro se* Notice Of Appeal (docket no. 252) of the denial of his motion to withdraw his guilty plea. On July 2, 2010, the Eighth Circuit Court of Appeals issued an Order (subsequently filed in this case on July 12, 2010, as docket no. 279), finding that Miell had failed to pay the required docketing fees for his interlocutory appeal and granting him fourteen days to show cause why the

46

appeal should not be dismissed for failure to prosecute.  On July 23, 2010, the Eighth Circuit Court of Appeals issued a Judgment (docketed in this case as docket no. 287) dismissing Miell's interlocutory appeal for lack of jurisdiction.  A Mandate from the Eighth Circuit Court of Appeals issued on August 13, 2010 (docketed in this case on August 16, 2010, as docket no. 300).

The parties filed various additional sentencing briefs between the sentencing hearings.  On September 11, 2009, the prosecution filed a Supplemental Sentencing Brief (docket no. 190) concerning determination of loss amount for the damage deposit fraud scheme.  On March 2, 2010, the prosecution also filed a Second Supplemental Sentencing Brief (docket no. 215), concerning the impact of additional Summary Of Move-Out Work forms, discovered in the execution of a search warrant at Miell's house after the first installment of the sentencing hearing, on the loss calculation for the damage deposit fraud scheme.  On August 10, 2010, the prosecution filed its Third Supplemental Sentencing Brief (docket no. 294), in response to Miell's objections, by new counsel, to the Final PSIR developed between installments of the sentencing hearing.  On August 12, 2010, Miell filed his Second Sentencing Memorandum (docket no. 296), through new counsel, setting out his arguments for the August 2010 installment of his sentencing hearing, specifically, as to loss amount for both fraud schemes and the appropriateness of a variance below the advisory guidelines range.

Also, in part in response to the problems with disclosure of the pertinent PSIR to Miell that led to replacement of counsel after the September 2009 installment of the sentencing hearing, new counsel sought (docket no. 260) and I authorized (docket no. 263) disclosure of a draft PSIR to Miell, but without victim impact statements.  Subsequently, new counsel also sought (docket no. 297) and I authorized (docket no. 298) disclosure of

the Final PSIR to Miell, allowing him to keep a copy in his sole possession, that is, without counsel present, while in the county jail, but without the victim impact statements.

### d.    *The second sentencing hearing*

I held the second installment of Miell's episodic sentencing hearing, nearly a year after the first, on August 17 and 18, 2010. At that hearing, the prosecution presented no witnesses, but did offer numerous exhibits. Miell's counsel called Gary Holsinger, a long-time friend of Miell's; June Locke, Miell's sister; and Marilyn Miell, Miell's mother. At Miell's insistence, his counsel also called and questioned Jacquelyn (Jackie) Varner, a former employee, using questions that Miell had been given an opportunity to write out during a brief recess. During the afternoon of August 17, 2010, and continuing on the morning of August 18, 2010, and against counsel's advice, Miell gave a rambling allocution, lasting approximately five hours over two days, in which he, *inter alia*, continued to deny that he engaged in any fraud schemes whatsoever and impugned the integrity of his prior attorneys in his civil and criminal cases and the attorneys in the United States Attorney's Office. He also asserted that the Iowa Real Estate Commission had given him a letter exempting him from the requirement to hold tenant deposits in a separate trust fund, because he had sufficient unencumbered assets.

At the conclusion of the hearing, Miell also reoffered, without objection, a transcript of a recording, previously filed on July 7, 2010, of a conversation on April 16, 2009, in his office during which he dismissed one of his trial attorneys. Miell also received leave to supplement the sentencing record to include the transcript of the deposition testimony of Jennifer Gideon, which was used in the trial of AFI's civil case and some other exhibits from the AFI trial. I also granted the parties leave to file post-hearing briefs. I also indicated during the sentencing hearing that I intended to leave the

record open, enter a written ruling on all contested legal and factual issues, then return to Cedar Rapids to impose sentence at a final hearing.

### e.   Post-hearing matters

By Order (docket no. 305), filed August 26, 2010, I set the completion of Miell's sentencing hearing for September 27, 2010.  On September 1, 2010, the prosecution filed its Fourth Supplemental Sentencing Brief (docket no. 306), to correct certain exhibit numbers and to address Miell's contention that he had an exemption from the requirement to segregate tenant security deposits in a separate bank account.  On September 7, 2010, Miell filed a Notice To The Court Re:  Sentencing Hearing (docket no. 307) requesting that the court add to the record the following exhibits:  Jennifer Gideon's videotape deposition and transcript; a faxed letter from Miell to AFI agent Bret Throlson asking for more time to complete hail-damage repairs; and a transcript of Miell's meeting with his prior attorneys on April 16, 2009.

With these submissions, the sentencing record was closed.  This decision was filed just shortly before the completion of Miell's sentencing hearing on September 27, 2010.

## II.  LEGAL ANALYSIS

### A.  The Methodology For Determination Of A Sentence

The Eighth Circuit Court of Appeals recently reiterated the methodology for determination of a defendant's sentence in the wake of *Gall v. United States*, 552 U.S. 38 (2007), as follows:

> The district court should begin by correctly calculating the applicable Guidelines range. The Guidelines should be the starting point and the initial benchmark, but the Guidelines are not the only consideration. The district judge should allow both parties an opportunity to argue for whatever sentence they

> deem appropriate, and then should consider all of the [28
> U.S.C.] § 3553(a) factors to determine whether they support
> the sentence requested by a party.

*United States v. Hill*, 552 F.3d 686, 690 (8th Cir. 2009); *see also United States v. Townsend*, ___ F.3d ___, ___, 2010 WL 3341249, *2 (8th Cir. Aug. 26, 2010) (quoting *Hill*, 552 F.3d at 690). More specifically, the Eighth Circuit Court of Appeals has established a three-step sentencing process:

> The first step in the sentencing process is to determine the
> proper guidelines range for the defendant's sentence. *Gall v.
> United States,* ---U.S. ----, 128 S. Ct. 586, 596, 169 L. Ed. 2d
> 445 (2007); *[United States v.] Thundershield,* 474 F.3d [503,]
> 506-07 [(8th Cir. 2007)]. A court should then consider
> whether a departure or a variance is appropriate and apply the
> factors in 18 U.S.C. § 3553(a). *Gall,* 128 S. Ct. at 596-97;
> *Thundershield,* 474 F.3d at 506-07.

*United States v. Roberson*, 517 F.3d 990, 993 (8th Cir. 2008); *United States v. Rivera*, 439 F.3d 446, 447 (8th Cir. 2006) ("In *United States v. Haack,* 403 F.3d 997, 1002-03 (8th Cir. 2005), we outlined the procedure a district court is to follow in imposing a post-*Booker* sentence. First, the district court should determine the Guidelines sentencing range. Second, the district court should determine whether any traditional departures are appropriate. Third, the district court should apply all other section 3553(a) factors in determining whether to impose a Guidelines or non-Guidelines sentence.").

Although "a court of appeals may apply a presumption of reasonableness when conducting substantive review of a sentence within the advisory range, 'the sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply.'" *United States v. Henson*, 550 F.3d 739, 740 (8th Cir. 2008) (quoting *Rita v. United States*, 551 U.S. 338, ___, 127 S. Ct. 2456, 2465 (2007)). The Supreme Court has recently reiterated this point, noting that "[o]ur cases do not allow a sentencing court to

presume that a sentence within the applicable Guidelines range is reasonable," and that "[t]he Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable." *Nelson v. United States*, 129 S. Ct. 890, 892 (2009) (*per curiam*) (emphasis in the original).

As the Eighth Circuit Court of Appeals has also explained,

> Under *Gall,* we may no longer require extraordinary circumstances to justify a sentence outside the Guidelines range. *Gall,* 128 S. Ct. at 595. However, "a district judge must give serious consideration to the extent of any departure from the Guidelines and must explain his conclusion that an unusually lenient or an unusually harsh sentence is appropriate in a particular case with sufficient justifications." *Id.* at 594. If, after an "individualized assessment based on the facts presented," the district court "decides that an outside-Guidelines sentence is warranted, [the district court] must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Id.* at 597. It is "uncontroversial that a major departure should be supported by a more significant justification than a minor one." *Id.* "[A]n abuse of discretion may occur when (1) a court fails to consider a relevant factor that should have received significant weight; (2) a court gives significant weight to an improper or irrelevant factor; or (3) a court considers only the appropriate factors but in weighing those factors commits a clear error of judgment." *United States v. Haack,* 403 F.3d 997, 1004 (8th Cir. 2005) (internal quotation marks and citation omitted). *See also Gall,* 128 S. Ct. at 597.

*United States v. Kane*, 552 F.3d 748, 752 (8th Cir. 2009).

Finally, the court may consider consecutive sentences to achieve what the court deems to be the appropriate total punishment. For example, the Eighth Circuit Court of Appeals has recognized, in a case involving conviction on multiple child pornography

counts, that a sentencing court could effectuate a life sentence under the advisory guidelines, in excess of the statutory maximum sentence of 20 years for any one count. *See United States v. Betcher*, 534 F.3d 820, 827 (8th Cir. 2008). The appellate court found that, after the sentencing court had given due consideration to the sentencing factors set out in 18 U.S.C. § 3553(a) and had recognized that the guidelines were advisory, the sentencing court had permissibly imposed consecutive statutory maximum sentences on all counts to ensure that the defendant served a term of lifetime imprisonment, as the Sentencing Guidelines advised. *Id.*; *see also United States v. Saddler*, 538 F.3d 879, 892 (8th Cir. 2008) ("Because each offense would have a statutory maximum of twenty years' imprisonment and because a district court may 'run sentences from multiple counts consecutively, rather than concurrently, if the Guideline sentence exceeds the statutory maximum sentence for each count,' the statutory maximum for both offenses if run consecutively was forty years' imprisonment.") (quoting *United States v. Zimmer*, 299 F.3d 710, 725 (8th Cir. 2002), with quotations omitted, and also citing U.S.S.G. § 5G1.2(d)); U.S.S.G. § 5G1.2(d) ("If the sentence imposed on the count carrying the highest statutory maximum is less than the total punishment, then the sentence imposed on one or more of the other counts shall run consecutively, but only to the extent necessary to produce a combined sentence equal to the total punishment. In all other respects, sentences on all counts shall run concurrently, except to the extent otherwise required by law."). Similarly, in *United States v. Jordan*, 435 F.3d 693 (7th Cir. 2006), the Seventh Circuit Court of Appeals affirmed a district court's imposition of consecutive sentences at the statutory maximum for each offense, even though the resulting sentence exceeded the advisory guidelines maximum sentence by 103 months. The court in *Jordan* stated that, "[b]y any measure, the sentence represents a significant upward variance from the advisory guidelines range," but nevertheless concluded that such a variance was justified by the

sentencing court's evaluation of the § 3553(a) factors. *Jordan*, 435 F.3d at 697. Thus, the sentencing court may use consecutive sentences on multiple counts to impose the sentence that the court considers to be appropriate in light of the § 3553(a) factors, notwithstanding either advisory guidelines or statutory maximum sentences.

### B.  Determination Of The Guideline Sentence

#### 1.    Miell's guidelines objections

The first step in the sentencing process is to determine the proper advisory guidelines range for the defendant's sentence. *Roberson*, 517 F.3d at 993; *Rivera*, 439 F.3d at 447. Miell made various objections to the guidelines calculations in the draft of the PSIR available before the September 2009 sentencing hearing[12] and reiterated some of those objections and added new ones to the Final PSIR made available before the August 2010 sentencing hearing.

Somewhat more specifically, Miell's objections to the Final PSIR, not already resolved in my recitation of the factual background, are the following:  that he did not engage in any conduct amounting to obstruction of justice; that the amount of time and

---

[12]Miell argued that there was minimal or no loss to AFI from the purported insurance fraud scheme, and that AFI cannot be considered a "victim," in the true sense of the word, because AFI's conduct caused him to make RCV claims prematurely and AFI has been recompensed more than the amount of the premature RCV payments through the judgment in its civil case; that the prosecution had widely inflated the number of victims and the amount of loss in the damage deposit fraud scheme; that there was no significant obstruction of justice from destruction of property files, even if the destruction of the files could be attributed to Miell, because the records in question were readily available to the government in computer records; Miell did not mislead or lie to his attorneys to try to obtain a continuance of trial; and the majority of the conduct that the prosecution argued warranted an upward departure had already been taken into account in the Sentencing Guidelines, so that this case actually falls in the "heartland" of cases of this type.

resources he saved the prosecution by pleading guilty to 20 counts warrants an adjustment or downward departure for acceptance of responsibility; that the 2007 edition of the Guidelines should be used; that AFI did not suffer any loss greater than $200,000 from the insurance fraud scheme, so that there should be no adjustment for amount of loss on **Counts 1** through **6**; that he did not use any "sophisticated means" in carrying out the insurance fraud scheme, nor was the conduct involved in that scheme so complicated that it resulted in a "substantial interference" with the administration of justice; that any intended loss from the damage deposit fraud scheme should be limited to amounts above what he could have legitimately claimed for cleaning and repairs, so that the prosecution's expert has widely miscalculated the intended loss from that scheme; that the damage deposit fraud scheme did not involve anywhere near 250 victims; that the damage deposit fraud scheme also did not involve "sophisticated means"; that the damage deposit fraud scheme did not involve abuse of a position of trust; that the perjury charge in **Count 20** was not a complicated and complex case and did not result in a "substantial interference" with the administration of justice; that the PSIR incorrectly determined the amount of loss on the tax counts and that the loss in any year exceeded $10,000; and, ultimately, that the Final PSIR incorrectly calculates the Total Offense Level, which should be closer to 14, resulting in an advisory guidelines range of 15 to 21 months and a fine range of $4,000 to $40,000.

Miell's new counsel adopted prior counsel's arguments, as follows:  that the prosecution has not established under **Counts 1** though **18** that there should be adjustments (or upward departures) under the advisory Guidelines for loss amount, sophisticated means, obstruction of justice, number of victims, and abuse of position of trust; that, regarding **Counts 19** and **20**, there should be no adjustments (or upward departures) for interference with the administration of justice and obstruction of justice; that, for **Counts**

**22** and **23**, the tax loss amount is incorrect and that the enhancement for loss exceeding $10,000 in any one year is inapplicable; and that, for all counts, increases for obstruction of justice and the lack of any reductions for acceptance of responsibility are inappropriate. Miell's new counsel actually briefed only two guidelines calculation issues before the August 2010 installment of the sentencing hearing, both relating to the amount of loss from the fraud schemes. *See* Defendant's Second Sentencing Memorandum (docket no. 296).

I turn next to consideration of these objections and other matters pertinent to the calculation of Miell's advisory sentencing guidelines range.

> **2.**  *Analysis*

> > **a.**  ***Edition of the Sentencing Guidelines***

One of Miell's objections is that, because his last conduct for the offenses of conviction was in 2007, the 2007 edition of the Guideline Manual should be used. I agree with the probation officer, however, that U.S.S.G. § 1B1.11 directs the court to use the Guideline Manual in effect on the date that the defendant is sentenced, unless the court determines that use of the Guidelines Manual in effect on the date that the defendant is sentenced would violate the *ex post facto* clause of the United States Constitution. In the event of a violation of the *ex post facto* clause of the United States Constitution, the court is directed to use the Guidelines Manual in effect on the date that the offense of conviction was committed. The U.S. Probation Office has not identified a violation of the *ex post facto* clause of the United States Constitution, nor has Miell; therefore, the Guidelines Manual in effect at the time of sentencing was used. Here, because Miell's sentencing began in 2009, I have used the 2009 edition of the Guidelines Manual.

### b.     Grouping

Miell did not adopt or reiterate, in any argument or objection by new counsel, any of prior counsel's objections to the "grouping" of the offenses for purpose of Sentencing Guidelines calculations.  Therefore, I find that any objection to "grouping" of the offenses is waived, and I adopt the "grouping" of the offenses in the Final PSIR, as follows.

As "Group 1," I have grouped **Counts 1** through **6**, the mail fraud counts arising from the insurance fraud scheme, as one closely-related group because the counts involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan.  U.S.S.G. § 3D1.2(b).  **Count 19**, the first perjury charge, is grouped into one closely-related group with **Counts 1** through **6** pursuant to U.S.S.G. § 3C1.1, comment. (n. 8) and § 3D1.2(c). The offense level for each count within the group was calculated to determine the highest offense level and the count with the highest offense level was used as the offense level for the group. U.S.S.G. § 3D1.3(a).[13]

---

[13]As the probation officer explains,

> Absent objection, the probation office discovered an error in the guideline calculation of Counts 1 through 6 and Counts 19 and 20.  Pursuant to USSG §3C1.1, comment. (n. 8), if the defendant is convicted both of an obstruction offense (Perjury) and an underlying offense (the offense with respect to which the obstructive conduct occurred), the count for the obstruction offense will be grouped with the count for the underlying offense under subsection (c) of §3D1.2 (Groups of Closely Related Counts).  The offense level for that group of closely related counts will be the offense level for the underlying offense increased by the two-level adjustment specified by this section, or the offense level for the obstruction offense, whichever is greater.  However, USSG §2J1.3(d)(1) directs

(continued...)

As "Group 2," I have grouped **Counts 7** through **18**, the mail fraud counts arising from the damage deposit fraud scheme, into one closely related group because the offense level is determined largely on the basis of the total amount of harm or loss, and the offense behavior is ongoing or continuous in nature and the offense guideline is written to cover such conduct.  U.S.S.G. § 3D1.2(d).  The offense level for each count within the group was calculated to determine the highest offense level and the count with the highest offense level was used as the offense level for the group.  U.S.S.G. § 3D1.3(a).

As "Group 3," I have only **Count 20**, the second perjury charge, because that offense is not groupable under U.S.S.G. § 3D1.2, pursuant to U.S.S.G. § 2J1.3(d)(1).

Finally, as "Group 4," I have grouped **Counts 22** and **23**, the false tax returns counts, into one closely related group because the counts involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan.  U.S.S.G. § 3D1.2(b).  The offense level for each count within the group was calculated to determine the highest offense level and the count with the highest offense level was used as the offense level for the group.  U.S.S.G. § 3D1.3(a).

---

[13] (...continued)

>Counts 19 and 20 cannot be grouped because the conduct occurred during separate proceedings.  The final draft presentence report will be amended to reflect the appropriate grouping of Counts 1 through 6 with Count 19.  Count 20 will remain a separate Count Group.  This change impacted paragraphs 85, 87, 97(a) - 97(g), 107 - 112, and 127.  This change did not impact the recommended guideline calculations or the resulting advisory guideline range.

Final PSIR, ¶ 85.

Group 1 (**Counts 1** through **6** and **19**), Group 2 (**Counts 7** through **18**), Group 3 (**Count 20**), and Group 4 (**Counts 22** and **23**), do not group, because they involve different victims and the acts of fraud are not connected by a common criminal objective nor do they constitute part of a common scheme or plan.

### c.    *Amount of loss*

The most significant fighting issue for the determination of Miell's advisory guidelines sentencing range for Group 1 (mail fraud and perjury related to the insurance fraud scheme), Group 2 (mail fraud related to the damage deposit fraud scheme), and Group 4 (filing of false tax returns) is the amount of loss. Indeed, amount of loss accounts for the majority of the disparity between the Final PSIR's calculation of an advisory sentencing guidelines range of 168 to 210 months and Miell's contention that the proper advisory sentencing guidelines range is only 15 to 21 months.

As the Eighth Circuit Court of Appeals has explained,

> Under the Sentencing Guidelines, the offense level for fraud offenses increases based on the amount of the loss. *See* USSG § 2B1.1(b). "As a general rule, the amount of loss is the greater of actual loss or intended loss." *United States v. Parish*, 565 F.3d 528, 534 (8th Cir. 2009); *see* USSG § 2B1.1, comment. (n.2(A)). "Actual loss" is "the reasonably foreseeable pecuniary harm that resulted from the offense." USSG § 2B1.1, comment. (n.2(A)(i)). Intended loss is defined as "the pecuniary harm that was intended to result from the offense." *Id.* § 2B1.1, comment. (n. 2(A)(ii)). "The court shall use the gain that resulted from the offense as an alternative measure of loss only if there is a loss but it reasonably cannot be determined." *Id.* § 2B1.1, comment. (n.2(B)); *see Parish*, 565 F.3d at 534.

*United States v. Miller*, 588 F.3d 560, 565 (8th Cir. 2009). The Eighth Circuit Court of Appeals has also explained,

"The district court's method for calculating the amount of loss must be reasonable, but the loss need not be determined with precision." *United States v. McIntosh*, 492 F.3d 956, 960-61 (8th Cir. 2007) (internal marks and citations omitted). We will affirm the district court's calculation "unless it is not supported by substantial evidence, was based on an erroneous view of the law, or [we have] a firm conviction that there was a mistake after reviewing the entire record." *United States v. Theimer*, 557 F.3d 576, 578 (8th Cir. 2009) (citing *[United States v.] Fazio*, 487 F.3d [646,] 657-58 [(8th Cir. 2007)]). The government must prove the amount of loss attributable to a defendant by a preponderance of the evidence. *See United States v. Hansel*, 524 F.3d 841, 847 (8th Cir. 2008) (stating the government must prove the facts supporting a sentencing enhancement by a preponderance of the evidence); *McIntosh*, 492 F.3d at 961 (noting the burden is on the government to prove the loss attributable to a defendant).

*United States v. Hodge*, 588 F.3d 970, 973 (8th Cir. 2009); *see also United States v. Farrington*, 499 F.3d 854, 859 (8th Cir. 2007) ("The district court's loss determination does not have to be precise; the court only has to make 'a reasonable estimate' of the loss. *United States v. Agboola*, 417 F.3d 860, 870 (8th Cir. 2005); *[United States v.] Scott*, 448 F.3d [1040,] 1044 [(8th Cir. 20 06)]; U.S.S.G. § 2B1.1, cmt. n. 3(C).").

I will consider Miell's objections to the amount of loss determination in the Final PSIR as to each pertinent group in turn.

*i.* **Group 1 loss**. As to the mail fraud offenses in Group 1, arising from the insurance fraud scheme, Miell argues that there can be no enhancement for the amount of loss, because the actual loss to AFI was zero, and Miell did not intend to cause AFI any loss. He argues that he used the insurance proceeds to fix most if not all the damaged roofs and added his own money to complete the project. He asserts that these actions show he did not intend to deprive AFI of its money, but he used the money for the purpose

59

intended. Also, he contends that AFI has been compensated for its payments. He also argues that, because he fixed the roofs at a cost greater than the amount paid by AFI, he gained nothing by using the insurance money to fix the damaged roofs, citing U.S.S.G. § 2B1.1, comment n.3(B). Consequently, he argues that he is entitled to a credit to offset any loss finding, pursuant to U.S.S.G. § 2B1.1, comment n.3(E)(i).

The record shows that AFI paid $336,541.26 in RCV payments, to reimburse Miell for repair costs *that he had not incurred at the time that he claimed them*, and that Miell accomplished this by using fraudulent documents purportedly showing that he had already paid the repair costs. Thus, AFI suffered an "actual loss" from Miell's fraudulent conduct. *Miller*, 588 F.3d at 565. Even assuming that AFI might ultimately have been contractually required to pay the same amount for RCV payments, if Miell had submitted legitimate supporting documents after actually performing the repair work, Miell's contention that this fact means AFI suffered no loss simply misses the point. Indeed, Miell's argument is yet another example of his inability to accept responsibility for his fraudulent actions. Because the prosecution proved "actual loss," Miell's lack of any "gain" is irrelevant. *Cf. id.* at 567 (the defendant's "gain" is only an alternative estimate of loss, if actual or intended loss cannot be determined); U.S.S.G. § 2B1.1, cmt (n.2(b)) (directing the sentencing court to "use the gain that resulted from the offense as an alternative measure of loss only if there is a loss but it reasonably cannot be determined"). The 12-level upward adjustment to the offense level for the Group 1 offenses for loss in excess of $200,000 stands, and Miell's objection to it is overruled.

*ii.* ***Group 2 loss***. Miell argues that there can be no enhancement for loss on the damage deposit fraud scheme offenses in Group 2, because the actual loss is zero, and the prosecution has not proved that he intended to cause the tenants any loss. He contends there is no proof that every penny he retained from the damage deposits or the repair

60

and/or replacement bills was wrongfully retained and not legally owed him based on the tenant's damage, misconduct, or moving out early. He also points out that I gave little weight to the prosecution's expert's calculation of loss on this scheme at the September 2009 sentencing hearing.

In a brief filed after the September 2009 sentencing hearing, at which I professed myself thoroughly unimpressed with the prosecution's methodology for determining intended loss from the damage deposit fraud scheme, and again at the sentencing hearing in August 2010, the prosecution attempted to explain why it had been forced to rely on the calculations that so little impressed me during the September 2009 sentencing hearing. The prosecution explained that, in light of the limited information available, the prosecution had attempted to determine, in essence, how much money was in the bank at the time it was robbed, to determine how much money Miell intended to steal, as opposed to actual loss. The prosecution argued that the evidence showed that Miell's intent was to retain damage deposits in the vast majority of cases, if not all of the time. The indicia of this intent, the prosecution argued, are the commingling of deposits with other funds in violation of state law, and the systematic fabrication of summary moveout forms, when a tenant did move out, to inflate damages to exceed the tenant's damage deposit. The prosecution then adjusted that amount based on the percentage of damage deposits that Miell actually returned, as determined from the limited sampling of adequate files.

Subsequently, the prosecution executed a search warrant at Miell's house after learning that he had boxes of business documents stored there. The search resulted in the seizure of 21 bankers' boxes of rental property files. The prosecution has made new calculations in light of this additional information. The prosecution reiterates its argument that the evidence shows that Miell treated every damage deposit as income by diverting the deposits into his general revenue account, instead of segregating the deposits into a trust

account, as required by law.   Thus, the prosecution reiterates its prior argument that Miell's subjective intent was to keep every damage deposit, through fraudulent means, if necessary.   The prosecution argues that, starting by determining the total number of rental units during the relevant time period, determining the average amount of damage deposit, and factoring in the turnover rate and occupancy rates, there was a total of $1,448,530.88 in damage deposits during the relevant time period.   The prosecution then adjusted the total number to arrive at a more conservative estimate based upon its conclusion that Miell returned some portion of damage deposits 26% of the time.   The average amount of damage deposit returned on those occasions was $329.51.   Accordingly, when the prosecution subtracted the portion of damage deposits that Miell did return ($235,075.73) from the total damage deposits during the relevant time period, the result is $1,212,891.56.   The prosecution asserts that Miell intended to defraud tenants of damage deposits in this amount. The prosecution reiterates that these calculations were based upon an extrapolation from the still-limited documents in the prosecution's possession.   The prosecution argues that, using the same procedure in light of the additional evidence now available, the amount of loss would only increase.   Thus, the prosecution reiterates that its original calculation is a conservative estimate of the intended loss amount attributable to the damage deposit fraud scheme.

The prosecution also notes that an alternative methodology, looking not just to the amount of damage deposits that Miell sought to keep, but including the additional sums over and above the damage deposits that defendant intended to seek from tenants, results in an even higher total intended loss, on the order of $3,676,470, because Miell often sought sums from renters in excess of their damage deposits.   The prosecution argues that this loss amount would result in an 18-level increase from the base offense level, versus

the 16-level enhancement that would result if the loss amount for the damage deposit fraud scheme was, as the government has proposed, $1,212,891.56.

The prosecution argues that the more conservative approach is the more appropriate one, not only because it gives Miell the benefit of the doubt, but because it probably more accurately reflects his intent.  The prosecution argues that Miell demanded the exorbitant sums in excess of the damage deposits not because he realistically intended to seek those sums from his tenants, but probably because that demand acted to intimidate tenants from seeking return of their damage deposits.  The prosecution contends that tenants would have been reluctant to go to court to seek their damage deposits if they faced even the possibility of owing Miell thousands of dollars more.  In the end, Miell knew he would more likely be able to walk away with the tenants' deposits by claiming exorbitant expenses, even if he did not really intend to try to collect them.

In light of these arguments, the fighting issue is the applicability of the 16-level adjustment for loss of more than $1,000,000.  While I remain unimpressed with the low level of sophistication in the prosecution's expert's calculation of intended loss from the damage deposit fraud scheme, I acknowledge that loss does not have to be determined with precision and that a reasonable estimate will do.  *See Hodge*, 588 F.3d at 973; *Farrington*, 499 F.3d at 859.  I also acknowledge that "[t]he loss estimate may be based on the approximate number of victims multiplied by the average loss to each victim." *Id.* at 860 (citing U.S.S.G. § 2B1. 1, cmt. n. 3(C), and *Agboola*, 417 F.3d at 868).  The prosecution has made such an estimate, and the imprecision of that estimate is due, in large part, to the purging of the property files that Miell originally produced pursuant to subpoenas and what can only be described as concealment of more complete files at his residence, not discovered until execution of a search warrant at his residence after the September 2009 installment of the sentencing hearing.  I also agree with the prosecution that its estimate

63

of loss is conservative, particularly in light of the higher estimates resulting from more complete files from Miell's residence and the alternative method of calculating intended loss that the prosecution also offered.  I am also persuaded that the prosecution is correct that Miell intended to hold as much of each damage deposit as he possibly could, evident from the commingling of deposits with general income of Miell's business and the systematic attempts that Miell made to inflate claims against damage deposits, so that intended loss is the appropriate basis for the loss determination.  *See Miller*, 588 F.3d at 565 (loss is the greater of actual loss and intended loss and, where actual or intended loss cannot be determined, may be based on the defendant's gain).

Miell complains that he could have legally retained at least part of the damage deposits that he retained, based on the tenant's damage, misconduct, or moving out early, and that he is not being given proper credit for damage deposits that he did return.  Again, Miell misses the significance of the fraudulent conduct in which he engaged to retain damage deposits, including the use of forged documents and inflated repair claims, just as he misses the significance of his fraudulent conduct to obtain insurance benefits to which he might have been entitled, had he used legitimate means.  Where his claims against tenants' damage deposits were systematically tainted with fraud, it is difficult, if not impossible, to give him any credit for parts of his claims that might have been legitimate, if he had tried to assert those claims by legitimate means.  Also, the prosecution has attempted to calculate what percentage of damage deposits Miell did return.  Certainly, Miell has not offered any alternative method of calculating either actual or intended loss.

Thus, I am now persuaded that the prosecution has offered adequate proof by a preponderance of the evidence that the intended loss from Miell's damage deposit scheme

exceeded $1 million, so that the 16-level upward adjustment to the offense level for Group 2 is appropriate, and Miell's objection to this adjustment is overruled.[14]

  ***iii. Group 4 loss***. The base offense level for the charges of filing false tax returns in Group 4 is determined by the alleged tax loss. *See* U.S.S.G. § 2T1.1(c)(1)(A). Miell contends that the alleged tax loss of $94,080 is based on hearsay and does not have sufficient indicia of reliability to support its accuracy. However, I found, above, that the RCV payments that Miell failed to report totaled just over $336,000. As the probation officer found, using a tax rate of 28%, the tax loss from failure to report that income would be $94,080. I expressly reject Miell's hearsay and reliability objections.

  In a similar vein is Miell's objection to the 2-level upward adjustment for failure to report income exceeding $10,000 in any year from criminal activity, pursuant to U.S.S.G. § 2T1.1(b)(1), because he contends that it is based on hearsay. Again, I find that the tax loss in each year at issue, 2001 and 2002, has been properly calculated, based on sufficient and sufficiently reliable evidence.

  Therefore, these adjustments to the offense level for the tax charges in Group 4 stands, and Miell's objections to them are overruled.

  **d. *Number of victims***

  Meill also objects to the conclusion in the Final PSIR that there were 250 victims or more of the damage deposit fraud scheme, for purposes of determining the advisory guidelines sentencing range for Group 2, which would result in a 6-level increase in the offense level pursuant to U.S.S.G. § 2B1.1(b)(2)(C). As the probation officer points out, however, as of the date of the Final PSIR, 41 of the 313 victims referenced in a list of

---

[14]I also believe that, in light of my variance, the amount of loss is essentially a moot question. Even if the loss had been substantially lower, I would still have varied upward to a 240-month sentence in light of all the factors considered in this opinion.

victims of the damage deposit fraud scheme who had come forward or been located, shown in Attachment A to the Final PSIR, did not report a loss or had an unknown loss.  Thus, at least 272 victims reported suffering a loss because of Miell's damage deposit fraud scheme.  Again, Miell offers no alternative count.  I find that the prosecution has offered adequate proof that there were 250 or more victims of Miell's damage deposit fraud scheme, and that the 6-level upward adjustment to the offense level for Group 2 on that basis, is appropriate.  Miell's objection to the number of victims adjustment is overruled.

### e.   *Sophisticated means*

Miell objects to recommended level increases pursuant to U.S.S.G. § 2B1.1(b)(9) for using "sophisticated means" to commit the Group 1 offenses based on the insurance fraud scheme and the Group 2 offenses based on the damage deposit fraud scheme.  I overrule these objections.

Guideline Section 2B1.1(b)(9) provides for a two-level enhancement "for employing 'sophisticated means' in [a defendant's] fraudulent scheme." *United States v. Kieffer*, ___ F.3d ___, ___, 2010 WL 3528581, *9 (8th Cir. Sept. 13, 2010).

> Sophisticated means under § 2B1.1(b)(8)(C) are "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense."  U.S.S.G. § 2B1.1 cmt. n. 6(B).  The sophisticated-means enhancement is proper when the offense conduct, viewed as a whole, "was notably more intricate than that of the garden-variety [offense]." *United States v. Hance*, 501 F.3d 900, 909 (8th Cir. 2007).

*United States v. Jenkins*, 578 F.3d 745, 751 (8th Cir. 2009).   Such an increase is appropriate, if the defendant's scheme "'did not involve a single fraudulent act, but a complex series of fraudulent transactions.'" *Kieffer*, ___ F.3d at ___, 2010 WL 3528581 at *9 (quoting *United States v. Halloran*, 415 F.3d 940, 945 (8th Cir. 2005).  Moreover,

"'[r]epetitive and coordinated conduct, though no one step is particularly complicated, can be a sophisticated scheme.'" *Jenkins*, 578 F.3d at 751 (quoting *United States v. Finck*, 407 F.3d 908, 915 (8th Cir. 2005)).  The increase is also appropriate for a "multi-layered plot, akin to the use of corporate shells," *Kieffer*, ___ F.3d at ___, 2010 WL 3528581 at *9 (citing U.S.S.G. § 2B1.1, cmt. (n.8(b), concerning use of corporate shells), and *United States v. Waldner*, 580 F.3d 699, 706 (8th Cir. 2009)), or other conduct that made it difficult to verify false statements.  *Id.* (citing U.S.S.G. § 2B1.1, cmt. (n.8(b)), concerning use of fictitious names as an indicia of "sophisticated means").  It may also involve conduct, such as using forged signatures, forged notary stamps, and falsified or altered documents, to support the fraud.  *See Jenkins*, 578 F.3d at 751.

Miell contends that the insurance fraud scheme did not involve "sophisticated means," because the charged mail fraud offenses were not sophisticated and the conduct described would be inherent in the crimes themselves, would be subsumed in the base offense level, and would be subsumed in any loss amount.  Additionally, he contends that the conduct is being used to seek an obstruction of justice enhancement and upward departure, so that this enhancement is a form of double-counting.  I disagree.

In the execution of the insurance fraud scheme, Miell manufactured 145 fraudulent invoices from existing and nonexisting roofing companies.  He drafted checks to the roofing companies to support the invoices, but those checks never were cashed and never were intended to be cashed.  Instead, copies of both the invoices and drafted checks were submitted to AFI to support Miell's false claims that repairs had been made to his damaged properties.  This conduct occurred from December 2001 to December 2002.  Thus, Miell's conduct involved more than a single fraudulent act, it involved a complex series of fraudulent transactions.  *Kieffer*, ___ F.3d at ___, 2010 WL 3528581 at *9.  Even if each of the steps was not particularly complicated, the scheme as a whole involved repetitive

and coordinated conduct. *Jenkins*, 578 F.3d at 751. Indeed, because the scheme involved invoices from existing and nonexistent roofing companies, and phony records of payments to those companies, it was certainly a "multi-layered plot, akin to the use of corporate shells," *Kieffer*, ___ F.3d at ___, 2010 WL 3528581 at *9. Thus, I have no hesitation imposing an increase for use of "sophisticated means" for the mail fraud counts in Group 1 related to the insurance fraud scheme.

Miell also contends that the damage deposit fraud scheme did not involve "sophisticated means." Again, he argues that the conduct described would be inherent in the crime itself and subsumed in the base offense level and any loss amount. Additionally, he contends that the conduct is being used to seek an obstruction of justice enhancement, and upward departure, so that this enhancement is a form of double-counting. Again, I disagree.

Miell fabricated repair invoices from The Home Doctor and wrote checks to The Home Doctor, which were never cashed, to support his false claims, which he submitted during small claims hearings resulting in judgments against tenants. This scheme also took place over at least a six-year period and involved multiple victims. Miell also used forged signatures of John McManus on The Home Doctor invoices and forged signatures of R. Gordon Sargent to make it more complicated for renters to make complaints about their treatment. Thus, Miell's conduct in the damage deposit fraud scheme also involved more than a single fraudulent act, it involved a complex series of fraudulent transactions. *Kieffer*, ___ F.3d at ___, 2010 WL 3528581 at *9. Even if none of the steps was particularly complicated, the scheme as a whole involved repetitive and coordinated conduct. *Jenkins*, 578 F.3d at 751. Because the scheme involved invoices from a nonexistent home repair company, phony records of payments to that company, and fictitious names, it was certainly a "multi-layered plot, akin to the use of corporate shells,"

*Kieffer*, ___ F.3d at ___, 2010 WL 3528581 at *9.  Indeed, I believe that the use of forged signatures and falsified or altered documents to support the fraud is sufficient, standing alone, to warrant the increase.  *See Jenkins*, 578 F.3d at 751.  Thus, I have no hesitation imposing an increase for use of "sophisticated means" for the mail fraud counts in Group 2 related to the damage deposit fraud scheme.

### f.    Substantial interference with the administration of justice

Miell also objects to the recommended increase of his offense level for the perjury count in Group 1 (**Count 19**) and the perjury count in Group 3 (**Count 20**) for "substantial interference with the administration of justice" pursuant to U.S.S.G. § 2J1.3(b)(2).  I also overrule these objections.

Guideline Section 2J1.3(b)(2) provides, "If the perjury, subornation of perjury, or witness bribery resulted in substantial interference with the administration of justice, increase [the offense level] by **3** levels."  "An upward adjustment for substantial interference is warranted where the perjury necessitated 'the unnecessary expenditure of substantial governmental or court resources.'"  *United States v. Plumley*, 207 F.3d 1086, 1092 (8th Cir. 2000) (quoting U.S.S.G. § 2J1.3, comment. (n. 1)).  The unnecessary expenditure of substantial governmental or court resources includes additional preparation, investigation, and testimony that result from the perjured statement.  *Id.* at 1092-93 (citing *United States v. Sinclair*, 109 F.3d 1527, 1538-40 (10th Cir. 1997)); *see also Sinclair*, 109 F.3d at 1539 (noting that expenses associated with the underlying perjury offense should not form the basis for the upward adjustment).

As to **Count 19**, Miell's false testimony to the effect that the handwriting for John McManus's signature was not his resulted in the prosecutor locating John McManus, obtaining handwriting exemplars, and employing the services of a forensic handwriting analyst with the United States Postal Inspection Service to compare McManus's purported

69

signatures with Miell's handwriting. After obtaining handwriting exemplars, Miell testified (during AFI's civil trial in January 2008) that the signature was his, but that he had power of attorney from McManus. The prosecutor then had to expend additional resources questioning current and former employees (including Miell) before the grand jury. Miell filed a motion to quash the prosecutor's subpoena, which required additional resources of the prosecutor, and required the court to expend resources evaluating the claims in Miell's motion to quash (including a hearing on the motion). Such conduct caused the unnecessary expenditure of substantial governmental resources, including additional preparation, investigation, and testimony regarding other charges as a result of the perjured statement. *Plumley*, 207 F.3d at 1092-93; *Sinclair*, 209 F.3d at 1539. Thus, the adjustment is appropriate as to **Count 19**.

Similarly, the adjustment is appropriate as to **Count 20**, the perjury charge based on Miell's false testimony that he had power of attorney to sign John McManus's name. After Miell changed his story—to assert that he did sign John McManus's name, but that he had power of attorney from McManus to do so—the prosecutor had to expend additional resources questioning current and former employees (including Miell) before the grand jury. Miell filed a motion to quash the prosecutor's subpoena, which required additional resources of the prosecutor, and required the court to expend resources evaluating the claims in Miell's motion to quash (including a hearing on the motion). Such conduct also caused the unnecessary expenditure of substantial governmental resources, including additional preparation, investigation, and testimony regarding other charges as a result of the perjured statement. *Plumley*, 207 F.3d at 1092-93; *Sinclair*, 209 F.3d at 1539. Thus, the adjustment is appropriate as to **Count 20**.

### g.     *Abuse of a position of trust*

Miell next objects to the calculation of the offense level for Group 2, the mail fraud counts arising from the damage deposit fraud scheme, based on a 2-level upward adjustment for abuse of a position of trust pursuant to U.S.S.G. § 3B1.3. Miell argues that he did not hold a position of private trust as a landlord over his tenants, denies that he was responsible for determining the amount of damage deposit returned to his tenants, and denies that he was responsible for assessing the damage caused by his tenants. In his allocution, Miell also argued that he had been exempted by the Iowa Real Estate Commission from the requirement to maintain a separate trust account for renters' deposits. He has never produced any documentation of such an exemption, however. Through counsel, Miell also objects to the conclusion that he abused his position of trust by falsely inflating the cost of repairs owed, thereby keeping his tenants' damage deposits, and on occasion billing them more than what was rightly owed. Finally, Miell contends that the conduct used to apply this enhancement is the same conduct used to apply a sophisticated means enhancement resulting in double-counting.

In response to Miell's assertion, in his allocution, that he had an exemption from the requirement to segregate tenants' deposits in a separate trust account, the prosecution argues that it contacted the Iowa Real Estate Commission to find out if what Miell said was true. In response, the Commission sent the prosecutor an e-mail, filed as Exhibit 462, which disputes Miell's claims. In the e-mail, David Batts, Executive Officer for the Iowa Real Estate Commission, stated that he reviewed the Commission's files and found no evidence that Miell was ever sent a letter exempting him from trust account requirements. Mr. Batts explained that if the properties were wholly owned by Miell, then he was not required by Commission rules to maintain a trust account for property management of properties he personally and solely owns. This is different, Mr. Batts points out, from a

trust account required under landlord/tenant law.  Mr. Batts stated that landlord/tenant laws do not fall under the jurisdiction of the Iowa Real Estate Commission.  The prosecution argues that Miell may have simply been confused, but that the more likely explanation is that his failure to maintain a trust account for renters' deposits shows his intent to keep all damage deposits by fraud and abuse of his position of trust.

Guideline § 3B1.3 applies when a defendant "abused a position of public or private trust . . . in a manner that significantly facilitated the commission or concealment of the offense."  As the Eighth Circuit Court of Appeals has explained,

> The commentary to section 3B1.3 defines a position of private trust as a position that is
>> characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference).  Persons holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature.
>
> USSG § 3B1.3, comment. (n.1).  Once the sentencing court has determined that a person occupies a position of private trust, "the position of . . . trust must have contributed in some significant way to facilitating the commission or concealment of the offense . . ." before the enhancement may apply.  *Id*.  Furthermore, "[t]his adjustment may not be employed if an abuse of trust or skill is included in the base offense level or specific offense characteristic."  USSG § 3B1.3.

*United States v. Waldner*, 580 F.3d 699, 706 (8th Cir. 2009).  As to double-counting, the court has also explained,

> "[S]entencing courts err when precisely the same aspect of a defendant's conduct factors into his sentence in two separate ways."  *United States v. Smith*, 516 F.3d 473, 476 (6th Cir. 2008) (quotation omitted) (affirming abuse-of-trust

enhancement for convictions of wire fraud and making a false statement on a loan application). "But in this instance the [abuse-of-trust] enhancement[ ] [and the underlying offenses] penalize distinct aspects of [Waldner's] conduct and distinct harms." *Id.* (quotation omitted). The abuse-of-trust enhancement accounts for Waldner's efforts to use his position to defraud creditors who were entitled to rely on his representations at the creditors meeting. The prohibition on fraud during a bankruptcy proceeding is one instance of the more general prohibition on perjury that seeks to protect the integrity and dignity of government proceedings. Thus, the district court did not abuse its discretion in enhancing Waldner's sentence for abusing a position of private trust. *Cf. Fazio*, 487 F.3d at 659 (affirming abuse-of-trust enhancement for real estate agent who committed wire and mail fraud by submitting fraudulent claims to a mortgage company); *United States v. Goldman*, 447 F.3d 1094, 1096 (8th Cir. 2006) (holding that attorney who lied during a bankruptcy proceeding abused a position of public trust); *Erhart*, 415 F.3d at 972-73 (affirming abuse-of-trust enhancement for chiropractor who submitted false insurance claims).

Waldner, 580 at 707.

I find that Miell had a fiduciary duty to his tenants as it pertained to damage deposits, pursuant to IOWA CODE § 562A.12(2), which requires a landlord to hold rental deposits *for the tenant* in a separate, federally insured trust account. IOWA CODE § 562A.12(2) ("All rental deposits shall be held by the landlord for the tenant, who is a party to the agreement, in a bank or savings and loan association or credit union which is insured by an agency of the federal government. Rental deposits shall not be commingled with the personal funds of the landlord. Notwithstanding the provisions of chapter 117, all rental deposits may be held in a trust account, which may be a common trust account and which may be an interest bearing account. Any interest earned on a rental deposit

during the first five years of a tenancy shall be the property of the landlord."); *cf. Baculis v. McDougall*, 460 N.W.2d 186, 188 & n.2 (Iowa Ct. App. 1990) (noting that the statute requires that rental deposits be held for the tenant in a federally insured financial institution and not be commingled with personal funds, and suggesting that "landlords may find guidance in the accounting practices required of attorneys and real estate brokers in Iowa who are holding client funds in trust").   A landlord-tenant relationship, especially with respect to holding and returning damage deposits, is a position characterized by professional and managerial discretion.   *See Waldner*, 580 F.3d at 706 (quoting U.S.S.G. § 3B1.3, comment. (n.1), as defining a position of trust).   The record is clear that Miell, himself, adjusted the claims against the damage deposits above the amounts reported by his employees for cleaning and repairs.   Further, Miell used his position as landlord to both facilitate and conceal this offense.   *See id.* (the position of trust must have contributed in a significant way to facilitate the commission or concealment of the offense).   Meill received deposits, did not keep them separate from his own personal funds, then falsified documents to keep the deposits and, in some cases, charged for additional fraudulent damages.

I have found no authority, and Miell has cited none, for an exemption from the Iowa Real Estate Commission to the trust fund requirement of IOWA CODE § 562A.12(2). Moreover, the prosecution has now presented evidence that the Iowa Real Estate Commission does not exempt landlords from the trust fund requirement of IOWA CODE § 562A.12(2), and has not done so in Miell's case.   Chapter 543B of the Iowa Code,[15] which pertains to real estate brokers and salespersons, does not provide any exemption that

---

[15]Chapter 117, mentioned in IOWA CODE § 562A.12(2), has been transferred by the code editor to Chapter 543B.

would apply to Miell's activities as a landlord, rather than as a real estate broker.  Miell's assertion that he had an exemption from the requirements of IOWA CODE § 562B.12(2) is simply a red herring.

I find that the upward adjustment for abuse of a position of trust is applicable here.

I also reject Miell's double-counting objection.  This is not a case in which I am factoring precisely the same aspect of Miell's conduct into his sentence in two separate ways.  *See id.* at 707.  Rather, "in this instance the [abuse-of-trust] enhancement[ ] [and the underlying offenses] penalize distinct aspects of [Miell's] conduct and distinct harms." *Id.*  The abuse-of-trust enhancement accounts for Miell's efforts to use his position to facilitate retention of damage deposits, while he is charged with mail fraud in the course of a fraudulent scheme to retain damage deposits.

I overrule Miell's objection to the increase of his offense level for the Group 2 damage deposit fraud offenses for abuse of a position of trust.

### h.   *Obstruction of justice*

Miell objects to the Final PSIR's recommendation that his offense level for each group of offenses be increased for obstruction of justice.  Miell contends that he did nothing that amounts to obstruction of justice, so that I should not increase the offense level for any of his offenses on that basis.  I disagree with Miell and overrule his objection.

Guideline Section 3C1.1 states the following:

> If (A) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (B) the obstructive conduct related to (i) the defendant's offense of conviction and any relevant conduct; or (ii) a closely related offense, increase the offense level by 2 levels.

75

U.S.S.G. § 3C1.1. Thus, "the obstructive conduct must relate to the defendant's offense of conviction and any relevant conduct, or a closely-related offense." *United States v. Jones*, 612 F.3d 1040, 1046 (8th Cir. 2010) (citing U.S.S.G. § 3C1.1). "A district court must find the predicate facts supporting such an enhancement for obstruction of justice by a preponderance of the evidence." *United States v. Alvarado*, ___ F.3d ___, ___, 2010 WL 3034930, *5 (8th Cir. Aug. 5, 2010) (citing *United States v. Cunningham*, 593 F.3d 726, 730 (8th Cir. 2010)).

As the Eighth Circuit Court of Appeals has noted,

> Application Note 4 to U.S.S.G. § 3C1.1 provides examples of conduct triggering the enhancement. These examples include "committing, suborning, or attempting to suborn perjury"; "producing or attempting to produce a false, altered, or counterfeit document or record during an official investigation or judicial proceeding"; and "providing materially false information to a judge or magistrate." U.S.S.G. § 3C1.1 cmt. n. 4.

*Alvarado*, ___ F.3d at ___, 2010 WL 3034930 at *5. "'To impose an obstruction of justice sentence enhancement for perjury, the district court must review the evidence and make an independent finding that, by a preponderance of the evidence, the defendant gave 'false testimony concerning a material matter with the wilful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory.'" *United States v. Mashek*, 606 F.3d 922, 933 (8th Cir. 2010) (quoting *United States v. Kessler*, 321 F.3d 699, 702 (8th Cir. 2003), with internal quotation marks omitted).

Miell objects to the portion of the Final PSIR entitled "Obstruction of Justice," ¶¶ 81 and 82, which catalogues instances of Miell's obstruction of justice, and to each of the paragraphs of the Final PSIR recommending level increases for obstruction of justice for each group of offenses. Miell contends there should be no enhancement for obstruction

76

of justice pursuant to U.S.S.G. § 3C1.1, because the description of the prosecutor's work and the court's work on the case is inherent in any complicated prosecution and should not be singled out as a measure to determine whether his conduct was obstructive. He also believes that he is not responsible for any alleged destruction of files by Mr. Emig; that he did not make any obstructive statements through his attorney to seek a continuance of the trial and that the statements were made to uncover exculpatory evidence; and that he did not provide materially false information to the probation officer. He contends that, at most, the Final PSIR's summary of the allegedly obstructive conduct is demonstrative of confusion, mistake, or faulty memory.

I find not only that Miell's conduct was obstructive, but that his assertion that such conduct was merely the result of confusion, mistake, or faulty memory is belied by copious evidence that he acted with the intent to impede the investigation of his crimes and his financial condition, to give false explanations for his conduct, and to delay his trial. *Mashek*, 606 F.3d at 933 (false testimony must be willful, not simply the result of confusion, mistake, or faulty memory to support an increase for obstruction of justice). His obstructive conduct also relates to each count group. *Jones*, 612 F.3d at 1046. I find each of the following incidences of obstructive conduct by a preponderance of the evidence, if not by overwhelming evidence. *Alvarado*, ___ F.3d at ___, 2010 WL 3034930 at *5 .

Specifically, I find that Miell obstructed the administration of justice by making false statements during the trial of AFI's civil case when he claimed that he received the RCV checks from Brett Throlson, not directly in the mail from AFI. The false testimony with respect to the RCV payment mailings resulted in the prosecutor presenting the Indictment to the grand jury and superseding the indictment to correct specific language. Miell also testified during a deposition in AFI's civil case that he did not sign a Home

Doctor invoice that the prosecutor alleged to be fraudulent in the Indictment in this case. After Miell's false testimony, the prosecutor had to locate John McManus, obtain handwriting exemplars from Miell, and employ the services of a forensic handwriting analyst with the United States Postal Inspection Service to compare McManus's purported signatures with Miell's handwriting. Miell then changed his testimony and indicated that the signature was his, but that he had power of attorney from McManus. The prosecutor then had to expend additional resources questioning current and former employees (including Miell) before the grand jury. Miell filed a motion to quash the prosecutor's subpoena, which required additional resources of the prosecutor, and required the court to expend resources evaluating the claims in the motion to quash (including a hearing on the motion).

The Final PSIR also notes that Miell obstructed the administration of justice by destroying property records subpoenaed by the prosecutor. Although the destruction of records was, in one particular instance, carried out by Brett Emig, the sentencing record leads me to the conclusion that Miell placed those particular records in a dumpster for Emig to find, not least because Miell called Emig to the rental property where the dumpster was located and directed Emig to do work that would inevitably lead him to discover the records in the dumpster. Although the Final PSIR does not address this issue in its discussion of obstruction of justice, I also find that the state of the files that were retained in Miell's office, which appeared to have been purged of almost all information relevant to the prosecution's investigation, and the hiding of responsive files in Miell's home, discovered only when the prosecution executed a search warrant at Miell's residence after the September 2009 installment of the sentencing hearing, indicate that Miell systematically attempted to deprive the prosecution of information relevant to the damage deposit fraud scheme.

I also find that Miell obstructed justice by making false statements to the court, through his attorney, regarding a purported tax audit for 2001 and 2002. Miell made these false statements on the eve of trial on the tax charges, which caused the prosecutor to conduct a further investigation into the false statements and caused the court to waste resources in conducting additional hearings, entering orders, and scheduling and rescheduling the trial on the tax charges.

Finally, Miell also provided materially false information to the probation officer in respect to the presentence investigation for the court. During his presentence interview, Miell denied having a prior history of using controlled substances. However, during grand jury testimony in 1989, Miell admitted using marijuana and cocaine and sharing cocaine with others. This grand jury testimony was made available to the probation office after the prosecutor filed exhibit 403. Miell's history of substance abuse is a key factor when considering the 18 U.S.C. § 3553(a) factors, determining special conditions of supervised release, and assisting with institutional security and placement.

Prior to his presentence interview, Miell was provided financial disclosure forms by the probation office and instructed to complete the forms and return them to the probation office. He did not submit them as instructed. Rather, on March 17, 2009, he submitted his own financial paperwork, which included a handwritten list of loans from various individuals; a document entitled "Personal Financial Statement"; a document entitled "Net Worth Financial Analysis"; and several pages of what appear to be an Excel spreadsheet listing values of the properties he owns. Listed on the handwritten list of liabilities was a loan from Gary VanCura in the amount of $130,000. The prosecutor presented evidence at the sentencing hearing that Miell actually borrowed $100,000 of the $130,000 from Ron Kelley by passing a note through VanCura to Kelley. Kelley then loaned the $100,000 to VanCura, who passed on the loan to Miell. Further, on May 28,

2009, Miell initiated Chapter 11 bankruptcy proceedings in the Northern District of Iowa.

Miell did not report this to the probation office until August 6, 2009, and did not provide

any correction to his reported financial information except to say that "his bankruptcy

disclosure filings accurately reflect his financial status." A review of Miell's bankruptcy

schedules, filed on May 28, 2009, and Amended Schedules, filed on July 13, 2009, reveal

additional assets and liabilities that were not initially reported. Miell's financial

disclosures are important when determining ability to pay financial penalties.

The increase for obstruction of justice is, thus, appropriate for each offense group.

### i.   *Acceptance of responsibility*

Miell also objects to the Final PSIR's recommendation that he be denied level

decreases for acceptance of responsibility. Again, I disagree with Miell and overrule his

objection.

As the Eighth Circuit Court of Appeals has explained,

> A sentencing court should decrease an offense level by two
> levels if the defendant "clearly demonstrates acceptance of
> responsibility for his offense." U.S.S.G. § 3E1.1. "Whether
> the defendant accepted responsibility is a factual question that
> depends largely on credibility assessments made by the
> sentencing court. This Court gives great deference to the
> district court's denial of a request for a reduction for
> acceptance of responsibility and reviews the decision for clear
> error." *United States v. Long Soldier*, 431 F.3d 1120,
> 1122-23 (8th Cir. 2005) (citations omitted). A defendant
> bears the burden of demonstrating entitlement to a reduction for
> acceptance of responsibility. *Peters v. United States*, 464 F.3d
> 811, 812 (8th Cir. 2006).

*United States v. Jones*, 612 F.3d 1040, 1047 (8th Cir. 2010). "Where a defendant has

obstructed justice, it is the extraordinary case where a defendant may receive an adjustment

for acceptance of responsibility." *Id.* (citing U.S.S.G. § 3E1.1, cmt. (n.4)). This is so,

because, "[g]enerally, conduct resulting in an enhancement for obstruction of justice indicates that the defendant has not accepted responsibility for his criminal conduct." *Id.* (citing *United States v. Waldner*, 580 F.3d 699, 708 (8th Cir. 2009)).

Miell contends that his guilty plea to 20 counts of the Third Superseding Indictment warrants a downward adjustment for acceptance of responsibility. Further, he contends that the enormous amount of time and resources that he saved the government and the judicial system by pleading guilty in this very complex case involving numerous witnesses should be rewarded. I disagree.

First, to my mind, this is a classic example of a case in which the defendant's repeated and varied attempts to obstruct justice make him ineligible for an adjustment for acceptance of responsibility. *Jones*, 612 F.3d at 1047; U.S.S.G. § 3E1.1, cmt. (n.4). Miell's obstructive conduct demonstrates the opposite of acceptance of responsibility. Second, while it is possible for a defendant to go to trial and still obtain a reduction for acceptance of responsibility, this is not such a case. U.S.S.G. § 3E1.1, comment. (n. 2) states, in part,

> This adjustment is not intended to apply to a defendant who puts the prosecutor to its burden of proof at trial by denying the essential factual elements of guilt. Conviction by trial, however, does not automatically preclude a defendant from consideration for such a reduction. In rare situations, a defendant may clearly demonstrate an acceptance for his criminal conduct, even though he exercises his constitutional right to a trial. This may occur, for example, where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt (e.g., to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct).

Miell's decision to go to trial on the false tax return charges was not to preserve issues that did not relate to his factual guilt. *Id.* Moreover, even in his objections to the PSIR and in his allocution, Miell continued to deny that he was involved in any fraudulent schemes at all and, instead, attempted to blame his guilty pleas on bad lawyering, rather than his guilt, which is apparent from the overwhelming evidence in the record. Indeed, I find some of Miell's arguments attempting to minimize the amount of loss from his fraud schemes—such as his argument that AFI suffered no loss from his fraud scheme, because AFI would have had to pay the RCV claims, had they been legitimately presented—demonstrate that Miell still does not grasp or accept responsibility for the wrongfulness of his conduct.

Denial of the reduction for acceptance of responsibility is appropriate as to the total offense level for all offenses.

### 3.   *Guidelines calculations*

Notwithstanding Miell's various objections to the calculations of the offense levels and the included adjustments, I adopt the Final PSIR's calculations of offense levels. The specific calculations for each group follow.

#### a.   *Group 1*

As determined above, Group 1 consists of the mail fraud offenses in **Counts 1 through 6** arising from the insurance fraud scheme and the perjury charge in **Count 19**. The base offense level for the six mail fraud offenses is level 7, pursuant to U.S.S.G. § 2B1.1(a)(1)(A) and (B), because mail fraud offenses in violation of 18 U.S.C. § 1341 are referenced in the guideline and the offenses of conviction have a statutory maximum term of imprisonment of 20 years or more; the offense level is increased by 12 levels, pursuant to U.S.S.G. § 2B1.1(b)(1)(G), for a loss of more than $200,000, as explained above; the offense level is increased two levels, pursuant to U.S.S.G. § 2B1.1(b)(9), for

use of "sophisticated means," also as explained above; and the offense level is increased two more levels for obstruction of justice pursuant to U.S.S.G. § 3C1.1, also as explained above.   These adjustments result in an adjusted base offense level of 23 for **Counts 1** through **6**, which is higher than the adjusted offense level of 19 for the "grouped" perjury charge in **Count 19**, even with upward adjustments for that perjury charge of 3 levels for substantial interference with the administration of justice, pursuant to U.S.S.G. § 2J1.3(b)(2), and 2 levels for obstruction of justice, as explained above.

Thus, the adjusted offense level for Group 1 is 23.

### b.     Group 2

As determined above, Group 2 consists of the twelve mail fraud offenses in **Counts 7** through **18** arising from the damage deposit fraud scheme.   The base offense level for these twelve mail fraud offenses is level 7, pursuant to U.S.S.G. § 2B1.1(a)(1)(A) and (B), because mail fraud offenses in violation of 18 U.S.C. § 1341 are referenced in the guideline and the offenses of conviction have a statutory maximum term of imprisonment of 20 years or more; the base offense is increased 16 levels, pursuant to U.S.S.G. § 2B1.1(b)(1)(I), for loss of more than $1,000,000, as explained above; the offense level is increased an additional 6 levels, pursuant to U.S.S.G. § 2B1.1(b)(2)(C), for an offense involving 250 or more victims, also as explained above; the offense level is increased another 2 levels, pursuant to U.S.S.G. § 2B1.1(b)(9) for use of "sophisticated means," also as explained above; the offense level is increased another 2 levels, pursuant to U.S.S.G. § 3B1.3, for abuse of a position of public or private trust, also as explained above; and, finally, the offense level is increased another 2 levels, pursuant to U.S.S.G. § 3C1.1, for obstruction of justice, as explained above.   These adjustments result in an adjusted offense level for Group 2 of 35.

###### c.      *Group 3*

Group 3 consists of a single count of perjury, in violation of 18 U.S.C. § 1623, in **Count 20**.  I rejected, above, Miell's only objections to the calculation of the offense level for this offense.  Those objections were (1) to a 3-level upward adjustment for substantial interference with the administration of justice and (2) to a 2-level upward adjustment for obstruction of justice.  Thus, the calculation of Meill's adjusted offense level for this offense is as follows:  The base offense level is 14 pursuant to U.S.S.G. § 2J1.3(a)(1), because that is the appropriate guideline for a violation of 18 U.S.C. § 1623; the base offense level is increased 3 levels, pursuant to U.S.S.G. § 2J1.3(b)(2), for substantial interference with the administration of justice; and the offense level is increased a further 2 levels for obstruction of justice, resulting in an adjusted offense level of 19.

###### d.      *Group 4*

Group 4 consists of the two charges of filing a false tax return, in violation of 26 U.S.C. § 7206(1), in **Counts 22** and **23**.  The adjusted offense level calculation for this group is the following:  The base offense level is 16, pursuant to U.S.S.G. § 2T1.1(c)(1)(A), because this is the appropriate guideline for a violation of 26 U.S.C. § 7206(1), and the tax loss is $94,080, as explained above; the base offense level is increased 2 levels for failure to report income exceeding $10,000 in any year from criminal activity, pursuant to U.S.S.G. § 2T1.1(b)(1), as explained above; and the offense level is increased a further 2 levels for obstruction of justice, also as explained above, resulting in an adjusted offense level of 20 for Group 4.

##### 4.      *The Total Offense Level*

Pursuant to U.S.S.G. § 3D1.4, the Adjusted Offense Level for Group 2, 35, is assigned 1 unit, and no other group is assigned any units.  Thus, the greater offense level and combined adjusted offense level is 35.  Miell's only objections to the Total Offense

Level in the Final PSIR are his reiteration of his prior objections to the calculation of the adjusted offense level for each group and his assertion that he is entitled to a reduction for acceptance of responsibility.  I have overruled those objections, so the Total Offense Level stands at 35.

### 5.    *Criminal history calculation*

As I pointed out, above, Miell's criminal history is minor, consisting of a $100 fine in 1999 for "failure to assist"; a $500 fine in 2002 for "reckless driving"; and one day in jail and a $250 fine in 2003 for "driving while license under suspension."  As a result, he was assessed no criminal history points in the guidelines sentencing calculation, which places him in Criminal History Category I in the Sentencing Table at U.S.S.G. Chapter 5, Part A.

### 6.    *Advisory guidelines range calculation*

With a Total Offense Level of 35 and a Criminal History Category of I, Miell's advisory Guideline Imprisonment Range, pursuant to the Sentencing Table at U.S.S.G. Chapter 5, Part A, is 168 to 210 months.  Although Miell objects to this calculation, based on his previous objections, and contends that the proper advisory guidelines range would be 15 to 21 months, I expressly overrule that objection.   The advisory guidelines imprisonment range is in Zone D of the Statutory Sentencing Table and, therefore, the minimum term of imprisonment shall be satisfied by a sentence of imprisonment. U.S.S.G. § 5C1.1(f).

The applicable statutory provisions provide for supervised release for up to 3 years for **Counts 1** through **20**, *see* 18 U.S.C. § 3583(b)(2), and for up to 1 year for **Counts 22** and **23**, *see* 18 U.S.C. § 3583(b)(3).  The applicable guidelines provisions provide for supervised release for 2 to 3 years for **Counts 1** through **20**, *see* U.S.S.G. § 5D1.2(a)(2), and 1 year for **Counts 22** and **23**, *see* U.S.S.G. § 5D1.2(a)(3).  The applicable statutory

provision provides for probation for 1 to 5 years, *see* 18 U.S.C. § 3561(c)(1), and the applicable guidelines provision provides for no probation, *see* U.S.S.G. § 5C1.1(f). The applicable statutory provisions provide for fines of up to $250,000 for **Counts 1** through **18**, *see* 18 U.S.C. §§ 3571(b)(3) and 3571(d); up to $250,000 for **Counts 19** and **20**, *see* 18 U.S.C. § 3571(b)(3); and $100,000 for **Counts 22** and **23**, *see* 26 U.S.C. § 7206. The special assessment of $100 per count is mandatory and due immediately. 18 U.S.C. § 3013(a)(2)(A). The advisory guidelines provisions provide for fines of $20,000 to $250,000. U.S.S.G. § 5E1.2(c)(3). I overrule Miell's objections that the fine range should be $4,000 to $40,000, based on his assertion that the Total Offense Level should be 14, for all of the reasons previously stated.[16]

I find that the appropriate advisory guidelines calculation and consideration of all information developed during sentencing proceedings would warrant a guidelines sentence of 210 months of imprisonment, the top of the advisory guidelines range; supervised release for 3 years for **Counts 1** through **20**, and 1 year for **Counts 22** and **23**; and a fine of $250,000.

### C. *Determination Of Whether To Depart Or Vary*

In the second step of the sentencing methodology, I must consider whether a departure or a variance is appropriate. *Roberson*, 517 F.3d at 993; *Rivera*, 439 F.3d at 447. The prosecution sought an upward departure, based on its contentions that Miell's criminal conduct far exceeded what was necessary to establish his guideline offense level, citing U.S.S.G. § 5K2.0; that Miell committed offenses to conceal other crimes, citing

---

[16]As noted above, restitution was ultimately resolved by an agreement of the parties.

U.S.S.G. § 5K2.8, but presumably intending to cite U.S.S.G. § 5K2.9; and that Miell's offense level fails to account for the dismissed "perjury" charge, citing U.S.S.G. § 5K2.21.  Miell sought what he called "a downward departure" based on his objections to the guidelines calculations in the PSIR and the 18 U.S.C. § 3553(a) factors, *i.e.*, a variance.  Miell contends that no upward departure or variance is appropriate, but that a downward departure or variance is appropriate.

Miell's objections to the guidelines calculations in the PSIR simply do not state any cognizable ground for a downward departure.  *See* U.S.S.G. §§ 5K1.1, 5K2.0, 5K2.1-24. Moreover, Miell's reliance on the 18 U.S.C. § 3553(a) factors as the basis for a "departure" suggests that what he is seeking is actually a "variance" based on those factors.  Because I will explain, below, why I find that the § 3553(a) factors warrant an *upward* variance, I plainly reject any contention that they warrant a *downward* variance. Finally, because I overruled Miell's objections to the guidelines calculations, on factual grounds, the facts in the case do not otherwise provide a basis for a downward departure or downward variance.

Turning to the prosecution's upward departure motion, I recognize that the prosecution has asserted sound bases for an upward departure.  That is, there are features of this case that potentially take it outside the guidelines "heartland" and make it a special or unusual case; the Commission has neither forbidden nor discouraged departures on the grounds asserted by the prosecution; and, indeed, the Commission has encouraged departures based on those features.  *See, e.g., Koon v. United States*, 518 U.S. 81, 95 (1996) (agreeing that these are the questions that a sentencing court should consider on a motion for a departure, citing *United States v. Rivera*, 994 F.2d 942, 949 (1st Cir. 1993)). Nevertheless, I find that the features cited by the prosecution and others that I find particularly significant in this case are best addressed by an upward variance, rather than

by an upward departure, because in the context of a variance, I can consider the totality of the circumstances in light of the 18 U.S.C. § 3553(a) factors. *See, e.g., United States v. Jones*, 509 F.3d 911, 915 (8th Cir. 2007) (reiterating its rejection in *United States v. Solis-Bermudez*, 501 F.3d 882, 886 (8th Cir. 2007), of the contention that the sentencing court cannot grant an upward variance on grounds that it has failed to determine would justify an upward departure from the advisory guidelines, because the sentencing court can decline to depart from the advisory guidelines range but still impose a variance under 18 U.S.C. § 3553(a)). As explained in more detail in my analysis of the third step of the sentencing methodology, below, based on an individualized assessment of the facts presented, I find that a significant upward variance from the advisory guidelines sentencing range is warranted here by significant and compelling circumstances. *See Kane*, 552 F.3d at 752 (standards for determining whether and to what extent to vary).[17] Moreover, if

_____

[17]I note that, under prevailing law in this circuit, I was not required to give Miell notice pursuant to Rule 32(h) of the Federal Rules of Criminal Procedure of my intent to consider an upward variance. *See United States v. Sitting Bear*, 436 F.3d 929, 932 (8th Cir. 2006) (finding no merit to a defendant's claim that Rule 32(h) requires notice of the court's intent to vary in light of all of the § 3553(a) factors, citing *United States v. Long Soldier*, 431 F.3d 1120, 1122 (8th Cir. 2005) ("[N]otice pursuant to Rule 32(h) is not required when the adjustment to the sentence is effected by a variance, rather than by a departure."), and *United States v. Egenberger*, 424 F.3d 803, 805 (8th Cir. 2005) (same), *cert. denied*, 546 U.S. 1125 (2006)). However, I gave notice at the commencement of the sentencing hearing in September 2009 that I would consider an upward variance, and Miell could not articulate what prejudice he might suffer from lack of earlier notice of my intention to consider an upward variance nor did he seek a continuance to prepare to address the issue of an upward variance. Miell was plainly on notice prior to the sentencing hearing in September 2009 as well as the continuation of the sentencing hearing in August 2010 of the possibility of an upward variance, for example, from the prosecution's motion for an upward departure and notice of factors that might warrant an upward departure in paragraphs 178 and 179 of the PSIR available prior to the September

(continued...)

there is some flaw in my determination to vary upward, I would impose the same increase, in the alternative, as an upward departure.

Therefore, I deny Miell's motion for a downward departure (or variance) as unjustified in light of the Sentencing Guidelines and the § 3553(a) factors, deny the prosecution's motion for an upward departure, essentially as moot in light of my determination that an upward variance is appropriate, and vary upward from the advisory guidelines range in this case based on my consideration of the § 3553(a) factors, for the reasons explained below.

### D.   Consideration Of The § 3553(a) Factors

The final step in the determination of a defendant's sentence is to apply the factors in 18 U.S.C. § 3553(a). *Roberson*, 517 F.3d at 993; *Rivera*, 439 F.3d at 447.  Where the court has determined that an upward variance is appropriate, how much to vary upward also requires consideration of the § 3553(a) factors. *See United States v. Papakee*, 573 F.3d 569, 577 (8th Cir. 2009) (the question is whether the § 3553(a) factors, as a whole, justify the extent of a variance).

The § 3553(a) factors are "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1); "the need for the sentence imposed," § 3553(a)(2), including the need for the sentence "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," § 3553(a)(2)(A), "to afford adequate deterrence to criminal conduct," § 3553(a)(2)(B), "to protect the public from further crimes of the defendant,"

---

[17](...continued)
2009 sentencing hearing and paragraphs 180 and 181 of the Final PSIR.

§ 3553(a)(2)(C), and "to provide the defendant with needed educational or vocational training" or other care or treatment, § 3553(a)(2)(D); "the kinds of sentences available," § 3553(a)(3); "the kinds of sentence and the sentencing range established" for similar offenses, § 3553(a)(4); "any pertinent policy statement," § 3553(a)(5); "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," § 3553(a)(6); and "the need to provide restitution to any victims of the offense," § 3553(a)(7). In considering the § 3553(a) factors, "[a] district court is not required to recite each of the sentencing factors under 18 U.S.C. § 3553(a), as long as the record makes clear that they were considered." *United States v. Powills*, 537 F.3d 947, 950 (8th Cir. 2008) (citing *United States v. Hernandez,* 518 F.3d 613, 616 (8th Cir. 2008), and *Rita v. United States,* 551 U.S. 338, 127 S. Ct. 2456, 2468-69 (2007)).

After balancing the § 3553(a) factors, I find that an advisory guidelines sentence of 168 to 210 months for this defendant is inadequate to accomplish the goals of sentencing, and that a longer sentence, up to the longest statutory maximum for the offenses that Miell has committed, 20 years (for mail fraud in violation of 18 U.S.C. § 1341), is a sentence that is "sufficient, but not greater than necessary" to accomplish the goals of sentencing. 18 U.S.C. § 3553(a). Although I am not required to recite my consideration of each of the § 3553(a) factors, *see Powills*, 537 F.3d at 950, I will expressly do so in this case. In that consideration, as in my determination that an upward variance is appropriate, my central focus is the mail fraud group of offenses arising from the "damage deposit fraud scheme," not only because that group carries the longest advisory guidelines sentence and maximum statutory sentence, but also because I find that it involves the most egregious conduct.

90

### 1.    *The nature and circumstances of the offense*

The first § 3553(a) factor requires a sentencing court to consider "the nature and circumstances of the offense." 18 U.S.C. § 3553(a)(1). I recounted above, in some detail, the nature and circumstances of Miell's offenses, including the damage deposit fraud scheme. It is the aggregate loss of approximately $1.2 million and the number of victims, something over 300 and perhaps more than 1,000, that drive the advisory guidelines sentencing calculation for this group of offenses. *See* U.S.S.G. § 2B1.1(b)(1)(G) (16-level increase, because the loss was more than $1,000,000); U.S.S.G. § 2B1.1(b)(2)(C) (6-level increase, because the offense involved 250 or more victims). It is also true, as the prosecution argues in its motion for upward departure pursuant to U.S.S.G. § 5K2.0, that the number of victims involved far exceeds the number necessary for a 6-level enhancement pursuant to U.S.S.G. § 2B1.1(b)(2)(C). While I certainly find the aggregate amount of loss and the number of victims troubling, these are not the factors that I ultimately find most troubling about the nature and circumstances of the damage deposit mail fraud group of offenses.

Rather, what I find most troubling about the nature and circumstances of the damage deposit mail fraud offenses is that Miell routinely and systematically victimized people who were too economically vulnerable and often too unsophisticated to fight back for relatively slight gain in each individual case. The extra amount that he "squeezed" out of his tenants by fraudulent means was less than one thousand dollars in most cases—often considerably less. Yet Miell pursued such meager gains, either individually or in aggregate, in comparison to his substantial personal wealth,[18] without regard to the financial hardship,

---

[18]I will return to the gains that Miell obtained from his damage deposit fraud scheme relative to his personal wealth in consideration of "the history and characteristics
(continued...)

emotional distress, or other inconvenience that he might inflict, simply because he thought it unlikely that his victims would have the energy, time, or resources to contest his fraudulent damage claims in court. As one victim put it,

> For weeks I stressed over the possibility that I was going to have to miss classes to go to court just to fight back! In the end, I knew I was being suckered out of my security deposit that was due back in full, but I had decided that this was a fight I didn't have the strength or time to take on. In retrospect, I truly believe he counted on that.

Presentence Investigation Report, Victim Impact Statements, ¶ 32. In other words, Miell repeatedly "squeezed" economically vulnerable and often unsophisticated people, for relatively little extra "juice," because he could get away with it.

In the circumstances of this case, the 2-level enhancement of Miell's advisory guidelines sentence pursuant to U.S.S.G. § 3B1.3 for abuse of a position of trust with regard to damage deposits does not even begin to correlate to the nature and extent of the harm that Miell's scheme inflicted on people that he expected would be too economically vulnerable or unsophisticated to do anything about it. *See United States v. White*, 506 F.3d at 635, 645 (8th Cir. 2007) (the court may vary upward on the basis of factors already taken into account in the formulation of the guidelines). Miell's conduct in perpetrating such a scheme shows at least as much disregard for the consequences to others, if not downright intent to harm others, as can be attributed to the average drug mule, or even a mid-level or high-level drug conspirator, who could easily face a mandatory *minimum* statutory sentence at least as long as Miell's *maximum* statutory sentence. The perpetration of a scheme that inflicted harm on hundreds of victims and that

---

18(...continued)
of the defendant" pursuant to 18 U.S.C. § 3553(a)(1).

counted on the economic vulnerability or lack of sophistication of those victims, I believe, warrants an upward variance to the statutory maximum sentence of 240 months for the mail fraud offenses. *Cf. United States v. Erpenbeck*, 532 F.3d 423, 439 (6th Cir. 2008) (affirming a 65-month upward variance from the advisory guidelines maximum to 300 months of imprisonment under the § 3553(a) factors for bank fraud, in light of the sentencing court's consideration of the suffering and harm experienced by the 260 homeowners on whose property construction liens were not removed as the result of the defendant's bank fraud, even though they were not the primary victims of the fraud scheme).

Indeed, it is doubtful that Miell's victimization of hundreds of tenants would ever have come to light, but for the government's investigation of other fraudulent activity by Miell, which impinged upon an insurance company with the resources to fight back. It is clear that some small claims court judges had concerns that Miell was obtaining judgments without adequate documentation. Unfortunately, their concerns were mollified by the fraudulent Home Doctor invoices that Miell started to bring in, apparently because the judges had been demanding better documentation to support Miell's damage deposit claims and reducing judgments without it. Even though some of the judges remained sufficiently concerned that they asked Miell whether the company providing the invoices was affiliated with him, Miell mollified those concerns by brazenly lying, recognizing that the judges were unlikely to challenge his representations further in the absence of an opposing party and knowing that the judges had no independent source of information to the contrary. In other words, not only did Miell use sophisticated means to perpetrate his fraud scheme, involving frauds to perpetrate and perpetuate a larger fraud scheme and to avoid detection, *see* U.S.S.G. § 2B1.1(b)(9) (2-level enhancement for use of sophisticated means to perpetrate the fraud); *see also* U.S.S.G. § 5K2.8 (permitting an upward departure if the

93

defendant committed the offense in order to facilitate or conceal the commission of another offense), but fraud became his everyday way of doing business.

To my mind, the nature and circumstances of the damage deposit fraud offenses in this case, alone, warrant a sentence at the statutory maximum for the mail fraud offenses. When I consider those offenses in the context of all of Miell's other criminal conduct, I only become more convinced that such a sentence is appropriate.

### 2.     The history and characteristics of the defendant

The first § 3553(a) factor also requires the sentencing court to consider "the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1). What I find most troubling about Miell's history and characteristics is that Miell was already wealthy when he embarked on and pursued the scheme to defraud his tenants out of their damage deposits, yet he chose to victimize hundreds of economically vulnerable or unsophisticated people for relatively small gains in individual cases. As mentioned above, the extra amount that Miell "squeezed" out of his tenants by fraudulent means was less than one thousand dollars in most cases—often considerably less. Even in the aggregate, the gain that Miell obtained did little to enhance his total wealth, although it warranted the 16-level enhancement of his advisory guidelines sentence for loss in excess of $1 million.   *See* U.S.S.G. § 2B1.1(b)(1)(G). Miell cannot even urge the overwhelming temptation of great riches as an excuse for his illegal conduct, because the aggregate gain of approximately $1.2 million that he realized is slight compared to his self-professed net worth of more than $36 million, stated in a Personal Financial Statement submitted to the probation office, or the more modest net worth of $15 million reflected in his bankruptcy filings. A crime of fraud by one who already has more than enough—and who cannot argue that he suffered a deprived or abusive childhood or the compulsion of an expensive addiction—is simply a crime of

greed.[19]   A crime of fraud by one who is otherwise successful, apparently by legitimate means, is also particularly disturbing.  Thus, in light of Miell's history and characteristics, this is a case of greed for the sake of greed, not greed for the sake of gain.

Miell's long periods of apparently law-abiding behavior in this case are undermined by the length of time that he was perpetrating the fraudulent activities at issue in this case. Thus, he cannot be heard to claim that his criminal behavior was aberrant or should be outweighed by his lack of criminal history.  Again, I find that his criminal conduct was his everyday way of doing business.

I have not lost sight of the fact that Miell also had two years of law school before withdrawing to pursue his real estate business.  I have to consider that his legal training may have helped him to execute or hide his fraudulent scheme; certainly, it did not have the anticipated or at least hoped-for effect of encouraging him to recognize and avoid unlawful conduct.

Thus, I find that Miell's history and characteristics warrant more significant punishment than the advisory guidelines might mete out, despite Miell's lack of prior criminal history.  Instead, these factors warrant a sentence at the statutory maximum for the mail fraud offenses in this case.  On the other hand, although I could theoretically impose consecutive sentences for the various groups of offenses to exceed the statutory maximum of 20 years on the damage deposit mail fraud group of offenses, if I deemed it appropriate to do so in light of the § 3553(a) factors, *see Jordan*, 435 F.3d at 697, I do not

---

[19]Again, Miell tries to undermine such a conclusion by pointing to evidence of his tendency to "hoard."  However, I find only minimal evidence of "hoarding," and none that suggests a mental health problem sufficient to support a Rule 12.2 defense or a departure or variance.  The "hoarding" was certainly neither sufficiently serious nor sufficiently related to the offense conduct in this case to warrant any reduction in Miell's sentence or to mitigate evidence that an increase in his sentence is appropriate.

95

find that a sentence in excess of 20 years is appropriate in light of Miell's age, other personal characteristics, criminal conduct, or remaining § 3553(a) factors.

### 3.    *The need for the sentence imposed*

The second § 3553(a) factor that the sentencing court must consider is "the need for the sentence imposed," § 3553(a)(2), including the need for the sentence "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," § 3553(a)(2)(A), "to afford adequate deterrence to criminal conduct," § 3553(a)(2)(B), "to protect the public from further crimes of the defendant," § 3553(a)(2)(C), and "to provide the defendant with needed educational or vocational training" or other care or treatment, § 3553(a)(2)(D).   I find that this "need for the sentence imposed" factor also warrants imposition of a sentence at the statutory maximum of 20 years for the mail fraud offenses.

Specifically, I find that a sentence at the statutory maximum for Miell's damage deposit mail fraud offenses is necessary "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A).   Miell's fraudulent conduct, perpetrated over several years against hundreds of victims and motivated, I find, by greed and his belief that his victims would not or would not be able to fight back, also involved repeated abuse of the judicial system with fraudulent claims.   Thus, Miell's conduct is both very serious and demonstrative of profound disrespect for the law.   In these circumstances, I find that a sentence at the statutory maximum for the mail fraud offenses is required to provide just punishment.   In contrast, the paltry sentence that Miell asserts is appropriate, based on his serious misconceptions about his conduct, would amount to nothing more than a "slap on the hand," perpetuating the belief that mere "white collar" criminals do not pay for their disrespect of the law or the rights of others.   Even a sentence at the top end of the advisory

guidelines range, 210 months, is, in my view, insufficient either to reflect the seriousness of Miell's offenses or to provide just punishment for his repeated offenses. Indeed, I would find that a sentence of 240 months is appropriate for the mail fraud counts arising from the damage deposit fraud scheme, if those were the only charges against Miell. Such a sentence becomes even more compelling when I consider all of the other criminal conduct in which he engaged.

I also find that deterrence, including both specific deterrence of this defendant and general deterrence of others similarly situated, warrants a sentence at the statutory maximum for the mail fraud offenses in this case. *See* 18 U.S.C. § 3553(a)(2)(B). To the extent that Miell and people like Miell can be deterred from victimizing those more economically vulnerable or less sophisticated than themselves, and more specifically, to the extent that those in a position to defraud tenants out of their damage deposits can be deterred from doing so, particularly in light of the difficulty of discovering such schemes, a sentence at the statutory maximum for one such offense in this case is appropriate. Again, even "white collar" criminals, who repeatedly prey on economically vulnerable victims precisely because they believe that those victims are too economically vulnerable or too unsophisticated to fight back, should be deterred by substantial sentences up to the maximum for a fraud offense of the kind that they commit.[20] Such a sentence will also

---

[20]I am not sure that I have ever imposed a sentence to send a "message" to others or, in the parlance of sentencing lingo, as a "general deterrent." Certainly, in the daily ritual of sentencing drug defendants in our court to lengthy mandatory minimums, there is no anecdotal or empirical evidence that sentencing to "send a message to others" actually "works." In my view, it not only does not work as a general deterrent, but federal sentences in drug offenses—especially for the vast majority of addict defendants who are the daily grist of federal drug sentencing—are so harsh that these sentences themselves promote fairly widespread disrespect and undermine our citizens' confidence

(continued...)

have the effect of protecting the public from further crimes of this defendant, because he has proven himself to be a serial fraudster and perjurer. *See* 18 U.S.C. § 3553(a)(2)(C).

Finally, while a defendant who shows "exceptional" acceptance of responsibility may receive a reduction in his sentence, notwithstanding that he also receives an increase for obstruction of justice, *see* U.S.S.G. § 3C1.1, cmt. n.4; *United States v. Johnson*, 474 F.3d 515, 521 (8th Cir. 2007), Miell's conduct amounts to, if anything, exceptional denial of responsibility. This is so, because of his lengthy allocution in which he continued to deny any criminal conduct, his attempt to call more than one hundred witnesses at the sentencing hearing to contest his guilt on the charges to which he pleaded guilty, and his motion to set aside his guilty plea on untenable grounds of alleged innocence.

### 4.      *The kinds of sentences available and the sentencing ranges for similar offenses*

The third § 3553(a) factor that the sentencing court must consider is "the kinds of sentences available," *see* 18 U.S.C. § 3553(a)(3), and the fourth factor is "the kinds of sentence and the sentencing range established" for similar offenses. 18 U.S.C. § 3553(a)(4). Neither of these factors mitigates my belief that a sentence at the statutory maximum for the mail fraud offenses is appropriate here.

---

[20](…continued)
in the fairness of federal sentencing. That would probably be a risk worth taking if these sentences actual worked, but they don't.

In this case, however, while "sending a message" is not my motivation or intent to any major degree, I hope that this sentence sends a seismic shockwave to every unscrupulous landlord who has repeatedly, unfairly, and unlawfully withheld renters' damage deposits. You know who you are. As this topnotch federal prosecution shows, the long arm of the United States Department of Justice, backed by endless resources, is here to seize you whether you are an inner-city slumlord, a college town landlord with a history of ripping off college students, a rural property owner, or an unscrupulous landlord working your scam anywhere in between.

As to the kinds of sentences available, 18 U.S.C. § 3553(a)(3), the statute applicable to Miell's mail fraud offenses expressly provides for imprisonment up to a maximum of 20 years for each such offense. As calculated above, the advisory guidelines sentence available for the damage deposit mail fraud offenses is 168 to 210 months. On the other hand, probation is also an available sentence on the damage deposit mail fraud offenses pursuant to 18 U.S.C. § 3561(c)(1), but probation is not recommended under the advisory guidelines, pursuant to U.S.S.G. § 5C1.1(f), which requires that the minimum term of imprisonment shall be satisfied by a sentence of imprisonment in a "Zone D" case, such as this. I have to say that I have trouble imagining a case in which probation, although theoretically available, was less appropriate, for the reasons stated above.

Similarly, although the mail fraud, perjury, and tax charges all carry significant fines—up to $250,000 for each mail fraud and perjury offense, *see* 18 U.S.C. § 3571(b)(3), and up to $100,000 for each tax offense, *see* 26 U.S.C. § 7206—and even the advisory guidelines provisions suggest significant fines—between $20,000 and $200,000, *see* U.S.S.G. § 2(c)(3)—imposing the total maximum statutory or guidelines fines, from about $4 million to about $5.2 million, on someone with Miell's ability to pay might be appropriate, but still would not be enough, in my view, either standing alone or in conjunction with some lesser term of imprisonment, to effect the other purposes of sentencing for all of his offenses. Moreover, the present condition of Miell's finances is confusing, because of his bankruptcy and the likelihood that mortgages have been foreclosed by now on a substantial number of his properties. In these circumstances, a longer term of imprisonment is appropriate, because a shorter term cannot be imposed in conjunction with the heaviest fines.

As to the sentences available for similar offenses, *see* 18 U.S.C. § 3553(a)(4), the advisory guidelines sentencing range for the other mail fraud offenses arising from the

insurance fraud scheme—the most comparable offenses at issue here—is considerably less than the advisory guidelines sentencing range for the mail fraud offenses arising from the damage deposit fraud scheme, even though the statutory maximum sentence is the same. The difference between the advisory guidelines sentences for the insurance mail fraud offenses, on the one hand, and the damage deposit mail fraud offenses, on the other, gives me no pause, however.  This is so, because the harm inflicted in the two groups of mail fraud offenses is quite different, in terms of the number of victims, aggregate loss, the kind of individual harm to the victims, and the presence of predation on economically vulnerable or unsophisticated people in the damage deposit fraud scheme.  Similarly, the statutory and advisory guidelines sentencing ranges for the other offenses in this case are considerably less than either the statutory or advisory guidelines sentences for the damage deposit mail fraud offenses, but I do not find those offenses to be sufficiently similar to the damage deposit mail fraud offenses for the differences in advisory or statutory sentences to cause me any concern.

Finally, the advisory guidelines sentencing range is not increased by the "grouping" of the mail fraud offenses arising from the damage deposit fraud scheme over what it would be for a single mail fraud offense, if the sentencing court takes into account all of the relevant conduct from the damage deposit fraud scheme.  Nor is the advisory guidelines range increased by Miell's other criminal conduct in other counts or count groups.  I find the lack of any effect on Miell's advisory guidelines range from his multiple convictions for two separate fraud schemes, perjury, and filing of false tax returns to be a powerful justification for what is a relatively modest upward variance of 30 months to the statutory maximum for the mail fraud offenses.

Therefore, I do not find that either of the factors in 18 U.S.C. § 3553(a)(3) and (4) counsels against a sentence at the statutory maximum for the mail fraud offenses and, instead, I find that each supports such a sentence.

### 5.   *Any pertinent policy statement*

The fifth § 3553(a) factor is "any pertinent policy statement." 18 U.S.C. § 3553(a)(5).  Here, one pertinent policy statement can be found in U.S.S.G. § 5C1.1(f), which provides, "If the applicable guideline range is in Zone D of the Sentencing Table, the minimum term shall be satisfied by a sentence of imprisonment."  While this policy statement does not necessarily counsel a sentence of imprisonment up to the statutory maximum, it certainly does counsel imposition of a term of imprisonment.  I have not found any other pertinent policy statement, nor have I been directed to one by the parties, suggesting either a more stringent or more lenient sentence in this case than the statutory maximum sentence for the mail fraud offenses that I find is appropriate based on consideration of other § 3553(a) factors.  Therefore, this factor is "neutral" here.

### 6.   *The need to avoid unwarranted disparities*

The sixth § 3553(a) factor is "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).  A concomitant of this principle is the need to avoid *unwarranted similarities* among defendants who are *not* similarly situated.  *See, e.g., Gall*, 128 S. Ct. at 600 ("[I]t is perfectly clear that the District Judge considered the need to avoid unwarranted disparities, but also considered the need to avoid unwarranted similarities among other co-conspirators who were not similarly situated," and there was no procedural error in doing so).

A brief survey of sentences for mail fraud or conspiracy to commit mail fraud in violation of 18 U.S.C. § 1341 in the Eighth Circuit Court of Appeals in the last few years

101

reveals a few substantial, but nevertheless more lenient sentences for such offenses than I am imposing here. Even so, these high-end sentences all involved circumstances that are plainly distinguishable from the fraud scheme here in terms of the number of victims chosen because the defendant believed that they were too economically vulnerable or unsophisticated to fight back and the defendant's abuse of the judicial process demonstrating disrespect for the law. *See, e.g., United States v. Straw*, ___ F.3d ___, ___, 2010 WL 3034766 (8th Cir. Aug. 5, 2010) (affirming 180-month sentence imposed following conviction for four counts of wire fraud in violation of 18 U.S.C. § 1343, one count of mail fraud in violation of 18 U.S.C. § 1341, one count of making, possessing, and uttering a forged security in violation of 18 U.S.C. § 513(a), and one count of money laundering in violation of 18 U.S.C. § 1957, which was an upward variance from the advisory guidelines range of 97 to 121 months, where the district court found that the scheme involved 50 or more victims); *United States v. Parish*, 565 F.3d 528 (8th Cir. 2009) (affirming 156 months imprisonment for the organizer or manager of a mortgage fraud scheme, convicted of conspiracy to commit mail fraud, 60 months for his wife, and 120 months for their co-conspirator, but even though the scheme involved over 200 straw buyers, using new loan proceeds to pay older loans, and caused a loss of $20 million to $50 million, the victims were mortgage companies, not individual home buyers); *United States v. Lewis*, 557 F.3d 601 (8th Cir. 2009) (affirming 204 months of imprisonment for one of the defendants in a fraud scheme involving sale of a fitness program to schools with a promise of later reimbursement, involving a loss of approximately $30 million and 294 victim schools, noting that the sentence was on a downward variance from an advisory guidelines sentence of 324 to 405 months, based on the district court's conclusion that the guideline sentence was greater than necessary to promote respect for the law and to protect the public); *United States v. Harstein*, 500 F.3d 790 (8th Cir. 2007) (remanding a 135-

102

month sentence for mail fraud and credit card fraud, involving loss in excess of $2.8 million and 180 victims from a Ponzi scheme to obtain new loans from individuals to pay old loans from individuals, where the loans were obtained or delayed payments were tolerated by providing free travel to the lenders, for improperly shifting the burden of proof to the defendant to disprove amount of loss), *appeal after remand*, 557 F.3d 589 (8th Cir. 2009) (affirming resentencing to 133 months).

Thus, while I have noted that the sentence I impose on Miell is higher than other recent sentences imposed for violations of the same statute, I nevertheless conclude that the sentence I impose is appropriate to avoid *unwarranted similarities* among defendants who are *not* similarly situated. *See, e.g., Gall*, 128 S. Ct. at 600.

### 7.    *The need to provide restitution*

The final § 3553(a) factor is "the need to provide restitution to any victims of the offense." 18 U.S.C. § 3553(a)(7). Restitution is required by 18 U.S.C. § 3663A for the mail fraud offenses and permissible under 18 U.S.C. § 3663 for the tax offenses. Although the restitution issues in this case are complicated, they were ultimately resolved by an agreement of the parties, so that they need not have any impact on the appropriate sentence in this case. I note that Miell's capacity to provide restitution will not be limited by his imprisonment, where he already has considerable personal wealth. Therefore, this final § 3553(a) factor does not mitigate the appropriate sentence in this case, as indicated by other factors.

### 8.    *Summary*

For all of the reasons stated above, and upon a consideration of the totality of the circumstances in light of the 18 U.S.C. § 3553(a) factors, I vary upward from the greatest advisory guidelines sentencing range of 168 to 210 months for Miell's numerous offenses to 240 months, the statutory maximum for the mail fraud offenses. My determination that

an upward variance is appropriate is based, in particular, on my consideration of Miell's conduct in using a fraud scheme to "squeeze" hundreds of tenants out of their damage deposits, because he believed that they were too economically vulnerable or unsophisticated to do anything about it, for no other reason than greed for greed's sake. In my view, a sentence of 240 months of imprisonment is appropriate in light of all of the § 3553(a) factors and, therefore, is sufficient, but not greater than necessary, to accomplish the goals of sentencing. I impose concurrent sentences, at the statutory maximum, for each of the other counts, pursuant to the "grouping" rules and U.S.S.G. § 5G1.2(c).

## III. CONCLUSION

For all of the reasons stated above, I vary upward from the greatest advisory guidelines sentencing range of 168 to 210 months for Miell's numerous offenses to 240 months, the statutory maximum for the mail fraud offenses.

THEREFORE,

1.      The prosecution's August 20, 2009, Motion For Upward Departure (docket no. 175) is **denied as moot**, in light of my upward variance;

2.      Defendant Miell's August 26, 2009, Motion For Downward Departure (docket no. 182) is **denied**; and

3.      **Defendant Miell is sentenced to the following terms of imprisonment**:

a.      concurrent sentences of **240 months** of imprisonment, followed by 3 years of supervised release, on the mail fraud charges in **Counts 1** through **6** of the Third Superseding Indictment of the Indictment, arising from the insurance fraud scheme;

104

b.    concurrent sentences of **240 months** of imprisonment, followed by 3 years of supervised release, on the mail fraud charges in **Counts 7** through **18** of the Third Superseding Indictment, arising from the damage deposit fraud scheme;

c.    concurrent sentences of **60 months** of imprisonment, followed by 3 years of supervised release on each of the perjury charges in **Counts 19** and **20**; and

d.    concurrent sentences of **36 months** of imprisonment, with 1 year of supervised release, on each of the charges of filing a false tax return in **Counts 22** and **23**,

all with such other terms and conditions stated at the completion of the sentencing hearing on September 27, 2010.

This Memorandum Opinion And Order Regarding Sentencing shall be attached to and incorporated by reference, in its entirety, into the Statement of Reasons and Judgment in this case.

**IT IS SO ORDERED.**

**DATED** this 27th day of September, 2010.

MARK W. BENNETT
U. S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA